UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                                          )
In re:                                                    )    Chapter 11
                                                          )
PERRY H. KOPLIK & SONS, INC.,                             )    Case No. 02-40648 (REG)
                                                          )
                    Debtor.                               )
———————————————————————)
                                                          )
MICHAEL S. FOX, as Litigation Trustee of                  )
PERRY H. KOPLIK & SONS, INC.,                             )
                                                          )
                                                          )    Adversary Proceeding
                    Plaintiff,                            )    No. 04-02490 (REG)
                                                          )
        *against*                                         )
                                                          )
MICHAEL KOPLIK                                            )
and ALVIN SIEGEL,                                         )
                                                          )
                    Defendants.                           )
———————————————————————)

BENCH DECISION ON MOTIONS TO STRIKE
LAY WITNESS TRIAL TESTIMONY

APPEARANCES:

SATTERLEE, STEPHENS, BURKE & BURKE LLP
Counsel for Plaintiff
230 Park Avenue
New York, New York 10169
By:   Christopher R. Belmonte, Esq.
      Pamela A. Bosswick, Esq.

SEWARD & KISSEL LLP
Counsel for Defendants
One Battery Park Plaza
New York, New York 10004
By:   Ronald L. Cohen, Esq.
      Walter A. Naeder, Esq.

SANFORD P. ROSEN & ASSOCIATES, P.C.
Counsel for Defendants
747 Third Avenue
New York, New York 10017
By:    Sanford P. Rosen, Esq.

BEFORE:          HON. ROBERT E. GERBER
                 UNITED STATES BANKRUPTCY JUDGE

In this adversary proceeding under the umbrella of the confirmed chapter 11 case of Debtor Perry Koplik & Sons, the plaintiff Litigation Trustee charges former insiders of the Debtor with breach of fiduciary duty. In the trial of the action, the Litigation Trustee has submitted the direct testimony affidavit[1] of Barry Kasoff, a Certified Turnaround Professional and Certified Public Accountant, who studied the Debtor's affairs, including, *inter alia*, the insiders' activities. In his direct affidavit, Mr. Kasoff has described his perceptions of the defendants' acts and, in more than a few instances, his subjective views with respect to those acts, based on a combination of his review of the acts and his training and experience in business and accounting matters. But he hasn't been offered as an expert under Fed.R.Evid. 702, nor has the plaintiff complied with Fed.R.Civ.P. 26 requirements for expert disclosures.

The defendants move to strike portions of the direct testimony as impermissible lay witness opinion testimony. Their motion is granted in part and denied in part, as described in the accompanying table. My conclusions of law and bases for the exercise of my discretion follow.

Fed.R.Evid. 701(a) provides, in relevant part:

---

[1] Under the Court's case management order, direct testimony in the trial has been submitted by affidavit, with cross-examination and subsequent testimony to proceed live.

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

As usual, I start with textual analysis. Under Fed.R.Evid. 701, lay opinion testimony is permissible if, but only if, the three subsections of Rule 701(a) are satisfied. I note in that connection, however, that while subsections (a) and (b) are stated affirmatively, subsection (c) is articulated in the negative.[2] That means, as a practical matter, that lay opinion testimony is permissible if subsections (a) and (b) are satisfied, and if the testimony isn't then excluded by reason of the effect of subsection (c).

The Second Circuit has twice spoken to this issue, in *Bank of China v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004), and *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007), in each case involving a fact pattern similar to that here, where an individual conducted an investigation of matters that preceded his arrival on the scene, and then testified about what he found.

In *Bank of China*, the Circuit held that the admission of lay opinion testimony that was based on a combination of a lay witness's observations and his knowledge of business custom and the business community's understanding of certain kinds of transactions and business concepts was an abuse of discretion. Admission of that testimony was held to be error because it wasn't based entirely on the witness's

---

[2] Rule 701 was amended in 2000, at which time the original language was divided by the lettered subdivisions that now appear in the Rule, and the material that is now in subdivision (c) was added. *See* Mueller and Kirkpatrick, *Federal Evidence*, § 7:1 (2007). Thus it now explicitly bars the admission of lay opinions that are "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701(c).

perceptions. The district court abused its discretion to the extent it admitted the testimony based on the witness's experience and specialized knowledge in international banking. *See* 359 F.3d at 181.

The *Bank of China* court explained that "Subsection (c) of Rule 701, which was amended in 2000, explicitly bars the admission of lay opinions that are 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *Id.*, quoting Fed.R.Evid. 701(c). Testimony admitted pursuant to Rule 701 must be "rationally based on the perception of the witness." *Id.*, quoting Fed.R.Evid. 701(a).

Thus, to the extent that the testimony was based on the perceptions of the witness, it was admissible, but to the extent that it was based on specialized knowledge, as contrasted to personal observation, it was inadmissible. *See id.* The Circuit clarified:

> To some extent, [the investigating witness] Huang's testimony was based on his perceptions. As a Bank of China employee, Huang was assigned to investigate defendants' activities at the tail-end of their scheme and after Bank of China stopped doing business with them. Huang's senior role at the Bank and his years of experience in international banking made him particularly well-suited to undertake such an investigation and was likely a factor in the Bank's decision to assign the task to him. *The fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge, did not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking.* "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his [ ] position in the business."

-4-

*Id.*, quoting Fed.R.Evid. 701 advisory committee's note (emphasis added).[3]

Thus, to the extent the investigating witness Huang's testimony was grounded in the investigation he undertook in his role as a Bank of China employee, it was admissible pursuant to Rule 701 of the Federal Rules of Evidence because it was based on his perceptions. But to the extent that the testimony was not based on his perceptions, it was inadmissible.

Similarly, in *Rigas*, the Circuit affirmed criminal convictions after a trial in which Judge Sand of the district court had permitted the introduction of testimony by Robert DiBella, a forensic accountant retained by Adelphia's new management to examine Adelphia's books and records, and to investigate transactions that had been entered into while Adelphia was operating under the Rigases' watch. Citing *Bank of China*, the *Rigas* court found the testimony admissible, as it was based on witness perception, and did not materially involve specialized knowledge with respect to the particular issues on which he was testifying. That was so even though the Second Circuit's decision at least implied (and this Court from its firsthand knowledge knows) that Mr. DiBella's witness

---

[3] I'm aware that the *Bank of China* court stated that testimony involving personal perception with the benefit of professional expertise was permissible so long as it wasn't "rooted exclusively" in the witness's professional expertise (there, in international banking). That could be read as suggesting that a peppercorn of personal perception would permit a great deal of lay opinion testimony, circumventing the safeguards of Fed.R.Evid. 702 and Fed.R.Civ.P. 26. I think it is truer to the language and spirit of *Bank of China* to try to separate the testimony based on perception from that based on opinion on an answer-by-answer basis (and individually within each answer, to the extent necessary), and in the exercise of my discretion, I will be permitting testimony only to the extent that any aspect of a larger body of testimony embodies, in material part, witness perception. *See Bank of China*, 359 F.3d at 181 (noting purpose of Rule 701(c) "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing").

perception—*i.e.*, his ability to observe—was materially assisted by his accounting expertise.[4]

Each of *Bank of China* and *Rigas* involved circumstances, like those here, where an individual wasn't personally involved in the events that were the principal focus of his testimony, and instead involved the testimony based on participation in an investigation of events that predated the witness's appearance on the scene. *Rigas* is particularly relevant, because it involved a situation, very similar to the one we have here, where a skilled accounting professional studied what happened before he arrived, and explained in testimony what he had discovered. That was permissible, as reflecting witness perception.

Significantly, however, in neither *Bank of China* nor *Rigas* did the Circuit endorse the admission of testimony as to the witness's views as to whether what the witness had perceived was *wrongful*, or as to what *should* have been done under the circumstances.

In support of contentions that *all* of the challenged testimony should be stricken, the defendants cite three other cases, all from outside the Second Circuit. *See JGR, Inc. v. Thomasville Furniture Indus.*, 370 F.3d. 519 (6th Cir. 2004); *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003); *Autoforge, Inc. v. Am. Axle & Mfg., Inc.*, 2008 U.S. Dist. LEXIS 755 (W.D. Pa. Jan. 4, 2008). None of these, of course, could trump a Second Circuit decision on point. And in any event, they are nowhere as closely

---

[4] My understanding of the Second Circuit's ruling in *Rigas* is assisted by my personal knowledge, as a consequence of Adelphia's bankruptcy case having been before me, and matters as to which I can take judicial notice. I know that Mr. DiBella had accounting expertise, because I heard testimony by Mr. DiBella, on distinct, but related, issues, myself. But Mr. DiBella's testimony in the criminal case was in material respects based on what he *observed*, and did not go to issues where his accounting expertise, other than his ability to explain what he saw, was material to the issues on which he was testifying. Mr. DiBella testified on matters invoking his accounting expertise to a considerably greater degree in the *Adelphia* bankruptcy case, without objection by any party.

-6-

similar to the facts we have here, and to the extent they are relevant at all, they support the nuanced standard articulated by the Second Circuit in *Bank of China* and *Rigas*. None involved the testimony of a trained financial professional who had studied financial transactions and reported on what he saw.

Instead, each involved testimony on lost profits and/or the value of a business—areas where an outsider's personal perception would often be modest at best, and that traditionally would involve testimony of bona fide experts, except in cases where the actual owner of the business might have the requisite personal perception. *See JGR*, 370 F.3d at 524, 526 (CPA and lawyer testifying about lost profits and business value relied on information primarily obtained from plaintiff's principal); *DIJO*, 351 F.3d at 685 (testifying financial consultant "had little significant actual knowledge about DIJO and its operations;" contrasting ability of "business *owners or officers* to testify based on *particularized knowledge* derived from their position") (emphasis in original); *Autoforge*, 2008 U.S. Dist. LEXIS 755 at *19-*20 (relying on circuit court holdings that "persons outside of a business, including attorneys and financial consultants," who were not able to establish the requisite foundation of personal knowledge, "may not offer a lay opinion as to value or project lost profits of a business") (citing *JGR* and *DIJO*).

With those principles in mind, the Court will permit lay opinion testimony that reflects the perceptions of the witness Mr. Kasoff as to *what happened* (including, *inter alia*, what the defendants *did*)—even if Mr. Kasoff was aided in forming his perceptions by an ability, aided by his training and experience, to understand what he saw. But to the extent Mr. Kasoff seeks to testify not with respect to his perceptions, but rather with respect to views as to (a) whether what he perceived was right or wrong; (b) what *should*

-7-

*have been done*; (c) what is customary in business practice; or (d) what his training and experience tell him about appropriate conduct in these cases, the testimony will be excluded.

My rulings with respect to the particular aspects of the Kasoff testimony that were the subject of the lay opinion evidence objections appear on the attached Table A to this Decision.

SO ORDERED.

Dated: New York, New York       *s/ Robert E. Gerber*
      February **19**, 2008              United States Bankruptcy Judge

Table A

Rulings on Testimony In Issue

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 9 | "Debtor had serious issues relating to its equity and clearly was in the zone of insolvency," | Objection sustained. |
| 20 | "Koplik and Siegel knew or should have known by virtue of their positions at the Debtor of the terms of the RCF and the Trade Credit Insurance Policy. Siegel was responsible to the Bank for reporting about the Debtor's compliance with the various RCF covenants, and Michael Kelly, who reported directly to Siegel, was responsible for compliance with the Trade Credit Insurance Policy." | First sentence: objection sustained. Second sentence: objection overruled. |
| 21 | "Beginning in 1997, the Debtor was experiencing financial difficulty and continued to do so through 2001. As the Debtor's financial situation began to deteriorate, it inexplicably took on extraordinary credit risks, in the form of advances, loans and other unreasonable trade and non-trade extensions of credit, that were disproportionate to its equity position. Such problems began to appear after Perry H. Koplik, the Debtor's founder, became less involved in the management of the Debtor with the defendants taking over more active roles." | First and third sentences: objection overruled. Second sentence: objection sustained. |
| 22 | "In fact, one of the key factors contributing to the Debtor's financial breakdown was the absence of any objective decision-making process. Any system of internal controls employed by the Debtor was overridden routinely by defendants as the key executives involved in all key financial aspects of the Debtor. Since the Debtor's internal control processes, if any, were subject to defendants' override, an environment existed that allowed transactions to occur without sufficient regard for level of risk, having considerable detrimental consequences to the Debtor's business.<br>…<br>I believe that the Debtor did not have, implement or utilize any credit policy manuals as a guide to extend credit, loans, advances and/or other financial accommodations made to third-parties." | Objection overruled. |

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 23 | "Examples of transactions entered into by the Debtor under defendants' management in the absence of any objective decision-making process include: the extension of approximately $27 million of total debt to ATC which included funding ATC's payroll on an emergency basis, the extension of non-trade credit that was not supported by proper loan documentation and clearly in violation of the RCF, the reduction of accounts receivable in exchange for uninspected, and possibly non-existent, inventory, the holding of post-dated checks, which bounced and were re-deposited and bounced again, the extension of additional credit to ATC when it was delinquent on existing receivables, and the extension of non-trade credit and/or investment in International Supply and Agency, Ltd. and Samoa Pacific Cellulose, LLC. Thus, despite having less than $10 million of equity a part of which was illiquid, the Debtor entered into several transactions, the majority of which were with ATC, which put the Company's viability at severe risk." | Objection overruled. |
| 24 | "Without a doubt, defendants knew that ATC was experiencing severe liquidity problems. ATC's grave liquidity issues were largely the result of its funding the acquisition of long term assets with short term liabilities." | First sentence: objection was previously sustained for testifying as to another's state of mind, and is not saved by calling this lay opinion. Second sentence: objection overruled. |
| 24 | "Despite such knowledge," | Objection was previously sustained for testifying as to another's state of mind, and is not saved by calling this lay opinion. |

718528_1

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 24 | "Despite being aware of ATC's financial distress, defendants had Debtor advance approximately $27 million to the now bankrupt ATC with knowledge that a significant portion of those advances would be events of default under the RCF and not covered by the Trade Credit Insurance Policy. To extend an amount of trade and non-trade credit to one customer, which amount was three times the Debtor's equity, and which jeopardized its relationship with the Bank, exemplifies the defendants' complete lack of credit-risk assessment in connection with the Debtor's business operations." | First sentence portions ("Despite being aware" and "with knowledge that"): objections were previously sustained for testifying as to another's state of mind, and are not saved by calling this lay opinion. First sentence remainder: objection overruled. Second sentence: objection sustained. |
| 25 | "These loans violated the terms of the RCF and were not covered by the Trade Credit Insurance Policy; thereby endangering the Debtor's working capital." | Objection overruled. |
| 27 | "despite ATC's delinquent and/or nonexistent payments to the Debtor. The Debtor essentially served as a financier for ATC, providing millions of dollars of financing for ATC's production without any guarantee of payment by Kimberly Clark who only agreed to the arrangement for the month of March, 2001." | Objection overruled. |
| 28 | "Defendants heedlessly exposed the Debtor to unwarranted risk by continuing to finance production after the end of March and by depending upon ATC's relationship with Kimberly Clark to support the invoices. As defendants should have expected, ATC bounced checks that it issued to Kimberly Clark for the pulp purchases, resulting in Kimberly Clark's offsetting its pulp receivables against tissue payables owed to ATC." | Objection to "heedlessly" and "As defendants should have expected suspected" sustained. Remainder of quoted testimony: objection overruled. |
| 30 | "Defendants provided ATC with the foregoing financing in complete disregard that such actions with ATC and Kimberly Clark violated the RCF and were not covered under the Trade Credit Insurance Policy. Given the bounced checks and the continued requests for advances, defendants by March of 2001 were well aware of ATC' s fiscal crisis. Yet, ignoring these red flags, the Debtor continued to extend trade and non-trade credit to ATC." | Objection to "in complete disregard," "were well aware," and "ignoring these red flags" sustained. Remainder of quoted testimony: objection overruled. |

718528_1

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 31 | "[the Ponderosa advance constituted an event of default under the RCF,] endangering the Debtor's entire business operations." | Objection overruled. |
| 32 | "The Ponderosa advance was made in the absence of any objective decision making process on the part of defendants for the following reasons: (a) defendants knowingly engaged in the transaction without the benefit of appropriate loan documentation; (b) defendants extended to ATC an amount equal to approximately one-quarter of its equity at a time when ATC was long overdue on receivables; (c) defendants' actions violated Bank covenants causing a breach under the RCF, putting its working capital and the Debtor as a going-concern at risk; and (d) defendants did not seek advice from, or discuss with, Debtor's counsel or accountants the consequences of such actions." | Objection to "knowingly" sustained. Remainder of quoted testimony: objection overruled. |
| 36 | "Since ATC had ongoing cash-flow difficulties and defendants knew that the Debtor needed to keep ATC's trade accounts receivable balance below the $15 million limit of the Trade Credit Insurance Policy, defendants negotiated an arrangement to reduce ATC's accounts receivable in exchange for approximately $3,776,941 of inventory of finished goods from Ampad, an ATC affiliate." | Objection to "defendants knew" sustained. Remainder of quoted testimony: objection overruled. |
| 37 | "It is my belief that this arrangement was, in fact, an illusory transaction, designed to keep the receivables below the Trade Credit Insurance Policy's limit. The use of the Ampad inventory to reduce ATC's accounts receivable balances is another example of defendants embarking on a transaction without any aforethought or regard for risk." | Objection sustained. |
| 38 | "Defendants improperly characterized APP's accounts receivable as eligible in the Debtor's borrowing base certificates for August and September of 2001. The Debtor continued to extend credit to ATC despite the latter's clearly demonstrated inability to pay and questionable viability.<br>…<br>endangering the Debtor's own existence." | First sentence: objection sustained. Second sentence and third sentence fragment: objection overruled. |
| 42 | "Each of these unpaid, non-trade extensions of credit in its own right constitutes an event of default under the RCF." | Objection overruled. |

-12-

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 43 | "In short, defendants caused the Debtor to engage in numerous high risk transactions by extending approximately $8.5 million of non-trade credit to ATC for the latter's purchase or funding of various under performing mills without the benefit of obtaining any supporting loan documentation or consulting with Debtor's attorneys. If known by the Bank, such breaches of the RCF would have resulted in the acceleration or refinancing of the loan or the restructuring and/or liquidation of the Debtor's business. Thus, each and every non-trade extension of credit put the Debtor's working capital and, consequently, the Debtor's viability at risk." | First and third sentences: objection overruled. Second sentence: objection sustained. |
| 44 | "No reasonable person would believe that putting the Debtor's business at risk was worth the unlikely benefit of transacting business with ATC. Indeed, it is questionable whether defendants conducted any type of assessment of the high risks associated with the non-trade credit transactions with ATC, and, to the best of my knowledge, no document exists evidencing such assessment or analysis." | First sentence: objection sustained. Second sentence, portion stating "and, to the best of my knowledge, no document exists evidencing such assessment or analysis": objection overruled. Remainder of sentence: objection sustained. |
| 45 | "Likewise, defendants' reliance on ATC's proposed bond offering was given without the benefit of any objective decision-making process or advice from professionals. Defendants did not analyze the financial statements supporting the bond issue. Instead, defendants somehow claim to have relied upon the prospectus and alleged due diligence conducted by UBS Warburg, despite knowing that ATC's true financial condition was not accurately depicted therein, in part, because defendants failed to disclose the extraordinary loan transactions outlined above. The Debtor's history shows that, after ATC's prior bond offering in 1999, the Debtor's business with ATC declined even though ATC had the cash flow to engage in such business." | Third sentence: objection sustained. Remainder of testimony in this paragraph: objection overruled. |

-13-

718528_1

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 46 | "As the years progressed and the Debtor's financial condition deteriorated, it became increasingly more reliant on ATC as a customer. Defendants' reliance, however, was disproportionate with the actual amount of revenue produced by ATC. In 1998-1999, the revenue generated by sales to ATC represented approximately 13%-14% of the total revenue of the Debtor. However, in 2000, the revenue generated by sales to ATC dropped to approximately 7% of the Debtor's total revenue, and, while sales to ATC picked up in 2001, to equal approximately 10% of the Debtor's total revenue, those sales were a function of ATC's difficulty in obtaining credit from other companies. Moreover, the Debtor was not receiving the cash generated from those sales in 2001 since almost all of the sales in 2001 to ATC were on credit. The Debtor sold approximately $28 million to ATC in 2001 but collected only a few million dollars for those sales on a net basis during that same time period." | Second sentence: objection sustained. Remainder of testimony in this paragraph: objection overruled. |
| 48 | "The Debtor unnecessarily continued to enter into high risk transactions and to extend unjustifiable amounts of credit to ATC despite defendants' knowledge of ATC's illiquidity. Such illiquidity was clearly evident by February of 2001, <br>… <br>The Debtor's receivables from ATC were not being paid in a timely manner. Days-sales-outstanding skyrocketed to 120 days in February of 2001 and were not paid in cash. The Debtor chose to re-age or extend the credit terms to ATC on those receivables from 30 days to 60 days and then to 90 days all in violation of the Trade Insurance Credit Policy. By April, ATC could not even cover its own checks and bounced approximately $4 million in checks to the Debtor between May and June of 2001." | First and second sentences: objection sustained. Remainder of quoted language in this paragraph: objection overruled. |

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 49 | "In short, the Debtor was extending credit beyond that which a reasonable business person would extend under terms that no reasonable business person would have extended to ATC. To extend such an extraordinary amount of trade and non-trade credit to a customer while jeopardizing its banking relationship is not prudent business.<br>…<br>As a result, Koplik, without the benefit of any objective analysis, outside legal or accounting advice, or Board of Directors' input, extended additional credit to ATC for trade and non-trade transactions until ATC's bond offering could theoretically be completed." | First and second sentences: objection sustained. Third sentence: objection overruled. |
| 50 | "In addition to the extraordinary transactions entered into with ATC," | Objection overruled. |
| 55 | "The transaction with Samoa both violated the RCF and generated a significant loss to the Debtor. Again, no legal advice was sought in connection with the alleged loans, and, consequently, no rational decision-making process was employed." | Objection overruled. |
| 58 | "Somewhat suspiciously, only after RST questioned the loan,<br>…<br>The memo written by Siegel is inconsistent with the Debtor's audited financial statements for the years 1996 through 2000, for which Siegel was responsible, since such documents show the loan as an asset without any offsetting liability. Notably, this loan was in addition to the base salary paid to Siegel in the amount of $300,000. It is my belief that such salary was excessive given that the majority of Siegel's services were performed from his home in Florida away from the Debtor's actual daily business operations." | First sentence: objection sustained. Second and third sentences: objection overruled. Fourth sentence: objection to portion "It is my belief that such salary was excessive" sustained, but objection to remainder overruled. |
| 59 | "To the best of my knowledge and given the exorbitant salaries already received by defendants, the Debtor did not receive fair consideration and/or reasonably equivalent value in exchange for the Transfers." | Objection sustained. |

-15-

718528_1

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 61 | "The Debtor violated the RCF and/or entered into transactions not covered by the Trade Credit Insurance Policy by, among other things, funding ATC's various acquisitions of mills such as the Ponderosa, Keiffer Paper and Shelby mills, funding the production of goods for sale to Kimberly Clark, extending certain working capital loans to ATC, providing loans, advances and/or excessive compensation to the Debtor's officers and employees and their relatives, advancing funds with respect to Willendra and his company and Samoa, borrowing against ineligible accounts receivable and improperly applying payments to reduce ATC's accounts receivable rather than APP's accounts receivable." | Objection overruled. |
| 66 | "Since each of these transactions, in and of itself, violated the RCF and constituted events of default thereunder, the Bank was entitled to accelerate the indebtedness of the Debtor due under the RCF. Accordingly, the Debtor essentially was rendered insolvent upon its first unauthorized transaction with ATC. Simply put, without the ability to access funding or working capital, the Debtor could not meet its obligations to others." | Objection overruled. |

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 67 | "Moreover, it was completely irrational for the defendants to believe that the Debtor could recover under the Trade Credit Insurance Policy, when, in violation of such policy, the Debtor allowed the days-sales-outstanding to get inordinately high and then reached an agreement, without the insurance carrier's knowledge or consent, with ATC to re-age its receivables from 30 to 60 to 90 days. The Debtor also accepted payment for such receivables in inventory without even inspecting the same solely for the purpose of reducing the ATC receivables to within the policy's limits and improperly reduced ATC's receivables instead of those belonging to the true party in interest." | First sentence: objection sustained with respect to "it was completely irrational for the defendants to believe that the Debtor could recover under the Trade Credit Insurance policy," and overruled with respect to "in violation of such policy, the Debtor allowed the days-sales-outstanding to get inordinately high and then reached an agreement, without the insurance carrier's knowledge or consent, with ATC to re-age its receivables from 30 to 60 to 90 days." Second sentence: objection overruled. |
| 68 | "In addition, the Debtor withheld information regarding ATC's true financial condition. ATC's bounced checks, its inability to fund its own payroll, and its wholesale dependence on ATC's bond offering are huge red flags which should have put the defendants on notice to take steps to limit its exposure to ATC in a proper fashion. The Trade Credit Insurance Policy is not a guaranty for any loss irrespective of defendants' actions. When defendants became aware of these red flags, they had an obligation to take steps to reduce the Debtor's exposure to ATC or run the risk that the insurance company would not cover such obligations. Defendants illogically chose to accept that risk. Under these circumstances, no rational person would believe that the Trade Credit Insurance Policy would cover the extraordinary amount of credit extended to ATC, and defendants' reliance on the same as a safety net is completely unjustifiable." | Objection sustained. |

| ¶ # | Testimony in Issue | Ruling |
|---|---|---|
| 68 n.1 | "Similarly, defendants clearly could not rely on the guarantees issued by Mehdi Gabayzadeh, former CEO of ATC, and Super American Tissue, an ATC affiliate, to recover the sums owed by ATC since defendants neither evaluated the credit worthiness of the guarantors and their respective assets nor requested any security with respect to the same." | Portion "defendants neither evaluated the creditworthiness of the guarantors and their respective assets nor requested any security with respect to same": objection overruled. Remainder of quoted sentence: objection sustained. |
| 69 | "Over the course of those three days, RSI reviewed the Debtor's assets, liabilities, and equity and concluded by October 28, 2001, that the Debtor was in the zone of insolvency." | Objection overruled. |
| 70 | "Based on this further analysis, it grew clear that the Debtor became insolvent between March and June of 2001.<br>…<br>Moreover, the Debtor clearly was in violation of the RCF at that time and, without the ability to have funding from the Bank, would have no working capital, rendering it insolvent." | Objection overruled. |