UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
In re:                                              :
                                                    :        Chapter 11
PERRY H. KOPLIK & SONS, INC.,                       :
                                                    :        Case No. 02-B-40648 (REG)
                        Debtor.                     :
--------------------------------------------------------------X
MICHAEL S. FOX, as Litigation Trustee of            :
PERRY H. KOPLIK & SONS, INC.,                       :
                                                    :        Adv. Pro. 04-02490 (REG)
                        Plaintiff,                  :
                                                    :
        -against-                                   :
                                                    :
MICHAEL KOPLIK and ALVIN SIEGEL,                    :
                                                    :
                        Defendants.                 :
--------------------------------------------------------------X


PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW AFTER TRIAL

APPEARANCES:

SATTERLEE STEPHENS BURKE & BURKE LLP
Attorneys for Plaintiff
230 Park Avenue
New York, New York 10169
By:     Christopher R. Belmonte, Esq. (argued)
        Pamela A. Bosswick, Esq.

SEWARD & KISSEL LLP
Attorneys for Defendants
One Battery Park Plaza
New York, New York 10004
By:     Ronald L. Cohen, Esq. (argued)
        Walter A. Naeder, Esq. (argued)

SANFORD P. ROSEN & ASSOCIATES, PC
Attorneys for Defendants
747 Third Avenue
New York, New York 10017
By:     Sanford P. Rosen, Esq. (argued)

Introduction ........................................................................................................ 1

Facts .................................................................................................................. 5

1.    Background ............................................................................................. 5

2.    The Revolver .......................................................................................... 6

3.    The Trade Insurance ............................................................................... 7

4.    The American Tissue Extensions of Credit ............................................. 8

      (a)    Overview ..................................................................................... 8

      (b)    Particular Transactions with American Tissue ............................. 12

             (1)    Neenah Facility-Kimberly Clark .......................................... 12

             (2)    Purchase of Kimberly Clark Receivables ............................. 13

             (3)    Ponderosa, Keiffer, and Shelby Mills Transactions .............. 13

             (4)    Asia Pulp Transaction ....................................................... 16

             (5)    Ampad Transaction ........................................................... 17

             (6)    Boise Cascade Transaction ................................................ 19

      (c)    Care in Trade Credit to American Tissue .................................... 20

             (i)    Trade Credit Generally ..................................................... 21

             (ii)   Trade Credit Insurance ..................................................... 25

      (d)    Care in Loans to American Tissue .............................................. 34

      (e)    Documentation of Transactions ................................................. 37

      (f)    Corporate Governance Matters .................................................. 37

      (g)    Reliance on American Tissue Bond Offering ............................... 38

      (h)    Failures to Consult Professionals .............................................. 40

      (i)    Violations of the Revolver ......................................................... 40

      (j)    Summary of Findings on Alleged Failures of Duty of Care with
             Respect to American Tissue ...................................................... 44

5.    American Tissue's Bankruptcy & Criminal Cases .................................... 47

6.    The Debtor's Bankruptcy Filing ............................................................. 48

7.    The Transactions with Entities Other Than American Tissue ................... 49

      (a)    Willendra .................................................................................. 49

      (b)    Samoa ...................................................................................... 53

      (c)    Liberty Umbrella ....................................................................... 55

9.      The Self-Dealing Transactions ................................................. 57

        (a)     Forgiveness of Koplik Loan ................................. 57

        (b)     Forgiveness of Siegel Loan ................................. 61

10.     Causation ........................................................................ 64

11.     Solvency ......................................................................... 65

12.     Damages .......................................................................... 68

        (a)     Trade Credit Insurance (Breaches of Duty of Care)......... 68

        (b)     Liberty Umbrella ............................................ 70

        (c)     Koplik Loan .................................................. 70

        (d)     Siegel Loan .................................................. 71

Discussion ................................................................................. 72

I.     Applicable Principles ..................................................... 73

       A.     Duties Imposed Upon the Officers .......................... 73

       B.     Does Solvency Affect Officers' and Directors' Duties? .............. 76

       C.     To What Extent Do Different Standards Apply for Closely Held
              Corporations? ................................................ 78

       D.     Causation ..................................................... 83

       E.     Duty of Loyalty Concerns .................................... 86

       F.     Fraudulent Transfer Claims .................................. 88

II.    Application of Principles to Facts Here ............................... 90

       A.     Alleged Breaches of Duties of Loyalty and Care ............. 90

              1.      Transactions with American Tissue ................... 90

                      (a)     Loans ....................................... 90

                      (b)     Trade Credit Generally ..................... 93

                      (c)     Trade Credit Insurance ..................... 95

              2.      Transactions with Entities Other Than American Tissue .......... 96

              3.      Self Dealing Transactions ........................... 97

       B.     The Fraudulent Transfer Claims ............................. 98

III.   Damages ...................................................................... 99

Conclusion ............................................................................... 100

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

<u>Introduction</u>

In this adversary proceeding under the umbrella of the chapter 11 case of debtor

Perry Koplik & Sons, Inc. (the "**Debtor**," or the "**Company**"), a closely held corporation

organized under New York law, plaintiff Litigation Trustee Michael Fox (the "**Trustee**")

seeks to recover $30 million from defendants Michael Koplik ("**Koplik**") and Alvin

Siegel ("**Siegel**")[1]—the Debtor's two most senior officers, and two of its three

directors—principally[2] for alleged breaches of fiduciary duty.  The Debtor was forced

into bankruptcy after suffering losses on uncollectible debt, most significantly by reason

of extensions of trade credit and outright loans to its customer American Tissue Inc.

("**American Tissue**"), which went into bankruptcy itself.

As described more fully below, the Court finds Koplik's and Siegel's level of care

as officers and directors to have been grossly deficient—even recognizing, as the Court

thinks it should, different levels of formality under which closely held corporations

operate, and the critical distinction between management "best practices" and that which

is necessary to meet minimal acceptable standards.  Indeed, in several respects, discussed

below,[3] the Court finds the conduct, and related testimony, of Koplik and Siegel to be

outrageous.  And the Court finds, in the case of each of Koplik and Siegel, constructive

---

[1]     Shortly before this Decision was finalized, the Court was informed that Siegel had just passed
away.  The Court does not decide the extent, if any, to which that affects the parties' rights here.
Both sides will of course have reservations of rights as to any effect which his passing might have.

[2]     That sum also includes $299,800 from Koplik, and $100,000, from Siegel, for loans that were
made to each of them that they caused to be forgiven.  *See* Pretrial Order ¶¶ 4(b)-(d).

[3]     *See* pages 16, 17 and 19, *infra*.

-1-

fraudulent transfers and breaches of the duty of loyalty as well as that of care, when they authorized the forgiveness of loans to themselves after the Debtor was insolvent.

But except for the loan forgiveness claims (where the resulting damages are in the hundreds of thousands, not millions), and a number of areas where any mismanagement did not diverge so much from accepted standards as to be actionable, several issues of law, as to which New York law is thin, make this case nevertheless difficult—the most significant of which is causation, since notwithstanding the lack of care with which the loans and other extensions of credit to American Tissue were made, American Tissue's financial statements were fraudulent. And the Court must also consider legal issues with respect to the extent to which different standards should be applied in light of the fact that the Debtor was closely held, and whether it matters that at the time the extensions of credit were made, the Debtor was not yet insolvent.

As a legal matter, for the reasons that follow, the Court concludes, under the New York law that is applicable here, that while lesser degrees of corporate formality are acceptable for closely held corporations, the duty of care is imposed on officers and directors of closely held corporations as well. The Court further concludes, also as legal matters, that it does not matter that violations of the duty of care took place when the Debtor was not yet insolvent, and that adherence to the duty of care is required irrespective of who might have standing to challenge wrongful conduct. And as a factual matter, the Court finds that the Trustee proved breaches of the duty of care, on the part of each of Koplik and Siegel, with respect to the loans to American Tissue and (though the matter is closer) the trade credit to American Tissue as well.

But on the most difficult question, causation, the Court concludes, as mixed questions of fact and law, that with respect to many of the failures on the part of Koplik and Siegel, as serious as they were, those failures did not cause the resulting loss, or were trumped by intervening cause. Ultimately, only the failures to take the basic steps necessary to protect the Debtor's ability to collect on its trade receivables credit insurance (the "**Trade Credit Insurance Policy**") (and the extensions of credit to a company owned by a Koplik family member, which were violative of the duties of good faith and of loyalty) can be found to have caused the Debtor's losses. With the accounting fraud at American Tissue, it is more likely than not that the remaining American Tissue losses would have taken place even if the pre-lending due diligence and documentation had been properly accomplished. In any event, the Trustee did not meet his burden to prove otherwise. Those losses must be regarded as subject to that intervening cause.[4]

Thus, the Court finds some, but less than all, of the many violations of the duty of care here to have satisfied causation requirements.

Accordingly, the Court proposes[5] that judgment be entered against Koplik and Siegel for $5.4 million of the Debtors' losses with respect to American Tissue. The

---

[4]    While the losses on the trade credit could be said to be subject to similar considerations, the causation analysis is somewhat different. The Debtor would still not have suffered the losses if the Officers had taken the steps to protect the Debtor's ability to collect under its Trade Credit Insurance Policy.

[5]    The great bulk of the claims asserted here are for breach of fiduciary duty under state law and are non-core. Thus, with its Article I status, this Court cannot issue a final judgment as to those non-core claims in the absence of consent. *See* 28 U.S.C. § 157(c). Neither side raised any objections to this Court issuing a final judgment in this adversary proceeding before it was tried. But very recently, after a conference with the parties in which the Court described its then-tentative findings as to the Officers' level of care and asked for supplemental briefing on causation, the Officers stated that they now do not consent. Thus the Court has recast this opinion, which as originally drafted was an ordinary decision after trial, to denominate most of its conclusions as *proposed* findings of fact and conclusions of law.

-3-

Court further proposes that judgment be entered against Koplik in the additional amount of $52,494 for his violations of the duties of loyalty and care in extensions of credit to Liberty Umbrella Corporation ("**Liberty Umbrella**"), a supplier of promotional materials owned by Koplik family members. The Court further proposes that (with an appropriate credit for any amounts paid on account of the fraudulent transfer claims) judgment be entered, for breaches of their duties of care and loyalty, against Koplik for the Debtors' aggregate of $399,800 in losses associated with the loan forgiveness to each of Koplik and Siegel, and against Siegel for the $100,000 in losses associated with the loan forgiveness to himself. Judgment should also be entered against Koplik, in the amount of $299,800, and Siegel, in the amount of $100,000, on the fraudulent transfer claims.[6]

---

However, the Court has otherwise drafted it in a fashion no different than the way it would normally write any other decision after trial. Its conclusions should simply be deemed to be *proposed* with respect to any matters as to which this Court is not constitutionally empowered to issue a final judgment.

[6]   The Court agrees with its colleague Judge Drain that the fraudulent transfer claims asserted here are within this Court's power constitutionally to enter final judgment, for reasons Judge Drain articulated in *Kirschner v. Agoglia (In re Refco Inc.)*, 461 B.R. 181 (Bankr. S.D.N.Y. 2011) ("***Refco***"). Thus this Court could issue a judgment with respect to the fraudulent transfer claims if such were otherwise appropriate under Fed.R.Civ.P. 54. However, Judge Drain's views in *Refco* are not the only thoughtful ones. For a different view, *see Heller Ehrman LLP v. Arnold & Porter, LLP et al. (In re Heller Ehrman LLP)*, 464 B.R. 348, 2011 U.S. Dist. LEXIS 143223, 2011 WL 6179149 (N.D. Cal. Dec. 13, 2011) (Charles Breyer, J.), *Adelphia Recovery Trust v. FPL Group (In re Adelphia Commc'n Corp.)*, 2012 U.S. Dist. LEXIS 10804, 2012 WL 264180 (S.D.N.Y. Jan. 30, 2012) (Crotty, J.), and *Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)*, --- B.R. ---, 2012 WL ---, No. 11-8251, slip op. (S.D.N.Y. Mar. 29, 2012) (Cote, J.) (in each case determining that a bankruptcy court cannot enter a final judgment on a fraudulent transfer claim, but nevertheless declining to withdraw the reference).

Here, in addition, this Court's fraudulent transfer judgment would be for the same loss covered by its proposed judgment on duty of loyalty claims as to which the Court could not constitutionally enter a final judgment, and steps need to be taken to avoid duplicative recovery. For these reasons, collectively, the best course, in the Court's view, is for this Court either to defer entry of the judgment it is empowered to enter on the fraudulent transfer claims pending determination of the remainder of the case by the district court, or to enter the judgment on the fraudulent transfer claims and then stay execution on it, pending determination of the remainder of the claims. For the time being, the Court will do the former, but it will do the latter if it that is necessary or desirable to facilitate appellate review.

The Court's Findings of Fact and proposed Findings of Fact, and Conclusions of Law and proposed Conclusions of Law,[7] follow.

Facts[8]

*1.    Background*

Koplik's father Perry Koplik and Koplik (who was then about three years out of college) founded the Debtor in 1960. After Perry Koplik's retirement, Koplik took over its leadership.  The Debtor's shares were family owned; Koplik was the only shareholder of the Debtor at all relevant times.

The Debtor employed approximately 50 people, and operated primarily as a broker of waste paper, pulp, tissue, and other paper grades.[9]  In addition to acting as a broker, the Debtor acted as sales agent as well as a distributor.[10]

Defendants Koplik and Siegel (collectively, the "**Officers**") are the former President and Chief Executive Officer and Vice President and Chief Operating Officer of the Debtor, respectively.[11]  Both have had substantial experience in the paper industry.

The parties have stipulated that the Officers "were authorized to make the decisions to enter into and consummate all of the transactions that are complained of in

---

[7]    They are findings of fact with respect to the fraudulent transfer claims, and are *proposed* findings of fact with respect to the remainder of the claims.  Though strictly speaking, the same distinction might be made with respect to the conclusions of law, it there does not make a difference, as conclusions of law are in any event subject to de novo review.

[8]    To avoid lengthening this decision further, the Court limits citations to the most significant matters.  Likewise, to avoid unnecessary repetition, certain facts appear only in connection with the Court's discussion of legal issues.

[9]    Pretrial Order ¶ 5.1.

[10]    Siegel Aff. ¶ 6.

[11]    Perry Koplik, Michael Koplik's father, was not actively involved in the operation of the business during the time addressed in the Amended Complaint.

the Amended Complaint."[12]  Koplik was responsible for approving whether non-trade

extensions of credit, advances, loans and/or other financial accommodations over a

nominal amount would be made by the Debtor to a third party.[13]

     2.     *The Revolver*

For its principal source of financing, the Debtor entered into a $60 million secured

revolving credit facility (the "**Revolver**") in 1999, with Fleet Bank, as agent (the

"**Bank**").  The Revolver was secured by a first lien on certain Debtor assets, including

most significantly the Debtor's accounts receivable and inventory.  Availability under the

Revolver was asset-based—principally on the levels of the Debtor's eligible accounts

receivable and inventory.[14]

The Revolver restricted the Debtor from making various kinds of investments or

loans without the Bank's prior written approval.[15]  Additionally, the Revolver imposed

express limitations on the amount and nature of Debtor receivables.  Significantly, the

Revolver ultimately limited the amount of eligible trade accounts receivable due to the

Debtor from American Tissue to $15 million,[16] and required the Debtor to obtain trade

credit insurance with respect to its American Tissue receivables in that amount.

---

[12]     Pretrial Order ¶ 5.74.

[13]     *Id.* ¶ 5.66.

[14]     Pretrial Order ¶ 5.11; Kasoff Aff. ¶ 15.

[15]     Pretrial Order ¶ 5.14; Kasoff Aff. ¶ 17.

[16]     Pretrial Order ¶ 5.13; Kasoff Aff. ¶ 16.  Through a series of amendments, the lenders permitted the
Debtor to increase the credit line from $8 million to $15 million with the requirement that the
Debtors maintain credit insurance on its American Tissue receivables in the amount of the credit
limit.

3.    *The Trade Insurance*

In 1999, the Debtor secured the Trade Credit Insurance Policy, issued by

Lumbermen's Mutual Casualty Company ("**Lumbermen's**"), a subsidiary of Kemper

Insurance Companies, to insure the risk of an American Tissue default.  The Trade Credit

Insurance Policy covered losses up to $15 million.[17]  The policy excluded from coverage

any trade debt owed by American Tissue when that debt was more than 60 days

overdue.[18]

Conditions of coverage included conditions that the Debtor "take all reasonable

steps to avoid or minimize loss," and that the Debtor "not enter into any agreement

concerning a Qualifying Default or potential Qualifying Default without the Insurer's

prior written consent, including any agreement providing for the rescheduling of payment

of the debt."[19]  The Trade Credit Insurance Policy further provided that if the insured

should make any materially false or fraudulent statements to the insurer or withhold any

material information in connection with the Trade Credit Insurance Policy, the Trade

Credit Insurance Policy would become void.[20]

As described more fully below, Koplik and Siegel failed to take reasonable steps

to comply with the requirements of the Trade Credit Insurance Policy, which would have

limited the losses the Debtor suffered, even in the face of the fraud at American Tissue, to

about half the amount the Trustee claims.

---

[17]    Pretrial Order ¶ 5.17; Kasoff Aff. ¶ 18; Pl. Exh. 9.

[18]    The exclusion applied to invoices that were unpaid 60 days after the due date of the invoice.
Pretrial Order ¶ 5.17; Pl. Exh. 9; Pl. Exh. 33 at 1.  Since the invoices were due either 60 or 90 days
from the date of issue, the exclusion applied to invoices that were unpaid after 120 days or 150
days, respectively.  *Id.*

[19]    Pl. Exh. 9 § IV:3; Pretrial Order ¶ 5.18; Kasoff Aff. ¶ 19.

[20]    Pretrial Order ¶ 5.19; Kasoff Aff. ¶ 19.

4.    *The American Tissue Extensions of Credit*

(a) *Overview*

From 1999 to 2001, the Debtor engaged in massive extensions of credit—trade credit and outright loans—to American Tissue, in amounts that, at their peak, exceeded $27 million.  A major portion of these extensions of credit, and "re-aging" of receivables owing from American Tissue, violated covenants under the Revolver and conditions for recovery under the Trade Credit Insurance Policy.

At the time, American Tissue was one of the Debtor's largest customers.  By extending both trade and non-trade credit to American Tissue, in such large amounts and without regard to the requirements for recovery under the Trade Credit Insurance Policy, Koplik and Siegel exposed the Debtor to very substantial—and ultimately disastrous— consequences if American Tissue were to default.  American Tissue filed for bankruptcy on September 10, 2001.

From 1999 through 2001, the Debtor's financial condition deteriorated as it became increasingly more reliant on American Tissue as a customer, and exposed to American Tissue's ability to repay its debt.  Nevertheless, Koplik increased the Debtor's exposure to American Tissue, in part by reason of American Tissue's perceived importance to the Debtor as a customer,[21] and in part by reason of the close working relationship that the two companies had for many years.  The CEO of American Tissue, Mehdi Gabayzadeh ("**Gabayzadeh**"), had worked with Koplik extensively.[22]  The relationship between the companies was drawn even closer when, in 1999, Gabayzadeh

---

[21]    The Court says "perceived" because while the revenue generated by sales to American Tissue represented approximately 13% to 14% of the Debtor's total revenue in the period 1998-1999, it dropped to 7% of the Debtor's total revenue in 2000.  Kasoff Aff. ¶ 46.

[22]    *See infra* at n.95.

-8-

asked to hire the Debtor's CFO at the time, one Ed Stein ("**Stein**"), who had been one of Koplik's trusted advisors and a coworker for 22 years. [23]

In the period from January 1, 2001 to September 10, 2001 (the date of American Tissue's bankruptcy filing)—and though knowing that American Tissue was experiencing severe liquidity problems—the Debtor (as a consequence of decisions of Koplik and Siegel) extended approximately $8.5 million in non-trade credit (*i.e.*, direct loans) and approximately $18 million in trade credit to American Tissue.

Koplik authorized the loans and trade credit to American Tissue even though the Debtor previously, and indeed often, had trouble collecting on both trade and non-trade credit from American Tissue. Though American Tissue successfully completed a $165 million bond offering in 1999 (which should have generated sufficient cash flow to engage in increased business with the Debtor), American Tissue thereafter disputed invoices issued by the Debtor and continued to be difficult and delinquent in paying outstanding receivables before Koplik granted even more credit to American Tissue.[24]

With respect to the non-trade advances to American Tissue, Koplik authorized nearly 20 separate transfers of funds to American Tissue, in violation of provisions of the Revolver. These non-trade extensions of credit included providing working capital loans to American Tissue as early as January 2001, and continuing with increasing frequency thereafter,[25] to: (a) fund American Tissue's payroll;[26]  (b) cover American Tissue's

---

[23]        Pretrial Order ¶ 5.117-5.120.

[24]        Pl. Kelly Aff. ¶ 6; Kasoff Aff. ¶ 45.

[25]        Kasoff Aff. ¶ 25.

[26]        *Id.* ¶¶ 26, 29.

bounced or outstanding checks;[27]  (c) finance production at various American Tissue

mills;[28] and (d) finance American Tissue's acquisition of still other mills.[29]

Additionally, even when unable to provide funding requested by American Tissue

due to the Debtor's own liquidity constraints, Koplik made arrangements with others to

do so at the Debtor's risk.  Koplik arranged for Asia Pulp & Paper Trading (U.S.A.), Inc.

("**Asia Pulp**"), one of the Debtor's customers, to pay instead to *American Tissue*

approximately $3 million that Asia Pulp owed the Debtor—in order to help American

Tissue meet an interest payment on the 1999 bond issue the Court referred to above.

American Tissue thereafter repaid this advance to the Debtor.  But when American

Tissue did so, Koplik and Siegel recorded the transaction on the Debtor's books as a

payment from *American Tissue* (rather than Asia Pulp), thereby reducing American

Tissue's account balance with the Debtor, and leaving the Asia Pulp $3 million

receivable open as eligible collateral under the Revolver—even though Asia Pulp's

obligations in that respect had already been satisfied.[30]

Additionally, in that period January 1, 2001 through September 10, 2001, Koplik

extended approximately $18 million in trade credit to American Tissue despite having

only $25 million in sales.[31]  The net cash received from American Tissue during that

same period was only approximately $3.7 million, after taking into account the non-trade

---

[27]    *Id.* ¶¶ 28, 33.

[28]    *Id.* ¶¶ 27, 28, 39-41.

[29]    *Id.* ¶¶ 31, 34, 35.

[30]    This was at least arguably fraudulent as against Fleet Bank and the other lenders on the Revolver, but insofar as the American Tissue duty of care claims are concerned, it was in substance simply a means of extending even more credit to American Tissue, on which duty of care claims would rise or fall with the remainder of the American Tissue duty of care claims.

[31]    Kasoff Aff. ¶ 47.

-10-

extensions of credit discussed below.  Over this same time period, the Debtor's accounts

receivable balance from American Tissue climbed from approximately $6.6 million to

$18 million—an amount that exceeded the Debtor's coverage under the Trade Credit

Insurance Policy (even assuming that requirements of the Trade Credit Insurance Policy

had been complied with) and that was in violation of provisions of the Revolver.

By February 2001, the Debtor's "days-sales-outstanding" for American Tissue

had climbed to 120 days (approximately 4 months), and were not being paid in cash.[32]  In

an attempt to address this situation, Koplik and Siegel ordered the "re-aging" of their

American Tissue receivables from 30 to 60, and then to 90, days in violation of

requirements for recovery under the Trade Credit Insurance Policy.[33]

By the summer of 2001, the Debtor's accounts receivable from American Tissue

were approximately $15 million, and the unpaid loans and advances by the Debtor to

American Tissue totaled in excess of $12 million.[34]  By the third quarter of 2001, the

Debtor had extended $27,770,100 in credit to American Tissue and its affiliated

entities.[35]

The Court's more detailed findings with respect to alleged violations of the duty

of care follow.

---

[32]    *Id.* ¶ 48.

[33]    *Id.*

[34]    Pretrial Order ¶ 5.49.

[35]    *Id.*

*(b) Particular Transactions with American Tissue*

Principally as a consequence of decisions by Koplik, the Debtor advanced non-trade credit to American Tissue in 2001, from January 1, 2001 to September 10, 2001, in amounts totaling $8.5 million.[36]  More specifically:

*(1)    Neenah Facility-Kimberly Clark*

From March to May of 2001, the Debtor funded the production of goods at American Tissue's Neenah facility.  American Tissue had been commissioned to produce these goods for Kimberly Clark.  The Debtor agreed to fund production in exchange for an assignment of the invoices due to American Tissue from Kimberly Clark plus a 3% commission.  The consequence of this arrangement, as a practical matter, was that if Kimberly Clark didn't make payment on those invoices, the Debtor would suffer the consequences.

The Debtor advanced almost $7 million to fund American Tissue's production of goods for sale to Kimberly Clark throughout March 2001.[37]  After the expiration of Kimberly Clark's agreement to this arrangement, in May 2001, the Debtor advanced an additional $1.65 million.[38]

After American Tissue begun funding its own productions at Neenah, American Tissue bounced checks that it had issued to Kimberly Clark for American Tissue's pulp purchases, and Kimberly Clark set off against its duty to pay American Tissue (and hence the Debtor) its unpaid receivables resulting from the bounced checks.[39]  Kimberly Clark's

---

[36]    Kasoff Aff. ¶ 24; Pl. Exh. 15.

[37]    Kasoff Aff. ¶ 27.

[38]    *Id.* ¶ 27.

[39]    Kasoff Aff. ¶ 28; Pl. Exh. 57.

setoff resulted in a loss to the Debtor of approximately $1.1 million when the Debtor

could no longer collect on the invoices.[40]  Kimberly Clark's right to the setoff was

debatable, and the Litigation Trustee pursued Kimberly Clark for the amounts that it set

off.  The Litigation Trustee's lawsuit against Kimberly Clark was settled for $245,000,[41]

and the Debtor suffered the loss of the remainder.

### (2)    *Purchase of Kimberly Clark Receivables*

In a separate transaction during the same time period, the Debtor purchased

Kimberly Clark receivables totaling $1.74 million from American Tissue in exchange for

a $1.69 million payment so that American Tissue could fund its payroll.[42]  The Debtor

recovered in full on the purchased receivables and made a profit.[43]

The Court finds this transaction to be significant not because the Debtor suffered

losses on it.  It is significant only because Koplik and Siegel became aware, at the time

they were extending credit to or for the benefit of American Tissue, that American Tissue

could not, without outside assistance, fund its payroll.

### (3)    *Ponderosa, Keiffer, and Shelby Mills Transactions*

In April 2001, the Debtor advanced $2.1 million to American Fiber Mills of

Tennessee, an American Tissue affiliate, in order to fund American Tissue's acquisition

of Ponderosa Fibers of America ("**Ponderosa**"), a customer of the Debtor.[44]  In

exchange, American Tissue granted the Debtor "an exclusive agreement to supply 100%

---

[40]     Pretrial Order ¶ 5.31.

[41]     Trial Tr. 2/28/08 at 173.

[42]     Pretrial Order ¶ 5.46; Kasoff Aff. ¶ 29; Pl. Kelly Aff. ¶ 9; Pl. Exh. 14 at 34; Pl. Exh. 44.

[43]     Pl. Exh. 14 at 34-35.

[44]     Pretrial Order ¶ 5.33; Pl. Exh. 24.

of the fiber needed to produce pulp at the facilities purchased as well as a sales contract

to have [Debtor] sell (as an agent) all of the pulp produced at the plants . . . ."[45]

Siegel forecast that the transaction would generate $1.2 million in profit annually,

based on Ponderosa's production capacity,[46] after Siegel made notes and computations on

a scratch pad as to the profit he expected.[47]  Many of these notes were not kept and have

since been discarded.[48]  The terms of this transaction were memorialized only in a letter

agreement.[49]  There was no promissory note with respect to the $2.1 million that the

Debtor lent to American Tissue.[50]  American Tissue never repaid this loan.

The Debtor and American Tissue entered into a similar transaction the following

month, May 2001, when, at American Tissue's request, the Debtor funded American

Tissue's acquisition of Keiffer Paper Mills ("**Keiffer**"), to the extent of $772,739.[51]  As

was the arrangement with Ponderosa, American Tissue appointed the Debtor the

exclusive supplier for Keiffer, and awarded the Debtor a contract to sell the excess pulp

produced at the purchased plant.

As with the Ponderosa transaction, the transaction was documented by only a

letter agreement.[52]  Siegel engaged in some basic calculations and concluded that the

---

[45]     Def. Exh. 49 at 144.

[46]     Siegel Aff. ¶ 94.

[47]     Trial Tr. 7/16/08 at 135.

[48]     *Id.*  However, nothing in the record indicates that the Officers were attempting to destroy
documents or evidence.

[49]     Pl. Exh. 24.

[50]     Pretrial Order ¶ 5.33.

[51]     Def. Exh. 49 at 146.

[52]     Pl. Exh. 25.

transaction would yield $800,000 in profit.[53]  Once more, there was no promissory note

with respect to the $772,739 that the Debtor lent to American Tissue, and American

Tissue never repaid this loan.[54]

That same month, May 2001, again at American Tissue's request, the Debtor

assisted American Tissue in acquiring Shelby Tissue Mills in Tennessee ("**Shelby**

**Mills**") from General Electric Capital Corp. ("**GECC**").  GECC insisted that the

transaction include the sale of the Shelby Mills inventory,[55] but the Debtor was unable to

assist American Tissue by buying the Shelby Mills inventory due to its own liquidity

constraints.  Instead, the Debtor arranged for an affiliate of the Debtor's customer Asia

Pulp, Linden Trading Company ("**Linden**"), to purchase the inventory from GECC, and

then to sell it to the Debtor.[56]  The Debtor then sold the inventory to American Tissue, at

a mark up, billing American Tissue in the amount of $1,461,120 for the cost of the

inventory[57] which it acquired as part of this transaction.  This invoice remained unpaid at

the time of the Debtor's filing.

The Debtor's decisions were made "overnight" or within a very short period of

time with respect to the transactions involving the Ponderosa, Keiffer and Shelby Mills

loans—which aggregated approximately $4.4 million.[58]  Koplik decided not to inform the

Bank about these transactions, assertedly due to the time constraints.[59]   Though it

---

[53]      Siegel Aff. ¶ 96.

[54]      Pretrial Order ¶ 5.34; Kasoff Aff. ¶ 34.

[55]      Pretrial Order ¶ 5.35; Kasoff Aff. ¶ 35.

[56]      *Id.*

[57]      Pretrial Order ¶ 5.35; Kasoff Aff. ¶ 35; Trial Tr. 7/17/08 at 102-103.

[58]      Trial Tr. 6/12/08 at 5, 7; Trial Tr. 7/16/08 at 18-19.

[59]      Trial Tr. 6/12/08 at 4.

ultimately does not matter, the Court does not find such an explanation for failing to advise the Bank to be satisfactory.  Indeed, the Court finds the Officers' conduct, and explanations in this regard,[60] outrageous.

(4)    <em>Asia Pulp Transaction</em>

In a transaction summarized above,[61] in July 2001 Koplik[62] arranged for Debtor customer Asia Pulp to pay instead to American Tissue approximately $3 million that Asia Pulp owed the Debtor, to help American Tissue meet a $10.5 million interest payment on its 1999 bond issue.

Much like the Shelby Mills transaction, the Debtor was unable to assist American Tissue directly, due to the Debtor's own liquidity constraints.  However, Koplik arranged for Asia Pulp to pay (and effectively advance) American Tissue $3 million as a reduction of the $3.8 million debt owed by Asia Pulp to the Debtor.  Upon Asia Pulp's funding of the $3 million, the Debtor instructed American Tissue to repay the advance directly to the Debtor, and not to Asia Pulp[63]—which, if and when it transpired, would then effectively result in payment of Asia Pulp's obligation to the Debtor.

American Tissue subsequently paid the $3 million advanced by Asia Pulp to the Debtor.[64]  That, of course, is good, but the Debtor applied the $3 million to reduce <em>American Tissue's</em> trade payables balance to the Debtor, as contrasted to <em>Asia Pulp's</em>

---

[60]    Siegel also testified that as a mere inventory purchase, Shelby Mills was an ordinary course transaction that did not need to be disclosed to the Bank.  Trial Tr. 7/16/08 at 67.  This explanation insults the Court's intelligence.

[61]    <em>See</em> page 10 <em>supra</em>.

[62]    Siegel was not told about the Asia Pulp transaction until after it was already arranged by Koplik.  Trial Tr. 7/16/08 at 148, 151, 152.

[63]    Pretrial Order ¶ 5.129; Kasoff Aff. ¶ 38.

[64]    Pretrial Order ¶ 5.130.

balance—to keep the Debtor under the $15 million credit limit imposed by the Trade

Credit Insurance Policy.[65]  Though $3 million of the $3.8 million owed the Debtor by

Asia Pulp had been paid, that $3 million nevertheless was shown as eligible collateral

under the Revolver, and was reflected as collateral on the Debtor's July and August 2001

borrowing base certificate.[66]

The Court finds this transaction to be highly offensive.  If the Debtor lacked the

liquidity to lend American Tissue $3 million directly, the Court fails to see how the

Debtor responsibly could have given up its rights then to recover a $3 million receivable

owed by Asia Pulp.  It also is indicative of Koplik's awareness of American Tissue's

liquidity problems, and in particular, American Tissue's inability to meet its own debt

service obligations.  Additionally, and perhaps most obviously, the transaction was an

outright fraud against the Bank.

But as American Tissue ultimately paid the $3 million, and the Bank ultimately

took no further action against Debtor as a consequence of the fraud upon it, the Court

does not find that the Debtor suffered a financial loss (and thus can recover damages) as a

consequence of the Asia Pulp transaction.

### (5)    Ampad Transaction

In June 2001, American Tissue bounced $3,015,905 in checks issued to the

Debtor in payment of trade accounts receivable.[67]  Both Koplik and Siegel were advised

of the check bouncing as it occurred.[68]  But to keep American Tissue's accounts

---

[65]     Kasoff Aff. ¶ 38; Pl. Kelly Aff. ¶ 13; Trial Tr. 7/16/08 158-159.

[66]     Pretrial Order ¶ 5.131; Pl. Kelly Aff. ¶ 13.

[67]     Pretrial Order ¶ 5.47; Kasoff Aff. ¶ 36; Pl. Kelly Aff. ¶ 12; Pl. Exh. 46; Trial Tr. 5/15/08 at 34.

[68]     Pl. Kelly Aff. ¶ 12.

-17-

receivable under the $15 million limit in the Trade Credit Insurance Policy, the Debtor

negotiated an arrangement to reduce American Tissue's trade accounts receivable balance

by accepting, in lieu of cash, inventory—of finished goods from Ampad, an affiliate of

American Tissue.[69]  Koplik and Siegel agreed to this transaction even though the Debtor

was not in the business of selling finished inventory.[70]  This raises the obvious question

as to what, then, would the Debtor do with it?

    In fact, the Ampad inventory was never actually sent to the Debtor.  Instead, the

inventory was segregated in Ampad's warehouse for the Debtor's account during the

period that the Debtor owned the inventory.[71]  Ampad valued the inventory at

approximately $3.7 million, and the Debtor reduced American Tissue's accounts payable

balance to the Debtor by that amount.[72]  But nothing was done to verify that valuation in

advance of the transfer.[73]

    Upon the request of the Debtor, Linden inspected the inventory to determine if the

product was saleable to the Debtor customers.[74]  It was also Linden that told Koplik and

Siegel what kind of inventory that the inventory was.[75]  Nobody from the Debtor ever

inspected it.[76]

---

[69]     Siegel Aff. ¶ 103.

[70]     Trial Tr. 7/16/08 at 141 (Siegel Testimony).

[71]     Pl. Exh. 14 at 39; Def. Exh. 33; Trial Tr. 4/15/08 at 33-34.  The change in ownership was, however, reflected by warehouse receipt.

[72]     Siegel Aff. ¶ 103; Trial Tr. 7/16/08 at 106.

[73]     Trial Tr. 7/16/08 at 141.

[74]     Siegel Aff. ¶ 105; Trial Tr. 7/16/08 at 106.

[75]     Trial Tr. 7/16/08 at 142.

[76]     *Id.*

Upon Linden's inspection of the inventory, it advised the Debtor that the inventory was not saleable. Consequently, the Debtor returned the inventory to American Tissue in July of 2001, and reversed the credit on its books.[77] The $3,015,905 in bounced checks was then added back to American Tissue's accounts receivable balance.[78]

The Court finds this transaction too to be outrageous. Though ostensibly a sale of inventory, the "inventory never moved."[79] It was of product that the Debtor was not in the business of selling, and, if it had actually been transferred for purposes of sale, that would require the Debtor "to get into a brand new business."[80] There is no reason to believe that Koplik and Siegel even knew what they were "buying."[81] It was in substance another extension of credit to American Tissue, and an artifice to keep American Tissue's payable balance below $15 million—effectively a fraud upon the Bank, Lumbermen's, or both.

### (6)    Boise Cascade Transaction

In 2001, Boise Cascade was manufacturing tissue for American Tissue on a machine owned by American Tissue and located on Boise Cascade's property. American Tissue was obligated to pay Boise Cascade for the tissue that Boise Cascade thereby produced.[82]

---

[77]    Siegel Aff. ¶ 106; Trial Tr. 7/16/08 at 105-106; Pretrial Order ¶ 5.47; Kasoff Aff. ¶ 36.

[78]    Pretrial Order ¶ 5.47; Kasoff Aff. ¶ 36.

[79]    Trial Tr. 7/16/08 at 142 (Siegel Testimony).

[80]    Id.

[81]    It will be recalled that they learned what kind of inventory it was when "Linden Trading told us," id., and that Debtor personnel never looked at it.

[82]    Siegel Aff. ¶ 131-132.

In August 2001, Boise Cascade informed American Tissue that it would cease production because American Tissue had not been paying Boise Cascade on a timely basis for the tissue.[83]  Boise Cascade invited the Debtor to purchase the production, and the Debtor agreed to do so.  American Tissue cooperated with the Debtor by supplying the Debtor with its customer list for such production.[84]  The Debtor entered into a partnership agreement with Linden, which provided half the funding for the transaction.[85]

The Debtor generated about $8 million of accounts receivable in connection with its Boise Cascade activities, and an apparent profit of about $1 million.[86]  Though the Trustee focused on this transaction along with the others, the Court finds the Trustee failed to meet his burden of proof that the Officers did anything wrong in connection with the Boise Cascade transaction, or that the Debtor was damaged by it.

(c)      *Care in Trade Credit to American Tissue*

By the third quarter of 2001, of the approximately $27.8 million in credit to American Tissue and its affiliated entities that the Debtor had extended and was outstanding,[87] approximately $19.3 million was in the form of trade credit.  This amount, quite obviously, was more than $4 million in excess of the $15 million for which the Debtor had obtained trade credit insurance and would be insured, even assuming compliance with the requirements of the Trade Credit Insurance Policy.

---

[83]      Siegel Aff. ¶ 132.

[84]      *Id.* ¶ 133.

[85]      *Id.*

[86]      Siegel Aff. ¶ 134; *see also* Def. Exh. 55.

[87]      Pretrial Order ¶ 5.49.

-20-

*(i)      Trade Credit Generally*

The Debtor maintained a credit department which considered trade credit for the

Debtor's customers, including American Tissue.[88]  That department employed credit

analysts who maintained credit files on the Debtor's customers, including American

Tissue.[89]

The Debtor's Vice President Finance and CFO, Michael Kelly,[90] engaged in more

than minimal analysis with respect to the extensions of trade credit to American Tissue,

and regularly visited American Tissue's offices.[91]  His responsibilities included

supervising the Debtor's day-to-day business activities with American Tissue.[92]  Kelly

had discussions with Stein (who it will be recalled was the former CFO of the Debtor)

and with the various members of the American Tissue finance department on a regular

basis.[93]

Kelly's level of attention and care would be much more than enough to satisfy the

business judgment rule with respect to the extensions of trade credit to American Tissue

if it were not for the fact that Kelly's analysis was effectively trumped by Koplik and

Siegel when making business decisions of the type the Court discusses below, and that

---

[88]      Pl. Kelly Aff. ¶ 2; Def. Kelly Aff. ¶ 6.

[89]      Trial Tr. 7/17/08 at 92.

[90]      Michael Kelly served as Vice President of Finance and Chief Financial Officer from 1999 to 2002.
Kelly reported directly to Siegel but never served on the Board of Directors.  One of his job
functions was to collect accounts receivable, including the accounts receivable of American
Tissue, and maintain credit analysis of customers.

[91]      Trial Tr. 5/15/08 at 139.

[92]      Based on his experience with American Tissue, Kelly testified that he never believed that
American Tissue's accounts receivable would become uncollectible.  Def. Kelly Aff. ¶ 8.
Especially since Kelly was not cross-examined, the Court has no basis for disbelieving that
testimony.

[93]      Trial Tr. 5/15/08 at 143-144.

-21-

Koplik and Siegel failed to ensure compliance with the requirements of the Trade Credit

Insurance Policy, as also discussed below.

Koplik did not personally oversee the company's credit exposure, even though he

regularly approved nonstandard transactions which increased the Debtor's credit

exposure.  However, Koplik and Kelly both read American Tissue's financial

statements.[94]  Koplik also had dinner with Gabayzadeh (whom Koplik had known for

approximately 10 years[95]) approximately once a week to discuss American Tissue's

business.[96]  And Koplik also had a close relationship with Stein, going back 22 years.

Koplik trusted Stein, who had become CFO of American Tissue with Koplik's consent.

Thus, Koplik and Siegel were being regularly briefed on the status of American Tissue by

two close colleagues, and the Court accepts Koplik's and Siegel's testimony that they

trusted Gabayzadeh and Stein.

While American Tissue was a very major customer for the Debtor, it was far from

an ideal customer.  In 1999, American Tissue disputed invoices issued by the Debtor, and

was noticeably delinquent in paying outstanding invoices.[97]  But ultimately, prior to its

bankruptcy, American Tissue had never failed to pay any of its obligations to the Debtor,

including a $24 million balance outstanding in 1999 after American Tissue completed a

bond offering.[98]

---

[94]      Trial Tr. 5/14/08 at 188.

[95]      Trial Tr. 5/15/08 at 152.

[96]      Trial Tr. 5/15/08 at 125-127.

[97]      Kasoff Aff. ¶ 45; Pl. Kelly Aff. ¶ 6; Pl. Exh. 17.

[98]      Def. Kelly Aff. ¶ 4; Pretrial Order ¶ 5.116.

The Court heard considerable testimony, and debate, as to whether the Debtor, under Koplik's and Siegel's watch, had a credit manual that would govern the Debtor's extensions of trade credit to its customers.  While Koplik and Siegel offered into evidence what they characterized as a "credit manual" for the Debtor, the document included a number of different credit-related documents spanning a decade,[99] and Siegel could not identify the document as such, explaining that "I don't think it was bound like this in this form.  I think each of those documents were there."[100]  The Court finds, in this connection, that the Debtor had a credit policy of sorts, though it was primitive, and though Koplik and Siegel chose to override it regularly.

But ultimately, the Court does not regard the form in which the Debtor's standards for extending trade credit were embodied to be particularly meaningful.  The more important consideration, in the Court's view, is whether trade credit was extended under application of some kind of standards, and with what kind of focused inquiry.  In that connection, the Court finds that under the standards promulgated under Koplik's and Siegel's watch, the Debtor would gather available data, including financial statements (audited if available), published information from credit agencies, such as Dun & Bradstreet and Graydon, and references from banks, credit associations, and other vendors. [101]   It was also the Debtor's policy to periodically review the ongoing creditworthiness of existing customers.[102]

---

[99]    Trial Tr. 7/16/08 at 90-93.

[100]    Trial Tr. 7/16/08 at 91.

[101]    Pl. Exh. 14 at 96-97 (Realization Report).

[102]    *Id.*

But Siegel explained that the credit manual would govern only in traditional transactions, but not in instances such as American Tissue, in which profit motives would be weighted more heavily.  Siegel testified that the Debtor's regular credit policies would not apply here because:

> of the size of the company, the growth of the company and the help they needed to continue to grow and the relationship or the credit reviews for American Tissue really had no relationship to the credit policy for the rest of the company.[103]

But there were no documents in the Debtor's files substantiating any alternative credit evaluation, or for that matter, any credit evaluation with respect to any of the trade credit to American Tissue.[104]  This was a serious deficiency.  And the inference is compelling, and the Court finds, that the Officers' analysis underlying the Debtor's extensions of credit to American Tissue amounted to little more than "back of the envelope" analysis.[105]  If Koplik and Siegel were to utilize their expectations of profit to trump normal trade credit underwriting considerations, they needed to do so in a thoughtful way.  For the reasons just stated, the Court finds that they didn't.

Though the question is close, the Court finds, on balance, that the Trustee failed to meet his burden to show failures of the duty of care with respect to the $4 million in trade credit that exceeded the coverage under the Trade Credit Insurance Policy.  The combination of the due diligence that was undertaken and the Trade Credit Insurance

---

[103]    Trial Tr. 7/16/08 at 92-93.

[104]    Kasoff Aff. ¶ 22.

[105]    The Court accepts as true that extensions of trade credit are much more routine than loans to customers, and are often done with less formality.  But when Koplik and Siegel chose to make credit decisions based on factors other than traditional credit review, it was incumbent on them to consider those alternative factors with a level of analysis and care much more than any evidence this Court saw would support.

Policy—assuming compliance with the Trade Credit Insurance Policy requirements—
would bring the risk associated with the incremental $4 million in trade credit down to a
level where profit making opportunities could trump the risk.

But with respect to the first $15 million of the trade credit, the Court's findings
are different.  The Court saw no evidence that Koplik and Siegel weighed the risk of
trade credit defaults against the profitability of the American Tissue business in any
formalized way, and the first $15 million in trade credit could be justified only if Koplik
and Siegel scrupulously complied with requirements for recovery under the Trade Credit
Insurance Policy—which they manifestly failed to do.  That was a serious breach of the
duty of care.[106]

<em>(ii)    Trade Credit Insurance</em>

As noted above, the Court finds, in light of the other circumstances discussed
above, that Koplik and Siegel would not have violated their duty of care with respect to
the trade credit if they took reasonable steps to assure compliance with the requirements
for coverage under the Trade Credit Insurance Policy.  But they did not.

Though the two sides spent some time arguing the point, the Court does not need
to decide, and does not decide, whether obtaining the Trade Credit Insurance Policy was
the Officers' idea or Fleet's.  The important thing is that the Trade Credit Insurance

---

[106]    The losses resulting from that may be thought of as caused by the lack of care in connection with
the extension of the trade credit itself, or in failing to comply with requirements for recovery under
the Trade Credit Insurance Policy.  But the way they are denominated does not matter; the Debtor
suffered grievously when the Officers extended trade credit in a way by which they put their eggs
in the basket of protection under the Trade Credit Insurance Policy, and then failed to take
reasonable steps to assure that the requirements for recovery under the Trade Credit Insurance
Policy would be satisfied.

-25-

Policy was critical to managing the Debtor's credit risk, and the Officers were reckless in complying with the requirements for recovery under it.

What the Trade Credit Insurance Policy required, as conditions to recovery under it, is undisputed. The policy required that credit extended to the Debtor's customers not exceed a "Maximum Tenor"—123 days in the case of American Tissue (and all other US companies).[107] The Debtor could not recover for any loss "caused by or arising from . . . [m]aterial breach of any representation, condition, or covenant of the Insured contained in this policy."[108] Further, the Debtor was required to "take all reasonable steps to avoid or minimize loss,"[109] and the Debtor was specifically prohibited from entering into "any agreement concerning a Qualifying Default or potential Qualifying Default without [Lumbermen's] prior written consent, including any agreement providing for the rescheduling of the payment of debt."[110] Lastly, the policy excluded coverage for payments that were two months or more overdue.[111]

Notwithstanding these requirements, it is also undisputed that in March 2001, Koplik approved an American Tissue request to re-age $4.875 million in receivables, from 60 to 90 days from the date of shipment.[112] It likewise is undisputed that the re-aging extended the credit terms of the receivables owed by American Tissue from 30 to

---

[107]    *See* Pl. Exh. 9.

[108]    *Id.* § III:7.

[109]    *Id.* § IV:3 ("Cooperation").

[110]    *Id.* § IV:3.

[111]    *Id.*

[112]    Pretrial Order ¶ 5.32.

60, and then to 90, days in the first quarter of 2001.[113]  In each case, the Debtor did not

secure the required prior written consent.

Despite the importance of the Trade Credit Insurance Policy (and the just-noted

requirements for recovery under the Trade Credit Insurance Policy, which would be

apparent to anyone reading the policy, or otherwise familiar with its terms), the Officers

had a shocking lack of knowledge of the requirements for recovery under the Trade

Credit Insurance Policy.  Then, lacking knowledge of what needed to be done (and not to

have been done) to recover under the Trade Credit Insurance Policy, the Officers took

measures that were violative of conditions for recovery under the policy.

First, Koplik—though relying on the Trade Credit Insurance Policy as a risk

mitigation tool—had little, if any, understanding of the policy.  At his deposition, when

asked whether he had "any understanding of what the exclusions were from the Trade

insurance policy," he answered "no."[114]  At trial, Koplik admitted that he never read the

policy,[115] and his denials of total ignorance were vague and unpersuasive:

> Q: And isn't it true sir that you never read
> the policy?
>
> A: Yes sir.
>
> Q: Isn't it also true that you did nothing to
> familiarize yourself with the terms of the policy?
>
> A: That's not true.
>
> Q: Well what did you do to familiarize
> yourself with the terms of the policy?

---

[113]    *Id.* ¶ 5.138.

[114]    Trial Tr. 5/14/08 at 193-194 (discussing testimony from Koplik deposition).

[115]    Trial Tr. 5/14/08 at 193-195.

A: I don't recall but I had general
familiarity. I wasn't familiar with obviously the
exclusions but I had an overall familiarity.[116]

Even that was contradicted, in material part, by Koplik's deposition testimony.[117]  But

most important, the exclusions from coverage (with which Koplik "wasn't familiar")

were critical.

Similarly, while Siegel claimed to have some familiarity with the Trade Credit

Insurance Policy,[118] his knowledge of the actual requirements of the policy was, like

Koplik's, seriously inadequate.  Siegel's knowledge was sufficiently minimal that Koplik

didn't look to Siegel for knowledge as to that, looking to Kelly and the departed Stein

instead.[119]

And knowledge Siegel claimed to have was flatly contrary to the terms of the

Trade Credit Insurance Policy.  Siegel believed as "common sense," that the Debtor had

the right to negotiate invoices with American Tissue without written notice to

Lumbermen's,[120] when in fact the policy required as a condition to recovery, as noted

above, that the Debtor not enter into any agreement concerning a default in payment of its

receivables without the insurer's *prior written consent*, including any agreement

---

[116]    Trial Tr. 5/14/08 at 195.

[117]    As stated in Koplik's deposition:

A. No, I was not aware of the—I'm not aware of the specific
terms of the insurance policy.

Q. You were relying upon Mr. Stein and Mr. Kelly to be
familiar with that?

A. Correct.  That's correct.

Koplik Dep. at 117.

[118]    *See* Siegel Dep. at 21-24.

[119]    *See* n.117 *supra*.

[120]    Siegel Dep. at 83.

-28-

providing for the rescheduling of the payment of debt.[121]  Siegel incorrectly characterized
these negotiations with American Tissue as "quality issues" that did not involve
Lumbermen's.  Had he read and understood the policy with any specificity, he would
have known this behavior was violative of its terms.

It is possible that Koplik and Siegel failed to get the required prior written insurer
consent because they were ignorant of the policy requirements that they do so.  Of
course, if they had any meaningful knowledge of the requirements of the policy, their
actions in re-aging the American Tissue receivables, and failing to get Lumbermen's
advance approval to do so, are inexplicable.  Either way, their actions were reckless,
grossly negligent, or both.  These failures were compounded by the Officers' other
failures to comply with requirements for recovery under the Trade Credit Insurance
Policy, as described above and below, as a consequence of which the Court finds serious
breaches of the duty of care.

Of course, if Koplik and Siegel had delegated responsibility for monitoring and
ensuring compliance with requirements under the insurance policy, that would be quite
satisfactory.  But there was no oversight.  Stein originally obtained the policy,[122] and after
Stein left the Debtor, Koplik may have looked to Kelly to ensure compliance.  But Koplik
never took steps to ensure that there was compliance, and, importantly, to coordinate
operational decisions, made by Koplik and Siegel, with basic requirements for recovery
under the policy.  Koplik testified:

---

[121]    Pretrial Order ¶ 5.17 (Trade Credit Insurance policy excluded from coverage sales to American
Tissue when any payment by American Tissue was two or more months overdue); ¶ 5.18 (Debtor
could not enter into any agreement concerning a default in payment of its receivables without the
insurer's prior written consent, including any agreement providing for the rescheduling of
payment of debt).

[122]    Trial Tr. 7/16/08 at 74-75.

> I wouldn't have asked anybody to do something that
> I didn't think was a problem.  I didn't know about
> the problem.  I wasn't aware, couldn't conceive of
> the fact that there were any problems with the
> insurance policy.[123]

Koplik continued later to explain his understanding of the Trade Credit Insurance

Policy:  "[w]here you take out an insurance policy for anything[,] you believe you're

insured for whatever the consequences are.  So that's what I believed."[124]  But that is not,

consistent with the duty of care, a satisfactory approach for protecting a company from

$15 million of risk.

Though Koplik and Siegel do not dispute that they failed to comply with the

Trade Credit Insurance Policy's requirements, they rely on a letter from the Debtor's

insurance broker, Vernon Proll of the insurance brokerage and consulting firm J.A.

Lorenzo and Co. Ltd. ("**Lorenzo**"), to Michael Kelly, in April 2001, which they contend

was a satisfactory substitute for that prior written approval.  The Court disagrees.

The letter, referring to a discussion with Trade Underwriter's Agency (an agent

on behalf of various insurance companies, one of which was Lumbermen's), stated:

> Dear Mike:
>
> Trade Underwriters is in agreement with the
> arrangement for 60 day open account sales
> presented to the bank on the 90th day for payment,
> to be treated for premium calculation purposes as
> 60 day O/A sales.[125]

The Court does not find that to be a satisfactory substitute for compliance, or of a

waiver by the insurer, for several reasons.  First, it was not obtained prior to the actions

---

[123]    Koplik Dep. at 121.

[124]    *Id.* at 122.

[125]    Def. Exh. 24.

-30-

for which approval was necessary, as the policy required.  Second, the letter, on its face, did not make reference to the condition for recovery, or say that the condition was satisfied or waived; in fact, it referred to an agreement with Trade Underwriters for "premium calculation purposes," which was quite different from an agreement with respect to conditions for recovery.  Third, it was executed by the Debtor's agent, not the insurer's; it did not constitute anything in writing executed by the insurer; and to the extent it made reference even to assent by the insurer (or the insurer's agent), was classic hearsay.

Even though Trade Underwriters was Lumbermen's agent and may have had the authority to speak on Lumbermen's behalf,[126] the Court cannot find that the letter evidenced an insurer assent to anything that could obviate compliance with the requirements of the Trade Credit Insurance Policy, or that, assuming *arguendo* that Koplik or Siegel relied on it, any such reliance would have been reasonable.

Very shortly after American Tissue's bankruptcy filing, in September 2001, the Debtor filed a $14.995 million claim under the Trade Credit Insurance Policy.  In November 2001, Lumbermen's disclaimed coverage under the Trade Credit Insurance Policy for six reasons, several of which are relevant here.  Lumbermen's first asserted that it could disclaim the entire amount on the basis that all of the American Tissue invoices submitted to support the Debtor's claim were greater than two months overdue.[127]  And then (and very importantly), Lumbermen's said that the re-aging of American Tissue's receivables letter led to several violations of conditions for recovery

---

[126]        *See* Pl. Exh. 9 § V:6.

[127]        Pl. Exh. 33 at 1-2.

under the Trade Credit Insurance Policy:  a violation of the Debtor's duty not to enter into

any agreements concerning the re-aging of receivables; a violation of the Debtor's duty to

take all reasonable steps to avoid or minimize loss; and a violation of the Debtor's duty

not to make a material false statement (through its nondisclosure of American Tissue's

default as of that date).  Lumbermen's also made reference to the Debtor's failure to

perform credit reviews on American Tissue, and the Debtor's efforts to recover on

receivables from American Tissue affiliates not listed under the policy.[128]

In January 2002, the Debtor's original insurance counsel, Kirkpatrick & Lockhart

("**K&L**"), prepared a detailed analysis of the Debtor's ability to recover under the Trade

Credit Insurance Policy.  Recognizing the many weaknesses in the Debtor's position,

K&L recommended that the Debtor initiate negotiations with Lumbermen's, or if

necessary, try to arbitrate its claim.[129]  K&L noted among other things, that application of

the overdue debtor endorsement (which would exclude from coverage sales to an account

debtor when any payment by that entity was two or more months overdue) would

potentially have the most significant impact on the Debtor's claim—with "even the most

favorable reading" of the endorsement resulting in a reduction of $2.5 million from the

Debtor's $15 million claim, with a less favorable reading of the endorsement resulting in

an additional reduction of $500,000 more.[130]  And if payment in kind (rather than cash)

were determined not to be a valid payment under the policy, application of the overdue

---

[128]     *See* Pl. Exh. 35.

[129]     *Id.* at 67.

[130]     *See id.* at 65-66.

debtor endorsement would reduce the Debtor's claim by approximately $7.9 million instead.[131]

Moreover, an endorsement to the policy identified "**Approved Debtors**" under the policy—entities with respect to whom receivables would be covered. A major portion of the Debtor's claim resulted from losses incurred from sales to American Tissue affiliates that were not Approved Debtors under the policy. Lumbermen's took the position that sales to such entities were not covered under the policy, and if Lumbermen's were to prevail on this defense (which most courts starting with textual analysis of the policy would, in this Court's view, respect, especially considering that an initial reference to the Approved Debtors as "American Tissue and its affiliates and subsidiaries" was later changed to substitute particular companies by name),[132] the Debtor's claim would be reduced further by another $5.4 million.[133]

Then, K&L commented on Lumbermen's assertion that the Debtor had failed to disclose material information relating to the status of its receivables from American Tissue and its subsidiaries. K&L described that defense as "the most potentially devastating defense in [Lumbermen's] arsenal,"[134] and noted that should Lumbermen's prevail on it, the policy would become void, though K&L regarded such an outcome as unlikely. Other Lumbermen's defenses were identified as well.[135]

K&L stated:

---

[131]    *See id.* at 66.

[132]    *See id.* at 86.

[133]    *See id.*

[134]    *See* Pl. Exh. 35 at 66.

[135]    *See id.* at 88-94 (cooperation, adherence to credit practices, failure to minimize loss, reporting requirements, and nondisclosure).

> In short, Kemper [Lumbermen's] has laid out a
> minefield of defenses in opposition to Koplik's [the
> Debtor's] claim. While the odds of avoiding any
> one mine may be greater than 50%, the odds of
> avoiding every mine in the field are necessarily
> lower. On balance, and subject to caveats that
> necessarily arise in light of the limitations affecting
> our examination of the coverage issues, we believe
> that, while Kemper may succeed in reducing the
> amount of Koplik's claim, Koplik is in a reasonably
> strong position to collect a portion of its initial
> claim, in the range of $2-$9.6 million (taking into
> account the applicable deductible and coverage
> percentage).[136]

The Debtor later discovered that it could not even recover the low end of this

range. After arbitration, Lumbermen's ultimately settled the claim for $1.7 million.[137]

Under the circumstances, it is hardly a surprise that the Debtor was able to recover as

little under the Trade Credit Insurance Policy as it did.

###### (d)      *Care in Loans to American Tissue*

Koplik and Siegel likewise showed little care in connection with the loans (as

contrasted to trade credit) to American Tissue. Ultimately the Court finds breaches of the

duty of care with respect to those loans, though that finding is subject to the causation

analysis that follows it.

Loans ranging from $1.7 million in size to $3 million in size (and totaling

$8.5 million in the aggregate) were made without requiring a single promissory note—

much less UCC-1s, mortgages, or other secured financing documents.[138]  Not a single one

---

[136]      Pl. Exh. 35 at 67.

[137]      Pretrial Order ¶ 5.53.

[138]      In May 2001, Koplik and/or Siegel secured written guaranties from Gabayzadeh of American
Tissue's indebtedness.  Pretrial Order ¶ 5.112.  The guaranties were obtained *after* at least much of
the loans to American Tissue were made—having been obtained after, at the least, the loans to

-34-

of these loans was made with written analysis.[139]  At least three of them—Ponderosa,

Keiffer and Shelby Mills—were made overnight or within a very short period of time.

What passed for analysis was Siegel's computations on a scratch pad of the profit he

expected—notes that he discarded after his retirement.[140]  Siegel testified that in

analyzing the profitability of a particular mill transaction:

> one of the methods employed by senior
> management to calculate the potential for gain to
> the Debtor was to make a simple calculation of
> multiplying the number of tons to be sold to the
> Debtor by, and/or purchased by the Debtor from, a
> particular mill by the dollar amount of the projected
> profit per ton.[141]

Siegel further explained that based on the Officers' analysis of the American

Tissue financials and their interaction with American Tissue management, he and Koplik

just believed that American Tissue "was hugely profitable. . . . [and that] Mr. Koplik and

---

American Tissue, through March 2001, in connection with Kimberly Clark, and the April 2001
loan for American Tissue's acquisition of Ponderosa.

When securing the guaranty, Koplik and Siegel did not obtain a then-current financial statement
from Gabayzadeh.  Instead, in an "analysis" that the Court finds to be shockingly deficient, Siegel
testified that he relied on a financial statement from 1997 (four years before the guaranty was
obtained); considered that Gabayzadeh was a 50% owner of American Tissue; and then considered
changes in American Tissue's reported shareholders' equity from 1997 to 2001, adding half of the
increase to compute Gabayzadeh's net worth.  Trial Tr. 7/17/08 at 104.  The Court saw no
evidence of consideration of anything else, especially Gabayzadeh's other assets and liabilities.
When in December 2001, 7 months later, the Trustee sought to recover $27 million in American
Tissue indebtedness under the guaranties, he discovered that creditors with claims of
approximately $60 million already had liens on Gabayzadeh's assets.  *See* Trial Tr. 2/28/08 at 130.
Neither side introduced evidence from which the Court could determine the extent to which the
liens on Gabayzadeh's assets existed when the guaranties were obtained, or earlier credit was
extended.  As with many of the other matters where Koplik and Siegel testified that they engaged
in analysis, no notes, memoranda or calculations as to this could be found in the Debtor's files.

[139]    Likewise, though all of the loans made by the Debtor would have to be regarded as out of the
ordinary course, and would at least seemingly require Board of Directors approval, the Debtor's
Board, consisting of Koplik and Siegel, did not function, and the loans all were implemented
without Board resolutions or other Board consideration.

[140]    Trial Tr. 7/16/08 at 69-70; Trial Tr. 7/16/08 at 135. *See also* n.48 *supra*.

[141]    Siegel Aff. ¶ 46.

I were pursuing the opportunities to grow the Debtor's business."[142]  But Koplik and Siegel conceded that they did not engage in even that much analysis with respect to at least some of the loans.[143]  As with the trade credit, there was no document in the Debtor's files substantiating any level of credit evaluation with respect to any of the loans made to American Tissue.

Though the Court's conclusions turn on other factors as well, the Court believes that the lack of any paper trail evidencing any credit evaluation or other thinking in advancing the credit is significant.  The Court accepts the testimony of Trustee expert William Guth:

> The fact that none of these transactions were documented means that we don't know what happened for sure, but it implies that there was not serious study of the creditworthiness of these particular individuals and their ability to repay. There wasn't the—lack of documentation is only important in the sense that to follow up and make sure that there is some appropriate follow  up to the terms of the deal, it would seem to me you normally have to have some documentation to make sure that the transaction doesn't get befuddled by people's poor memories and their self-interest.[144]

By reason of the haste by which the loans to American Tissue were made, the failure to obtain basic documentation, and the lack of focused credit analysis (even to the

---

[142]    *Id.* ¶ 47.

[143]    As Koplik testified:

> Q:  . . . Is it your testimony Mr. Koplik that with each of the non-trade extensions of credit that members of management discussed, assessed and concluded that the profit potential justified the risk?
>
> A: I would say as to most.  I don't believe it's accurate to say as to each.

Trial Tr. 5/14/08 at 170-171.  Siegel testified similarly.  Trial Tr. 7/16/08 at 61.

[144]    Trial Tr. 4/16/08 at 188.

point that no written evidence of any evaluation could be found), the Court finds (as a mixed question of fact and law, in light of the legal discussion that follows), breaches of the duty of care with respect to the American Tissue loans.

(e)    *Documentation of Transactions*

Surprisingly, in connection with none of the loans or advances to American Tissue did Koplik or Siegel obtain promissory notes.  Nor did they take any steps to obtain UCC-1s, mortgages, or other means to make those loans on a secured basis, which could have given the Debtor priority over other American Tissue Creditors.

However, the Court is not in a position to find that the failure to obtain promissory notes caused the Debtor's loss; the Debtor's problem resulted from an inability of American Tissue to pay its indebtedness back, rather than the Debtor's inability to prove the existence of the debt or to present a negotiable instrument to collect upon it.  And while the failure to lend on a secured basis was unwise in retrospect, it cannot be found to be as serious a departure from prudent practices as the other failures in connection with the loans.

(f)    *Corporate Governance Matters*

Koplik and Siegel met on a daily basis to discuss the business of the Debtor, including the advances made to American Tissue.[145]  But the Debtor's Board of Directors, which consisted of Koplik and Siegel, did not hold meetings or the equivalent to consider whether to approve the various non-trade extensions, advances, loans and/or other financial accommodations for the benefit of American Tissue.[146]  In fact, from

---

[145]    Trial Tr. 7/17/08 at 99.

[146]    Pretrial Order ¶ 5.64; Trial Tr. 7/17/08 at 49.

August 1999 through October 2001, there were no written minutes of meetings of the Debtor's Board,[147] if indeed there were any meetings of the Board at all.

The Court also heard evidence, and finds, that the Debtor's Board had no other directors—nor, of course, any independent directors.

The Court does not need to determine whether the failure of a closely held corporation of this type to have a functioning Board—which presumably would have considered the non-trade extensions of credit here—would evidence a failure to exercise the duty of care. Thus the Court makes no finding in this regard. The Court assumes, without deciding, that extensions of non-trade credit of the character that were made here were out of the ordinary course and would at least normally require Board approval. But if Koplik and Siegel, as officers, had met their duty of care, the presence of a functioning Board would make no difference. And if they didn't do so, the presence of a functioning Board likewise would make no difference if, as happened here, the matter weren't brought to the Board. While it is very possible that the presence of a functioning Board would in general impose greater discipline on officers considering whether to enter into out of the ordinary course transactions, and require them to exercise greater care, at least under the facts here such a conclusion would be speculative.

*(g) Reliance on American Tissue Bond Offering*

In an approach that the Court does not find to be improper per se, Koplik and Siegel placed heavy reliance, when granting credit to American Tissue, on American Tissue's ability to pay the Debtor back with the proceeds of American Tissue's proposed $400 million bond offering. But they did not analyze the bond offering documents—

---

[147]      Pretrial Order ¶ 5.65; Mandarino Aff. ¶ 7.

even the final prospectus for the offering.[148]  Nor did they communicate with American

Tissue's underwriters.[149]  Instead, they relied heavily on updates on the progress of the

bond offering from American Tissue management, and on assumptions that American

Tissue's underwriters and an American Tissue lender were engaging in the necessary due

diligence.

      The public offering did not take place.

      Though the Court does not find reliance on the bond offering to be violative of the

duty of care, it finds the failure of care associated with that reliance to have been

negligent.  However, the Trustee failed to meet his burden of proof that the omissions this

Court has found caused the Debtor's loss.  There is no explanation for the reason for that

in the record other than hearsay—Koplik's testimony that the offering failed to take place

because of Gabayzadeh's refusal to accept a higher interest rate than was originally

proposed and reduced bond proceeds of $325 million.[150]  And there is insufficient basis

in the record for the Court to find that if Koplik and/or Siegel had reviewed the offering

prospectus and American Tissue's financials (which we now know to be fraudulent), or

had consulted with American Tissue's underwriters or lender, anything would be

different.

---

[148]    Trial Tr. 5/14/08 at 186; Trial Tr. 7/16/08 at 154.  *See generally* Def. Exh. 34.  Siegel had previously reviewed an earlier version of the prospectus.  But the version he reviewed did not contain figures in its financial statement sections, Trial Tr. 7/17/08 at 116-117—one of the most important parts of the prospectus.

[149]    *See, e.g.*, Koplik Dep. at 303.

[150]    Koplik Aff. ¶ 22.

-39-

*(h) Failures to Consult Professionals*

Koplik consulted with the Debtor's outside counsel, Paul Weiss, with respect to the Revolver, the Forbearance Agreement, and their respective amendments.[151]  But neither he nor anyone else at the Debtor sought advice from any professionals—legal, financial, or otherwise—with respect to any of the transactions that ultimately caused the Debtor's losses.

More specifically, Debtor personnel did not seek the advice of professionals with respect to the Debtor's transactions with respect to: Kimberly Clark; the re-aging of American Tissue's receivables in March of 2001; Ponderosa Paper Mill; Keiffer Paper Mills; Shelby Tissue Mills; the arrangements under which Debtor customer Asia Pulp redirected its payable to the Debtor to advance funds to American Tissue to facilitate the latter in making the $10.5 million interest payment; the Debtor's partnership agreement with Linden Trading to provide funding in connection with Boise Cascade's Oregon mill; Ampad; forgiveness of the Siegel loan; and American Tissue's proposed $400 million bond offering.[152]

*(i) Violations of the Revolver*

The Debtor violated covenants under Revolver repeatedly.  The Court finds that Koplik and Siegel knowingly did so.[153]

---

[151]     The Debtor also engaged Paul Weiss in connection with the preparation of required Board resolutions (and/or consents) for the Debtor's entry into the Revolver, and Revolver amendments. But the Debtor did not seek the advice of Paul Weiss concerning the notice requirements and violations of the Revolver.  Borisoff Aff. ¶ 7.

[152]     Pretrial Order ¶ 5.51.

[153]     The Debtor had a credit department, whose manager, Kelly, realized that the some of the proposed transactions were in violation of provisions of the Revolver.  The Officers acknowledged Kelly's comments in this regard, and, they say, deliberated and decided that the risk of failing to assist American Tissue was greater than the risk of losing the Revolver.  Siegel Aff. ¶ 42.  In making these decisions, the Officers relied on rudimentary calculations.  *Id.* ¶ 46.  In addition to these

-40-

In November 2001 (about two months after the filing of the American Tissue bankruptcy and three months before the filing of the Debtor's), the Debtor entered into a forbearance agreement with Fleet Bank and its other lenders.[154]  In that agreement, the Debtor, along with its affiliate Koplik Anticosti, LLC, acknowledged defaults under the Revolver[155] including, but not limited to:[156]

    (a)    breach of representations and warranties under sections 4.05 (material adverse change), 4.11 (no material misstatements), 4.15 (use of proceeds), and 4.17 (solvency);[157]

    (b)    failing to make a mandatory prepayment that had been required on October 12, 2001, pursuant to Section 2.09 (c)(1) of the Revolver;[158]

    (c)    incurring indebtedness in breach of section 7.03 of the Revolver, which placed strict limitations on the Debtor's borrowing ability;[159]

    (d)    advancing funds to American Tissue in connection with transactions with Kimberly Clark;[160]

---

calculations, the Officers say that they relied on their substantial experience in the paper industry, and, in Siegel's case, on his previous experience in public accounting.  But how any of this could justify so many knowing violations of requirements of the Debtor's basic source of liquidity is a mystery to this Court.  The Court accepts the Officers' testimony in this respect as truthful, but so lacking in any real foundation that it finds that reliance on these matters was not a reasonable basis for disregarding requirements under the Revolver.

[154]    This agreement was amended in December 2001.

[155]    Pretrial Order ¶ 5.22; Pl. Exh. 7.

[156]    Pl. Exh. 7 § 2.4; Pl. Exh. 5.

[157]    Pretrial Order ¶ 5.23; Pl. Exh. 7 § 2.4(c)(i).

[158]    Pretrial Order ¶ 5.24; Pl. Exh. 7 § 2.4(c)(ii).

[159]    Pretrial Order ¶ 5.25; Pl. Exh. 7 § 2.4(c)(v).

[160]    Pl. Exh. 7 § 2.4(c) and Schedule 2.4(c).

(e)    advancing funds to American Tissue in connection with American Tissue's acquisition of Ponderosa's facility;[161]

(f)    advancing funds to American Tissue in connection with American Tissue's acquisition of the Keiffer facilities in Indiana;[162]

(g)    advancing funds to American Tissue in connection with American Tissue's acquisition of the Shelby Mills facility;[163] and

(h)    causing Asia Pulp and Paper to advance funds to American Tissue to facilitate the latter in making the $10.5 million interest payment.[164]

Koplik and Siegel were aware, as early as January 2001, that the non-trade loans to American Tissue were violations of provisions of the Revolver.[165] Kelly recognized the defaults under the Revolver and brought them to the attention of Koplik and Siegel (each of whom had little knowledge of the Revolver's terms) in January through April of 2001.[166] With respect to this, Siegel testified:

> The main result of those discussions was that even if it is in default our belief was and still is that it would have been easier to get a new bank if we had a problem with Fleet than it would be to find a new customer the size and profitability of American Tissue in it's rolled up [sic] condition.[167]

---

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] Pl. Exh. 7 § 2.4(c) and Schedule 2.4(c).

[165] Def. Kelly Aff. ¶ 7.

[166] *Id.*

[167] Trial Tr. 7/16/08 at 83.

-42-

The Court finds this testimony shocking, and wholly unpersuasive insofar as it might be argued to support an exercise of business judgment—especially in the absence of any documentation of the thought processes by which, if Siegel were to be believed, he and Koplik thought they could get a new lender after intentional defaults with Fleet, and would jeopardize the Debtor's critical liquidity, of which the Revolver was the only source, in pursuit of incremental sales gains.

These many matters, especially collectively, cause the Court to find dreadful management and irresponsibility with respect to the Revolver—a revolver which was essential to the Debtor's liquidity. The Court finds further that this conduct was, at the least reckless, and was knowing with respect to the underlying acts that were undertaken (though not necessarily knowing in focusing on the consequences).

But as a consequence of the Bank's willingness to forbear (at a price) in exercising its rights, the Debtor did not suffer the immediate loss of its financing or truly draconian consequences that would otherwise have occurred. In exchange for the Bank's forbearance under the agreement, the Debtor agreed to repay its obligations on an accelerated scheduled basis (accelerating repayment of the bank debt to $500,000 per day), and, in addition, to pay higher interest rates and a forbearance fee.[168] But the Bank did not pull the plug on the Debtor's financing.

The Trustee did not sue separately for, or introduce evidence of, the incremental costs to the Debtor (*e.g.*, the higher interest rates and forbearance fee) resulting from the violations of terms of the Revolver—focusing instead on the presumably much larger sums that the Debtor lost as a consequence of the American Tissue and other

---

[168]    Pl. Exh. 7.

transactions.  Thus the Court is not in a position to make findings or award damages for

any additional losses resulting from this conduct.

> (j)  *Summary of Findings on Alleged Failures of
> Duty of Care with Respect to American Tissue*

Of the many alleged deficiencies with respect to the Officers' dealings with

American Tissue, some evidence the lack of care associated with the loans and to a

greater or lesser extent caused or aggravated the Debtor's losses, but others cannot be

said to have been required, or to have ultimately made a difference.  The latter concern—

whether deficiencies made a difference—are addressed in Section 10, captioned

"Causation," below.[169]

With respect to the alleged deficiencies, the Court finds, for the reasons discussed

above and below:

(1) No promissory notes were prepared evidencing approximately

$8.5 million in loans.[170]

(2) Koplik and Siegel did not seek the advice of counsel with

respect to the loans or the trade credit.[171]

---

[169]    *See* page 83 below.

[170]    This is dramatic evidence of the marked lack of care with which Koplik made the $8.5 million in loans.  But it ultimately is not as significant as it otherwise might seem, because the Debtor's inability to collect resulted not from a failure to evidence the borrowing, but because American Tissue couldn't pay the indebtedness back.

[171]    Borisoff Aff. ¶ 3.  The Court's reaction to this is similar.  It is evidence of the lack of care with which Koplik made the loans, but likewise is not as significant as it otherwise might seem.  As a general rule, lawyers provide legal, not business, advice.  While lawyers sometimes provide useful business advice as well, the Court is not of the mind to hold that a failure to consult lawyers on the wisdom of a business matter, without a showing as to why that was necessary, evidences a failure to exercise due care.

-44-

(3) Koplik and Siegel did not seek the advice of the Debtor's

outside accountants, Arthur Andersen, with respect to any of the

transactions, either in analysis of American Tissue or otherwise.[172]

(4) No formal Board of Directors' meetings were held, nor were

any minutes of director action prepared, to consider approval of any of the

Debtor's various extensions of credit to American Tissue, including,

especially, the non-trade credit loans.[173]

(5) Koplik and Siegel did not conduct *any* internal due diligence or

financial analysis with respect to the American Tissue transactions. They

engaged in no objective decision-making process. They did not ask Kelly

to analyze any of American Tissue's financial statements (or financial

statements of Gabayzadeh, who was a guarantor), and Kelly did not do so.

The Debtor's records contained no document substantiating any level of

credit evaluation with respect to the American Tissue transactions, or any

type of financial analysis with respect to American Tissue's financials, or

American Tissue's financial wherewithal. [174]

---

[172]    Pretrial Order ¶ 5.51. Of course, the Court does not know the terms of Arthur Andersen's engagement (with neither side having introduced evidence as to this), and in particular does not know the extent, if any, to which Arthur Andersen was engaged to provide business advice, as contrasted to auditing services. As with the failure to consult counsel, the Court is not of the mind to hold that a failure to consult the company's outside accountants on the wisdom of a business matter, without a showing as to why that was necessary, evidences a failure to exercise due care.

[173]    Pretrial Order ¶ 5.64. As discussed below, while the Court concludes that fiduciary duties exist for large corporations and closely held corporations alike, the Court recognizes differences in the ways by which closely held corporations tend to operate. The Court does not find the failure to hold formal meetings, or to maintain appropriate minutes, to be the critical deficiency; it is, rather, the failure to engage in any meaningful analytical process prior to these massive extensions of credit.

[174]    Pl. Kelly Aff. ¶ 14; Mandarino Aff. ¶ 7; Kasoff Aff. ¶¶ 22, 44. This is far more significant than the three preceding findings. Officers and directors can meet their responsibilities in many

(6) Koplik made the non-trade extensions of credit when he knew or should have known that the terms of the Revolver prohibited the non-trade extensions of credit.[175]

(7) Though Koplik knew or if not negligent would have known that the terms of the Revolver prohibited the non-trade extensions of credit, and that breaches of the Revolver would risk the Debtor's critical liquidity, he likewise failed to seek the advice of counsel before taking acts that would be breaches of the Revolver.[176]

(8) Koplik never advised Arthur Andersen, when Arthur Andersen was engaging in its audit of the Debtor, of the true nature of the receivables from American Tissue, or the approximately $8.5 million in non-trade advances to American Tissue. And Koplik executed a management representation letter, addressed to Arthur Andersen, saying in substance, among other things, that there were no material transactions that had not been properly reported.[177]

---

different ways, and the failure to do any one of them can hardly be regarded as conclusive. (Thus, while the Court finds, as the Trustee argued, that the Debtor had no written credit manuals, that is insufficient to find, or buttress, a breach of the duty of care.) But here there was no reasoned analysis at all. Of all of the Court's factual findings as to the Officers' failure to exercise the duty of care, this is the most important.

[175]    *See* Trial Tr. 5/14/08 at 193 for his knowledge. Here, too, however, while this is also evidence of the lack of care with which Koplik made the loans, the Debtor's losses resulted from American Tissue's failure to pay back the debt owed, rather than any acts by the Bank. The violations of provisions under the Revolver cannot be found to have caused the Debtor's loss.

[176]    *See* n.171 *supra*.

[177]    Pl. Kelly Aff. ¶ 10. If inadvertent (though the Court has trouble seeing how it could be), this too evidences, at the least, a gross lack of care. If knowing, of course, it would be much worse. But the Court does not need to make an express finding as to this, because the false statements to Arthur Andersen cannot be found to have caused the Debtor's loss.

-46-

5.     *American Tissue's Bankruptcy & Criminal Cases*

American Tissue's proposed bond issue of $400 million dollars failed in the summer of 2001.[178]  On September 10, 2001, American Tissue filed its own petition for relief under the Bankruptcy Code,[179] in Delaware,[180] initially under chapter 11.[181] The case later was converted to chapter 7 on April 22, 2004.

In October 2001, a creditor of American Tissue uncovered a massive fraud at American Tissue.  Gabayzadeh and Stein were charged with inflating American Tissue's revenues and earnings by improperly capitalizing expenses as assets, overvaluing the company's inventory, and creating phony revenue and accounts receivable—thereby inducing American Tissue's lenders to continue to extend credit when American Tissue was no longer creditworthy.

Stein pleaded guilty, and Gabayzadeh was convicted and sentenced to imprisonment for bank and securities fraud, and conspiracy.  But there is nothing in the record to suggest that either Koplik or Siegel knew of the fraud.  And though the question is close (because Koplik and Siegel were aware of American Tissue's bounced checks, difficulty in making payroll, late payments, and lack of liquidity, and yet could see that American Tissue was still reporting profits), the Court cannot quite find that they were negligent in failing to discover the fraud.  While fraud is a possible explanation for financials showing profits while bouncing checks and making late payments, and having a lack of liquidity, it is not the only explanation.  Nor is fraud so likely that it screams out

---

[178]     Flicker Aff. ¶ 3.

[179]     Pretrial Order ¶ 5.52.

[180]     No. 01-10370-KG (Bankr. D. Del., petition filed 9/10/01).

[181]     *See id.*

for further inquiry.  And there is nothing in the record to suggest that the fraud was

discovered by UBS, which, at roughly the same time, presumably was undertaking due

diligence in connection with its underwriting of the bond offering.

Thus the Court finds that Koplik (and to the extent he was involved, Siegel) failed

to exercise due care in extending the non-trade credit to American Tissue.  And the Court

further finds that Koplik and Siegel failed to exercise due care in maintaining compliance

with the conditions to recovery under the Trade Credit Insurance Policy that protected so

much of the American Tissue trade credit that the Debtor provided.  But the Court cannot

and does not find that Koplik and Siegel were negligent or otherwise displayed violations

of the duty of care in failing to discover fraud at American Tissue before that fraud was

later revealed.

6.      *The Debtor's Bankruptcy Filing*

American Tissue's bankruptcy had a substantial impact on the Debtor.  In October

2001, the Debtor retained Realization Services Inc. ("**Realization Services**," sometimes

referred to in documents and the Pretrial Order as "**RSI**," and RSI employee Barry

Kasoff) to assist the Debtor in, among other things, (i) improving operating and financial

controls and accounts receivable collections; (ii) reducing expenses; and (iii) formulating

a way to repay the Debtor's secured and unsecured creditors.[182]  But Realization Services

spent the first three days of its employment analyzing the Debtor's working capital

requirements to determine if the Debtor could continue as a going concern—and

---

[182]      Pretrial Order ¶ 5.20.

Realization Services concluded by October 28, 2001 that a reorganization of the Debtor would be unlikely.[183]

On November 2, 2001, the Debtor's Board of Directors, with the advice of Realization Services, approved a plan providing for an out of court liquidation of the Debtor's assets.[184]  On November 9, 2001, the Bank notified the Debtor in writing that it was in default of the Revolver, citing the Debtor's exposure to American Tissue and the Debtor's default with respect to many covenants under the Revolver.[185]

In March 2002, four of the Debtor's creditors filed an involuntary petition under chapter 7 of the Bankruptcy Code.  Soon thereafter, creditors sought the appointment of an interim trustee, on the ground that the Debtor had been mismanaged while conducting its operations.  Thereafter, the case was converted from chapter 7 to chapter 11, and a reorganization plan (for a controlled liquidation) for the Debtor was thereafter confirmed. Under the Plan, Michael Fox was appointed as Litigation Trustee, charged with bringing litigation on behalf of the Debtor's estate.

7.      *The Transactions with Entities Other Than American Tissue*

(a)      *Willendra*

The Debtor engaged in two transactions with one Sam Willendra ("**Willendra**") and his company, International Supply and Agency, Ltd. ("**International Supply**"), in Indonesia, between 1995 and 2001.  While the record is not fully developed as to the specifics of the first of them, back in 1995, it appears that the Debtor would occasionally

---

[183]      Kasoff Aff. ¶ 69.

[184]      Pretrial Order ¶ 5.54.

[185]      *Id.* ¶ 5.79.

-49-

enter into "projects to build or rebuild paper machines"[186] abroad with International Supply.

One of these projects went "bad" in 1995, and Willendra accepted full responsibility for the loss. The buyer had to be reimbursed $2.2 million, but Willendra advised that he did not have the means to compensate the buyer. Debtor personnel agreed to, and did, pay that $2.2 million, with the understanding that Willendra would eventually pay the Debtor for that $2.2 million from "profits of future jobs."[187] At the insistence of the Debtor's outside auditor, Arthur Andersen, the Debtor wrote off this $2.2 million asset in 1999,[188] but it is undisputed, at least between the Trustee and the Officers, that after this time, Willendra still owed the money.

In the period from 1997 to 1999, Willendra discovered an opportunity that he and Debtor personnel believed would generate "substantial" profits, and allow him to pay back the debt he owed to the Debtor. The opportunity called for the dismantling of a paper machine in Finland, shipping it to Indonesia, and rebuilding and refurbishing it for an Indonesian customer, PT Citra Hutama Kertasindo ("**Kertasindo**"), which was also in the paper milling business and wanted to purchase second-hand paper mill machines and equipment. The contract provided that the Debtor would finance the purchase, on the condition that Kertasindo obtain a letter of credit backing up Kertasindo's payment obligations.

---

[186]      Def. Exh. 58.

[187]      *Id.* No attempts were made by Debtor personnel to sue for or otherwise collect that sum, Trial Tr. 7/17/08 at 28, but the Court heard no evidence that Willendra had the means to pay it.

[188]      Trial Tr. 7/17/08 at 33 (Siegel Testimony).

Kertasindo's payment obligations were thus backed up by a January 1999 letter of credit in the approximate amount of $5.3 million, in favor of the Debtor, from Bank Mandiri, an Indonesian bank.[189]  The letter of credit provided for payment upon presentation of documentation confirming delivery of the machine and equipment.[190]

However, Bank Mandiri failed to pay under the letter of credit.  Upon advice of counsel, the Debtor sued Bank Mandiri to recover under the letter of credit, first in Indonesia and then in an adversary proceeding in this Court.[191]

Under Indonesian law, proceedings in that country by a New York corporation required prosecution by a person or entity with the authority to participate in Indonesian courts.  The Debtor gave Willendra power of attorney to prosecute the suit in Indonesia.[192]

In 2000 and 2001, the Debtor advanced to Willendra an additional $939,481 as part of its efforts to recover on the letter of credit.[193]  The advances by the Debtor were to finance the lawsuit, pay for inventory parts, and to "help [Willendra] to live."[194]  The advances were neither repaid nor documented.[195]  There were no written analyses or any written projections concerning the advances to Willendra in the Debtor's files.

---

[189]    Def. Exh. 59 at 3.

[190]    *Id.*

[191]    *See Fox v. Bank Mandiri (In re Perry H. Koplik & Sons, Inc.)*, 357 B.R. 231 (Bankr. S.D.N.Y. 2006) (the "**Comity Decision**") (denying Bank Mandiri's motion to dismiss).

[192]    Trial Tr. 7/17/08 at 28-29; *Comity Decision*, 357 B.R. at 236 & n.2.

[193]    Kasoff Aff. ¶ 50.

[194]    Trial Tr. 7/17/08 at 30-33.  Siegel testified that the living costs totaled $100,000, and in the absence of any evidence to the contrary, the Court accepts that as true.

[195]    Kasoff Aff. ¶ 50.

-51-

The Court finds as a fact that these expenditures were nevertheless a reasonable exercise of business judgment. The Debtor's claim against Bank Mandiri was, at the least, a very strong one. When the merits of the suit were considered, the Debtor won once in the trial court, and then again in the Indonesian Supreme Court, until a decision by the latter was vacated, under circumstances that might appear strange to those accustomed to the U.S. legal system.[196] In the action here, this Court found issues of fact as to whether it should grant comity to the Indonesian judgment after, among other things, the Debtor's counsel here introduced a U.S. State Department report detailing corruption in the Indonesian judiciary.[197]

---

[196]    As described in the *Comity Decision*, the Indonesian District Court of Surabaya, where the Debtor first filed suit, ruled that the Letter of Credit was binding, and ordered Bank Mandiri to pay Koplik the $5.3 million. Bank Mandiri then appealed to the Indonesian High Court (an intermediate appellate court), which, on September 11, 2000, "cancelled" the District Court's decision. The Debtor then appealed the High Court's decision to the Indonesian Supreme Court, Indonesia's highest court. In a decision dated May 30, 2002 (the "***First Indonesia Supreme Court Decision***"), the Indonesia Supreme Court reinstated the District Court's decision, enforcing the Letter of Credit.

By a procedure that was not clear to this Court when it issued the *Comity Decision* (and still isn't), Bank Mandiri then obtained further review by the Indonesia Supreme Court of the First Indonesia Supreme Court Decision. In a decision dated September 29, 2003 (the "***Second Indonesia Supreme Court Decision***"), the Indonesia Supreme Court vacated its earlier decision enforcing the Letter of Credit, on the stated ground that the power of attorney that the Debtor had issued to permit Willendra to sue had not been satisfactorily "legalized." The power of attorney had to be acknowledged before a notary, and the Debtor had done so. But the acknowledgment of the power of attorney was lacking a second level of authentication, to be issued by the Indonesian Consul in New York.

The failure to provide this second level of authentication—similar or identical to what New York practitioners refer to colloquially as a "notarial flag," which would attest to the fact that the notary was, in fact, a notary—resulted in Koplik's inability to recover on a $5.3 million letter of credit that the Indonesia Supreme Court had just ruled, in the First Indonesia Supreme Court Decision, should be enforced.

*See* 357 B.R. at 235-36 & n.2.

[197]    *See id.* at 239-241. The Debtor's U.S. counsel also offered 12 newspaper articles detailing corruption in the Indonesian judiciary, which this Court was compelled to exclude as inadmissible hearsay. *See id.* at 239-240 & nn.11, 12. *See also Gryphon Domestic VI, LLC v. APP Intern. Finance Co., B.V.*, 41 A.D. 3d 25, 37, 38, 836 N.Y.S.2d 4, 9, 9-10 (1st Dep't 2007) (unwilling to be bound by an Indonesian decree procured by an Indonesian corporation absolving it from the duty to make payment on its bonds, commenting on the "extensive" materials that had been submitted evidencing corruption in the Indonesian legal system).

Ultimately, the Debtor recovered $2 million in 2010 in a settlement with respect to the letter of credit.[198]  The Court is unwilling to find fault on the part of Koplik or Siegel for the steps they took—including financing Willendra's efforts, to the extent of $900,000—in trying to recover that $5.3 million sum.

   *(b)    Samoa*

In or about 2000, the Debtor sought to invest in Samoa Pacific Cellulose, LLC ("**Samoa**") in connection with a pulp mill that produced chlorine-free tissue primarily used in Europe.  In July 2000, the Debtor and Samoa entered into an exclusive sales representative agreement for a five-year term to commence on the date of the closing of the Debtor's investment in Samoa.  The next day, the Debtor extended a $250,000 loan to Samoa Pacific Acquisition Corp. (the investor group), to fund the completion of due diligence in connection with the investment in Samoa.[199]  Koplik and Siegel did not obtain a written waiver from the Bank with respect to this $250,000.[200]

In or about mid-February 2001, the closing of the Samoa investment occurred. As part of the Samoa closing, the Debtor wired $4.55 million to Samoa including the Debtor's own investment of $1.775 million, additional loan funding in the amount of $900,000 (as a result of the withdrawal of some other investors), and $1.875 million representing the investment of Delfinet, a European customer of the Debtor that was a participant in the deal.  At the time of the Samoa closing, the Debtor received Samoa units, which it accounted for on its books.  The Debtor accounted for the Samoa

---

[198]    *See* Amended Stipulation and Order of Dismissal with Prejudice at Adversary Proceeding Docket 05-01136, ECF# 102.  Plaintiff represented that the settlement was for $2 million in its Proposed Findings of Fact, ¶ 202.

[199]    Pretrial Order ¶ 5.41.

[200]    Trial Tr. 7/17/08 at 24.

-53-

transaction on its books and records by recording a $1,775,000 investment in the Samoa units and a $900,000 loan receivable. Once more, the Debtor never obtained a consent or amendment under the Revolver to permit the $900,000 loan.[201]

In November 2001, the Debtor reached a settlement with Samoa concerning claims Samoa asserted against the Debtor for overdue accounts receivable. The settlement resulted in the return of approximately $3.33 million of consignment inventory to Samoa, which was in satisfaction of approximately $9 million debt.[202]

Then, in December of 2001, Samoa notified the Debtor of its intention to cancel the sales representation agreement that had been entered into in July, only seven months earlier. The Debtor then demanded the return of its $1,775,000 investment in Samoa, and the repayment of the additional $900,000 that the Debtor had provided at the closing.[203] Samoa, by its counsel, disputed that those amounts were owing to the Debtor—claiming, among other things, that the $900,000 was just an increase of its initial capital investment.[204]

The Trustee contends that the transaction with Samoa violated the Revolver, and generated a loss to the Debtor.[205] The Court agrees.[206] But as with many other of the knowing violations of requirements of the Revolver, the Bank did not take action by pulling the plug on its financing. Thus, as shocking as these and the other knowing violations of the Revolver were, they caused no incremental loss.

---

[201]    Pretrial Order ¶ 5.41; Kasoff Aff. ¶ 52; Trial Tr. 7/17/08 at 24.

[202]    Pretrial Order ¶ 5.55; Kasoff Aff. ¶ 53.

[203]    Pl. Exh. 37.

[204]    Pretrial Order ¶ 5.43; Kasoff Aff. ¶¶ 54-55.

[205]    The Trustee thus seeks damages of $2.675 million with respect to the Samoa transaction.

[206]    *See* Kasoff Aff. ¶ 55; Mandarino Aff. ¶ 9.

The real issue is with respect to the losses (proven, to the Court's satisfaction to be $2.675 million) that the Debtor did suffer as a consequence of the Officers' dealings with Samoa—and whether, under the standards described below, the Officers' conduct in considering and entering into the Samoa transaction so far diverged from acceptable business practices as to be violative of the duty of care.

The Court fails to see lapses here of such materiality to be significant. The Trustee has failed to meet his burden of proof to show violations of the duty of care with respect to the Samoa transaction.

### (c) *Liberty Umbrella*

Liberty Umbrella was owned by Koplik's cousin, Burt Biderman, and his wife.[207] It made umbrellas, ponchos, rain hats, and other premium items, and also distributed polo shirts, golf hats, and similar items.[208] It was used as the Debtor's principal supplier of promotional materials, with an association going back to at least 1984.[209]

Before 2000, the Debtor had extended a loan or a series of loans to Liberty Umbrella. In 2000, the outstanding amount of the loan was $175,000, although in the past the outstanding debt was as much as $420,000.[210] During the period 2000 through 2001, Liberty Umbrella experienced serious liquidity problems and was at risk of declaring bankruptcy. The loans in 2001 totaled $135,000, and their outstanding balance

---

[207]    Pretrial Order ¶ 5.134.

[208]    Koplik Aff. ¶ 39.

[209]    *Id.*

[210]    *Id.* ¶¶ 39 and 41.

was $397,000 by December 31, 2001.[211]  The loans to Liberty Umbrella were authorized

by Koplik, not Siegel.[212]

The Litigation Trustee eventually collected all but $52,494 of the outstanding

Liberty Umbrella debt.[213]

Though the Debtor's loans to Liberty Umbrella were made with the advice of

counsel[214] and Koplik employed some risk reducing mechanisms,[215] the Court finds the

Liberty Umbrella loans to be violative of Koplik's duties of loyalty and care.  The only

explanation proffered for why these loans were made to a promotions company was

because Koplik wanted to ensure a supply of promotional material for which the Debtor

may have obtained some favorable pricing.[216]  Koplik never conducted a serious search

for another competing promotions company because the Debtor was "being taken care of

very well by Liberty Umbrella."[217]

But there is nothing in the record corroborating the asserted favorable pricing

offered by Liberty, or explaining why promotions were particularly important for a

business-to-business paper intermediary such as the Debtor.  Though Koplik states that

he believed that it was important for Liberty Umbrella to remain in business to ensure

---

[211]    *Id.* ¶¶ 41-44; Def. Exh. 64.

[212]    Siegel did not know about the loans to Liberty Umbrella until after they were made.  Trial Tr. 7/16/08 at 23-24.

[213]    Mandarino Aff. ¶ 9.

[214]    Def. Exhs. 66, 73, and 76.

[215]    He secured financing statements in connection with certain of the loans, Def. Exhs 69 and 73, a note from Biderman in the amount of $50,000, Def. Exh. 75, and guaranties from Biderman with respect to $87,500 of the indebtedness.

[216]    Koplik Aff. ¶ 40.

[217]    Trial Tr. 5/15/08 at 87.

repayment of the loans that the Debtor had made in prior years,[218] the Court can find no satisfactory explanation, consistent with the duties of loyalty and care, for entering into the transactions in the first place, and cannot find due care in focusing on whether continued loans to Liberty Umbrella were warranted in light of the risk-reward ratio when Liberty Umbrella was nearing bankruptcy.

The inference is compelling, and the Court finds, that neither the transactions with Liberty Umbrella, nor, especially, the loans to it, were necessary or desirable for the Debtor's business, and that Koplik gambled with the Debtor's money, at the ultimate risk of the Debtors' creditors, to help a family member. The Debtor is fortunate that the losses resulting from this activity were as little as $52,494. The Court finds violations of the duties of loyalty and of care with respect to the Liberty Umbrella transactions, for which Koplik must be held to be responsible.

9.      *The Self-Dealing Transactions*

Amazingly, after the Debtor was already in bankruptcy, Koplik and Siegel authorized, or caused to be authorized, the forgiveness of loans each of them owed to the Debtor. Details as to the loan forgiveness, which the Court finds to be violative of the duties of loyalty and care (and in addition to support claims for constructive fraudulent transfers) are as follows.

(a)      *Forgiveness of Koplik Loan*

By 2000, the Debtor's books reflected earlier loans to Koplik of $520,000. Prior to year-end 2000, Koplik and/or Siegel authorized the Debtor to pay Koplik a bonus of $500,000. The Debtor applied the net after-tax portion of this bonus, $300,000, to reduce

---

[218]      Koplik Aff. ¶ 40; Def. Exh. 65.

-57-

the loan to approximately $220,000, and Koplik paid the Debtor the $220,000 balance

before year-end 2000.[219]

In January 2001, Koplik re-borrowed approximately $229,000, from the Debtor

and later borrowed approximately $70,000, with the effect that receivables on loans to

Koplik totaling $299,800 appeared on the Debtor's books as of the time the Debtor's

chapter 7 case was filed.[220]

In or about December of 2001, Koplik's outstanding $299,800 repayment

obligation was forgiven.  Koplik testified that he consulted Kasoff on how to resolve the

$299,800 balance, and that Kasoff recommended that the loan be converted into income

in the amount of the loan balance[221]—but "subject to obtaining approval and notifying

the steering committee of the creditors' committee."[222]  But Koplik never sought the

approval of the creditors' committee.[223]

Koplik paid $264,347.10 to the Debtor's payroll account at Fleet Bank prior to

year end 2001 in connection with the resulting tax liability.[224]  Koplik tried to raise an

issue as to whether the payment he made was on account of *his* personal tax liability for

---

[219]    Def. Exh. 61.

[220]    Def. Exh. 61 (3rd page).  Though these two transactions are not necessarily actionable (the record
being unclear as to whether the Debtor was yet insolvent in December 2000 and January 2001, and
how much the Debtor's decreasing liquidity was already manifesting itself), each is nevertheless
troublesome.  The first in substance was a cancellation of the $520,000 in indebtedness that
Koplik owed to the Debtor, and the second resulted in an outflow of $299,800 in cash, when (even
with a duty to repay) a need for liquidity, even if not critical, was then present or foreseeable.  It
will be recalled that the Shelby Mills transaction, in May 2001, and the Asia Pulp transaction, in
July 2001, just a few months later, were structured as they were, at least in part, because the
Debtor couldn't advance funds to American Tissue directly, by reason of Debtor liquidity
constraints.  *See* pages 15 and 16, *supra*.

[221]    Trial Tr. 4/15/08 at 98; Trial Tr. 5/15/08 at 84.

[222]    Trial Tr. 4/15/08 at 99.

[223]    Trial Tr. 5/15/08 at 85.

[224]    Def. Exh. 62; Koplik Aff. ¶37.

the forgiveness of his indebtedness, or for some kind of liability imposed on the Debtor,

for which he should receive some credit if the Court were to find this giveaway

actionable.

When asked about this, Koplik testified that he was not "certain" whether that

payment of withholding taxes was to satisfy his own personal income tax.[225]  But the

Court finds that equivocation inexplicable.  Of course this was a tax liability for which

Koplik was responsible—arising from the nearly $300,000 Koplik had taken from the

Debtor earlier in the year, structured as a loan, which, later in the year, after his company

had gone bankrupt, he was relieved of the duty to pay back.  It is easy to see how that

would result in cancellation of indebtedness income to Koplik, and impossible to see how

the Debtor could have tax liability for a transaction that, for the Debtor, resulted in a loss

or incremental expense.

After the loan conversion, Koplik continued to work for the Debtor at a reduced

salary level,[226] and assisted Kasoff and the Litigation Trustee in the liquidation of the

Debtor's property.[227]  Koplik was not operating the Debtor, but instead, was merely

helping with the liquidation.  There is no information in the record about Koplik's

workload during the liquidation or how it compared to his previous work responsibilities.

The Court is not in a position to find that services Koplik provided were worth anything

near the $299,800, or that forgiveness of the indebtedness and future services represented

flip sides of a bargained for exchange.

---

[225]    Trial Tr. 5/15/08 at 84.

[226]    Including the loan forgiveness, Koplik's salary in 2001 was $1,137,224.  Koplik Aff. ¶ 38.  His
base salary of $850,000 was reduced to $425,000 as of January 2002.

[227]    Fox Aff. ¶ 5; Trial Tr. 2/28/08 at 133.

During his testimony, Koplik said that he spoke with Realization Services and assumed that the proper procedures were being followed.  Koplik asserted that:

> All I know is that Kasoff did what was necessary to have this organized and Paul Weiss [the Debtor's pre-bankruptcy counsel] agreed.  As I said before, at this point in time I wasn't making any of these decisions on my own.[228]

But there was no evidence that anything was "organized," much less that any disclosure to the Court was made or any Court approval obtained.  And there is no evidence that anyone other than Koplik (or Koplik and Siegel) wanted that indebtedness released, or authorized it.  There was no evidence that any decision was made by disinterested directors, or, for that matter, anyone else.

Richard Borisoff, a Paul Weiss partner who had counseled the Debtor prior to its bankruptcy, testified that Koplik never engaged Paul Weiss about the loan forgiveness.[229] That does not foreclose the possibility that Paul Weiss personnel were consulted in some fashion.  But legal advice, even if obtained, could not provide absolution for such a self-dealing transaction of an obviously dubious nature, especially without consultation with the creditors' committee and disclosure to, and approval of, the Court.  The notion that a debtor officer or director would authorize forgiveness of debt he owed to his company under circumstances like these, after his company was in bankruptcy and about to be liquidated, is, to say the least, highly offensive to the Court.

The Court finds that the loan forgiveness was violative of the duties of loyalty and care.

---

[228]    Trial Tr. 5/15/08 at 85.

[229]    Borisoff Aff. ¶ 6.

*(b)        Forgiveness of Siegel Loan*

In 1983, when Siegel was first employed by the Debtor, he was given a $100,000

loan.[230]  At the end of 2001, that $100,000 debt was forgiven.[231]

At the time Siegel's $100,000 payable to the Debtor was forgiven, the Debtor was

insolvent and in bankruptcy.  Disclosure was not made to the Debtor's creditors'

committee or to the Court, nor was Court approval obtained.  The decision to forgive the

indebtedness was made by Koplik and Siegel, and was neither made, nor approved, by

any other director; at the time, there were no other directors.

Siegel attempted to show, however, that the loan forgiveness was not gratuitous,

and was instead in exchange for consideration he had provided at an earlier time.  The

Court finds his explanation neither persuasive nor credible.

The explanation was documented, to the extent it was documented, by a

handwritten note or memorandum, on what appears to be a sheet from a legal pad, in

Siegel's handwriting, bearing a date of June 3, 1996.  It said "To MRK" (presumably

Koplik), "From AS" (presumably Siegel), and "Re  Finalize 1995 Compensation plus

1996 Salary."  But it did not say that it was an agreement, nor that it confirmed an

agreement.  Nor was it countersigned by Koplik, or anyone else on behalf of the Debtor,

as an agreement would be.

Rather, it set forth, in its top half, what Siegel said was the amount the Debtor

owed him from 1995 and for a salary adjustment for 1996, aggregating $227,000.  It then

went on to provide:

---

[230]        Siegel Aff. ¶ 142.

[231]        Pl. Exh. 14 at 65; Siegel Aff. ¶ 142; Trial Tr. 7/17/08 at 35-36.

> Suggestion for Payment
>
> Defer 100,000 until after A.S. "retirement" and use
> to offset against loan to A.S. of 100,000 now on
> books as employee loan.[232]

The substance of the "[s]uggestion," then, was that the Debtor would pay Siegel

$127,000 of that compensation, and that Siegel would defer the unpaid balance of

$100,000 until his "retirement," at which time the unpaid $100,000 would be set off

against the previous $100,000 loan.[233]

The Debtor paid Siegel $127,000 by July 1, 1996.[234]  As noted, the Debtor

forgave the $100,000 loan at the end of 2001.[235]

But the Court cannot find that the document evidenced an agreement, and finds,

to the contrary, that it was not one.  The Court likewise does not believe, or find, that the

"[s]uggestion" became an agreement, even though a copy of that document was found in

Siegel's employment file[236] and Koplik testified that the memorandum accurately

reflected an agreement between Siegel and the Debtor.[237]

The Court disbelieves Siegel and Koplik in this regard.  The document did not

purport to be an agreement, and was not countersigned by Koplik.  No corporate minutes

evidence it.  No other documents in the Debtor's files confirm it, and the Debtor's books

---

[232]    Def. Exh. 60 (quote marks in original).  The quote marks around the word "retirement" were in the
original document.  Neither Siegel nor Koplik (assuming the latter saw it) explained what the
quote marks signified.

[233]    *Id.*

[234]    Pl. Exh. 14 at 66.

[235]    At that time, the Debtor reclassified the loan as income to Siegel, and Siegel reported the
additional income on the Form W-2 that accompanied his tax returns for 2001.  Pl. Exh. 14 at 65;
Trial Tr. 7/17/08 at 35-36.

[236]    Trial Tr. 7/17/08 at 126.

[237]    Koplik Aff. ¶ 33; Trial Tr. 5/15/08 at 81.

and records are inconsistent with it.  The receivable on the Debtor's books was not

removed when the alleged agreement was supposedly entered into, nor did the books

make any mention that the receivable would be extinguished at a later time.  In fact, for

five years after 1996, the $100,000 continued to be carried on the Debtor's books as a

receivable, and importantly, Koplik and Siegel each executed confirmations to Arthur

Andersen, the Debtor's auditor, attesting to the accuracy of Debtor books showing the

$100,000 to be a receivable.[238]

---

[238]    Siegel claimed that he asked about the memorandum every year when the Debtor's auditors, while
preparing the Debtor's financial statements, asked him to confirm that the $100,000 was an
account receivable, Trial Tr. 7/17/08 at 126, and that before signing the confirmation, he made
sure that the memorandum continued to be maintained in the files so that the loan forgiveness
would be honored.  Whether or not that testimony was true (though if it were, it would suggest he
was knowingly lying to the Debtor's auditors), it does not help Siegel.  He signed confirmations
wholly inconsistent with the agreement he now claims to exist, and, as noted, no documentation
exists supporting a finding that the alleged agreement was made.  Siegel's further testimony in this
regard was incredible:

> Q. Now, you said that Mr. Koplik approved this.  Did he ever
> get any approval in writing from Mr. Koplik of this?
>
> A. No, I didn't need any approval in writing from Mr. Koplik.
>
> Q. You were agreeing or you were suggesting if I'm reading
> this correctly, it says "suggestion for payment," you were
> deferring $100,000.00 of income compensation?
>
> A. Yes.
>
> Q. You didn't think you needed anything signed by anybody
> at the company memorializing your deferring $100,000.00 in
> income.
>
> A. Why would I need any approval?
>
> Q. You were giving up a significant amount of money. You
> were deferring $100,000.00.  You didn't want that
> memorialized in any kind of a writing from the company?
>
> A. I had Mr. Koplik's agreement and all I needed was Mr.
> Koplik's agreement and a handshake to say, don't worry about
> it.
>
> Q. Now, this was a suggestion on your part; right? It wasn't an
> agreement. That's your word there, "suggestion," correct, sir?
>
> A. Yes.
>
> Q. You never got written confirmation from anybody at the
> company?

When asked to explain why the receivable remained on the books if an agreement to erase it had been made, Siegel explained that:

> it would show as an expense as additional salary to me and because my salary was at that point higher than Mr. Stein's who had been there long before me, Mr. Koplik preferred that it not be shown as an expense or as income to me.[239]

That is not a satisfactory explanation for a state of affairs which, if true, would have been a fraud on the Debtor's auditors and anyone looking at the Debtor's financial statements.  Rather than finding that Koplik and, especially Siegel, lied to Arthur Andersen and executed knowingly false confirmations, the Court finds that the document never evidenced anything other than the "suggestion" it said it was.

10.     *Causation*

As discussed above,[240] the Trustee proved a very large number of violations of the duty of care.  But except to the extent discussed above, they did not cause the Debtor's losses.  For example, though the Court finds it shocking that loans totaling $8.5 million could have been made without getting any promissory notes, the Debtor's difficulties arose not by reason of an inability to prove the loans, but rather American Tissue's inability to repay.  Similarly, the Officers' failures to meet responsibilities as directors were effectively duplicative of their failures to meet responsibilities as officers.

In significant respects, the Court's findings as to causation are informed by the law relevant to causation (as to which the Court requested, and obtained, supplemental

---

A. I got verbal confirmation from Mr. Koplik and that's all I needed.

Trial Tr. 7/17/08 at 35.  The Court does not find this persuasive.

[239]     *Id.* at 37.

[240]     See, in particular, Section 4(j), and its footnotes.

-64-

briefing) and are mixed questions of fact and law, addressed below. They also are informed by the subset of causation law relevant to intervening cause, by reason of the fraud at American Tissue. If, in particular, Koplik and Siegel had more carefully analyzed American Tissue's financials (as the Court thinks they should have), the financials would have revealed artificially inflated revenues, earnings, and assets, and there is insufficient reason to believe that they then would have acted any differently. And as noted above, the Court does not believe that it can find that Koplik and Siegel should have discovered the American Tissue fraud.

The Court does feel, however, that the Trustee proved satisfactory causation with respect to the losses on the Trade Credit Insurance Policy and the credit extended to Liberty Umbrella. With appropriate care in attention to conditions for recovery under the Trade Credit Insurance Policy, more than $5 million in ultimately uninsured losses could have been avoided. And though the amounts lost are much smaller, if the credit to Liberty Umbrella had not been extended, the losses there would not have been suffered either.

*11.    Solvency*

The Court needs to make very few findings with respect to the Debtor's solvency, by reason of conclusions of law it makes below. Because the Court determines that the Officers owed fiduciary duties to the Debtor whether or not the Debtor was insolvent, the Court need not decide whether the Debtor was insolvent, or even would be rendered insolvent, at the times of the alleged breaches of fiduciary duty.

With that said, however, the Court finds, if such is useful for any reviewing court, that the Debtor was not insolvent before the extensions of trade credit and loans to American Tissue that took place between January 2001 and March 2001, but that it was

-65-

rendered insolvent by such. And the Court finds that the Debtor became insolvent no

later than the date in March 2001 when the Officers "re-aged" the American Tissue

receivables without getting the requisite insurer consent, thereby forfeiting the Debtor's

rights to insurance protection for $15 million in accounts receivable owed by American

Tissue.

The Court further finds that by December 2001 (at which time Koplik and Siegel

forgave the indebtedness each owed to the Debtor), and as to which the Court must make

a solvency finding for fraudulent transfer analysis purposes, the Debtor was even more

plainly insolvent. By this time, American Tissue was already in bankruptcy, having filed

its bankruptcy case on September 10, 2001,[241] owing approximately $28 million to the

Debtor. As of September 30, 2001, the Debtor's financial statements (which are useful

but not determinative)[242] showed assets of approximately $119 million, and liabilities of

---

[241]     Def. Exh. 5 at ¶ 52.

[242]     As this Court observed in *Ames Merchandising Corp. v. Cellmark Paper Inc. (In re Ames Dep't Stores, Inc.)*, 450 B.R. 24 (Bankr. S.D.N.Y. 2011) ("***Ames-Bankruptcy***"), *aff'd* --- F.Supp.2d ---, 2012 U.S. Dist. LEXIS 26418, 2012 WL 651778 (S.D.N.Y. Feb. 28, 2012) (Koeltl, J.) ("***Ames-District***"), "establishing solvency requires evidence of the value of [the Debtor's] assets and liabilities (and especially the former) at *a fair market value*." 450 B.R. at 31 (emphasis in original). "Financial statements' showings as to assets and liabilities (and especially assets) are not necessarily (and rarely are) reflective of actual fair market value, especially in industries where assets need not be 'marked to market.'" *Id. Accord Ames-District*, 2012 U.S. Dist. LEXIS 26418 at *4, 2012 WL 651778 at *2 ("book values are not ordinarily an accurate reflection of the market value of an asset"), quoting *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 36 (2d Cir. 1996) ("***Roblin Industries***"). But in *Roblin Industries*, the Second Circuit, speaking through Judge Koeltl, then sitting at the Circuit by designation, further observed that "[n]evertheless, while book values alone may be inappropriate as a direct measure of the fair value of property, . . . such figures are, in some circumstances, competent evidence from which inferences about a debtor's insolvency may be drawn." 78 F.3d at 36. In an analysis akin to the one this Court uses here, it approved an analysis that included the financial statements together with other things:

> In this case, it is appropriate to consider the financial statements included in the Registration Statement, as well as the accompanying descriptive text, to shed light on the schedules of property and debt values. Those schedules, prepared by the debtor, purported to show an excess of assets over liabilities of only about $3.9 million. Indications that the

---

approximately $112 million.  But that $7 million difference is illusory, as it fails to take into account the fact that at least $25 million in American Tissue receivables (none of which were ultimately collected) was uncollectible, as could easily have been foreseen at that time.[243]

Here, using an analysis like the Second Circuit's in *Roblin Industries*, the Court starts with the Debtor's financial statements (which show an excess of assets over liabilities of approximately $7 million), but further considers the fact that the assets side of the Debtor's balance sheet showed more than $25 million in receivables from American Tissue, after American Tissue entered bankruptcy, practically none of which could reasonably have been expected to be collected, and none of which were ultimately collected.  Either scenario would make the Debtor insolvent by a large measure.  Indeed, in the absence of any indication that the totality of the Debtor's assets were worth more than their book value as shown on the Debtor's balance sheet, if only $7 million of the $25 million had turned out to be uncollectible, the Debtor would be insolvent.  With American Tissue's bankruptcy filing in September 2001, it was obvious that these receivables would not be collected for months, if ever, and it was at least likely that much, if not all, of the American Tissue receivables would not be collected at all.

---

assets were overvalued in excess of $3.9 million would be affirmative evidence that the debtor was insolvent.  *Id.* at 37.

[243]    In an October 15, 2001 letter to Fleet, Mr. Kelly stated, putting it mildly, "[a]s a result of our largest customer filing for Chapter 11 Bankruptcy on September 10, 2001, we have suffered a material adverse effect to our September 30th operating results."  Def. Exh. 80.  He continued that the Debtor had written off $3.25 million in trade receivables as an extraordinary item as a result, representing the trade receivable portion that was not covered under the Debtor's Trade Credit Insurance Policy.  *Id.*  Of course, this amount was grossly insufficient.

Thus the Court accepts the testimony of Trustee witness Mandarino, and additionally finds by reference to the underlying documents, that the Debtor was undisputedly insolvent as of September 30, 2001.[244]

The Court concludes that by October 28, 2001, and most definitely by December 2001 (when Koplik and Siegel relieved themselves of their indebtedness to the Debtor), and after which the Debtor *acknowledged* being insolvent, on November 12, 2001,[245] the Debtor was insolvent.

## 12.    Damages

Because, for reasons noted above and below, the Court finds failures on the part of the Trustee to prove breaches of fiduciary duty other than with respect to the Trade Credit Insurance Policy, Liberty Umbrella, forgiveness of the Koplik loan and forgiveness of the Siegel loan, the Court does not need to make damages findings with respect to the other matters.  With respect to the matters as to which liability was established, the Court makes the following factual findings.

### (a) Trade Credit Insurance (Breaches of Duty of Care)

The Debtor's gross loss with respect to the Trade Credit Insurance was $13.3 million—the difference between the $15 million for which coverage was obtained, and the $1.7 million that the Debtors recovered.  The Trustee seeks recovery for that sum.

While the Trustee's position in that regard is hardly frivolous, the Officers assert that the Trustee should have recovered more than the $1.7 million from Lumbermen's,

---

[244]     Mandarino Aff. ¶ 10; Pl. Exh. 54.

[245]     In a forbearance agreement entered into with Fleet, Koplik acknowledged, on behalf of the Debtor, that events of default existed under the Revolver, including under its section 4.17, relating to solvency (*e.g.*, "After giving effect to the Transactions contemplated to occur on the Closing Date and to each Credit Event thereafter: . . . neither any Borrower nor any of their respective subsidiaries intends to incur debts beyond its ability to pay such debts as they mature.").

notwithstanding the Officers' many failures to comply with requirements for recovery

under the policy.  While many of their arguments reflect inappropriate second-guessing,

they can and do point to the K&L analysis, which predicted the likely bounds of recovery

to be from $2 million to $9.6 million.  They say they should not be tagged for the

Trustee's inability to recover a larger sum, particularly one below the low end of that

range.

The Court finds the K&L analysis to be of high quality and very professional.

And the Court has independently analyzed the issues itself, and is very comfortable

reaching like conclusions.  After doing so, the Court substantially agrees with the

Officers, and considers it unfair to saddle them with the totality of the shortfall that the

Trustee was unable to collect.  Instead, the Court believes that it should base the damages

on an imputed recovery, within the range of outcomes predicted by K&L.

The more difficult question, then, is at what point in the K&L estimated recovery

range should the damages be fixed?  The Court does not regard an award of damages at

some point in that range as in any way speculative, but nevertheless must recognize that

an award of damages within the K&L range requires an element of prediction of an

uncertain outcome.

The Court has considered, but ultimately rejected, a damages finding pegged to

the midpoint of the range, or any point less than the top of the range; such would either

be arbitrary or unwarranted by the inherent unpredictability of the outcome.  Rather, for

reasons discussed above and below, the Court concludes that it should find the damages

to be the difference between the $15 million for which coverage was obtained, and the

-69-

$9.6 million high end of recovery estimated by K&L.[246] Thus damages for this component of the Trustee's claims are most appropriately found to be $5.4 million, for which Koplik and Siegel should be jointly and severally liable.

### (b) Liberty Umbrella

The Debtor lost $52,494 as a consequence of its transactions with Liberty Umbrella—the portion of the larger extensions of credit to Liberty Umbrella that Liberty Umbrella did not pay back. As the Court noted above,[247] the loans to Liberty Umbrella were authorized by Koplik, not Siegel, and the Court thus finds that these losses were caused by breaches of the duties of loyalty and due care by Koplik alone.

The portion of the loans to Liberty Umbrella that was not paid back is the best measure of the Debtor's resulting losses. Thus damages for this component of the Trustee's claims are fixed at $52,494, for which Koplik, but not Siegel, is liable.

### (c) Koplik Loan

The Debtor lost $299,800 as a consequence of the forgiveness of the Koplik loan. Koplik was the recipient of the loan forgiveness (thereby violating his duty of loyalty), and caused the loss by his decision to make it happen. While the principles of law under which the loan amount is recoverable vary as between the Trustee's fiduciary duty claim and his fraudulent transfer claim (with the former based on wrongful conduct in allowing the loan forgiveness to take place, and the latter based on the *value received* as a

---

[246]   Computing the damages this way, it would be unnecessary and inappropriate to make a further adjustment by reason of the $1.7 million that was actually obtained. This means of damages calculation would effectively give the Officers credit for an imputed recovery of $9.6 million in lieu of $1.7 million (and thus result in damages of $5.4 million in lieu of $13.3 million)—a result that is harsh to the Trustee but which avoids penalizing the Officers for a negotiation outcome over which they had ceased to be in control.

[247]   *See* page 55 *supra*.

-70-

consequence of the fraudulent transfer), they are in substance for the same thing, and any award for this should not be duplicative.

The Court fixes the damages for each of the Koplik loan forgiveness duty of loyalty and fraudulent transfer claims at $299,800. The Court believes that separate judgment awards should be entered on each theory, so long as it is clear that duplicate recoveries are impermissible.

*(d) Siegel Loan*

Likewise, the Debtor lost $100,000 as a consequence of the forgiveness of the Siegel loan. Siegel was the recipient of the loan forgiveness (thereby violating his duty of loyalty, and causing him to be liable as the transferee of a fraudulent transfer), but, in addition, both he and Koplik caused the loss by their joint decision to make it happen, and thus both should be jointly and severally liable for it.

Again, while the principles of law under which the loan amount is recoverable vary as between the Trustee's fiduciary duty claims and his fraudulent transfer claim, they are in substance for the same thing. To the extent payment is made by anyone on account of the losses suffered on forgiveness of the Siegel loan, it should reduce the damages otherwise recoverable by either Defendant, and under any theory.

Thus the Court fixes the damages for each of the duty of loyalty (and, in Koplik's case, care) and fraudulent transfer claims at $100,000. The Court believes that joint and several judgments should be entered against Koplik and Siegel on the fiduciary duty claims, and against Siegel alone as a fraudulent conveyance transferee, so long as it is clear that duplicate recoveries are impermissible.

## Discussion

Koplik and Siegel recognize that with respect to this Debtor, they owed fiduciary duties.[248]  Nevertheless, they dispute, as matters of law, the Trustee's standing to assert alleged breaches of those duties before the Debtor became insolvent, and argue that for closely held corporations, lesser standards for officers and directors' fiduciary duties apply.

The parties also dispute, as mixed questions of fact and law, whether Koplik and Siegel actually committed any breaches of the duties of care and of loyalty, and, with respect to the former, whether their conduct is protected by the "business judgment rule." They also dispute, once more as a mixed question of fact and law, whether (even assuming that Koplik and Siegel were guilty of the breaches alleged) the Trustee established that deficient or wrongful conduct was the *cause* of the Debtor's losses— particularly in light of the fact, which is undisputed, that American Tissue's financial statements were fraudulent, inflating American Tissue's assets and income.

The Court addresses these issues in turn.

---

[248]    *See, e.g.*, Def. Post-Trial Reply (ECF #130) at 43 ("It is undisputed that Defendants owed a fiduciary duty to the Debtor.").

I.

Applicable Principles[249]

A.    *Duties Imposed Upon the Officers*

Under New York law, to prove a claim for breach of fiduciary duty, a plaintiff

must demonstrate (1) the existence of a fiduciary relationship between the parties; and

(2) a breach of the fiduciary duty.[250]  In addition, and significantly here, the plaintiff must

demonstrate that the fiduciary violation caused the injury.[251]

Here, in light of the Officers' understandable acknowledgement that as officers

and directors, they owed fiduciary duties to the Debtor, the Court does not need to

address whether fiduciary duties existed.  The Court instead must examine the Officers'

compliance with their duties, and applicable defenses, most significantly the "business

judgment rule,"[252] to which New York courts, like many others, adhere.[253]

---

[249]    The Debtor is a New York corporation.  Thus, with respect to its internal governance matters (including matters involving the fiduciary duties of its officers and directors), the Court applies New York law.  But in areas of law that are not as well developed in New York as they are in Delaware (and, of course, to the extent New York law is not inconsistent), the Court looks to Delaware law for direction.

On the fraudulent transfer claims (though the issues are essentially factual, rather than legal), the Court looks to New York and federal law for the section 544 claims, and federal law as to the section 548 claims, to the extent any decisions as to the underlying law must be made.

[250]    *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 510-511 (S.D.N.Y. 1994); *Cramer v. Devon Group, Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991).

[251]    *RSL Communications v. Bildirici*, 649 F.Supp.2d 184, 209 (S.D.N.Y. 2009) (Sullivan, J.) *aff'd by summary order*, 412 Fed. Appx. 337 (2d Cir. 2011), *cert. denied*, 132 S.Ct. 97 (2011) ("**RSL Communications**"); *Semi-Tech Litigation, L.L.C. v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 482 (S.D.N.Y. 2005) (Kaplan, J.) ("**Semi-Tech**"), *aff'd*, 450 F.3d 121 (2d Cir. 2006); *cf. Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004 ) ("[A] plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages.") (emphasis in original).

[252]    Duties of directors to New York corporations are also established, in part, by statute.  Under New York's Business Corporation Law:

(a) A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care

---

-73-

The business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."[254]  Thus, if the requirements of the business judgment rule have been satisfied, Koplik and Siegel cannot be held liable for decisions that led to bad results.  On the other hand, to the extent that they engaged in or authorized the transactions that caused the Debtor's losses in the absence of good faith, disinterestedness, or, as especially relevant here, due care, they may be held liable for the consequences.[255]

The New York Court of Appeals has explained that:

> [T]he business judgment doctrine, at least in part, is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments. . . . Thus, absent evidence of bad faith or fraud (of which there is none here) the courts must and properly should respect their determinations.[256]

But to invoke that rule, a court must be satisfied with the process by which the business decision was reached:

---

which an ordinarily prudent person in a like position would use under similar circumstances.

N.Y. Bus. Corp. L. § 717(a).  Here, Koplik and Siegel were both officers and directors, but the Trustee's allegations, in part, rest on evidence that they never functioned as the latter.  This would of course impair their ability to invoke defenses that are routinely applicable to director members of a functioning board, who made bad decisions but only after the deliberative processes that boards typically undertake.  But in a situation like this one, involving a close corporation, the Court would be satisfied if they performed their obligations solely as officers.  Here, unfortunately, Koplik and Siegel did neither.

[253]    *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274 (2d Cir. 1986) ("***Hanson***").

[254]    *Auerbach v. Bennett*, 47 N.Y.2d 619, 629 (N.Y. 1979) ("***Auerbach***").

[255]    *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 702 (2d Cir. 1980) ("***Crouse-Hinds***"); *Pereira v. Cogan*, 294 B.R. 449, 526 (S.D.N.Y. 2003) (Sweet, J.), *vacated and remanded on other grounds*, 413 F.3d 330 (2d Cir. 2005) ("***Cogan***").

[256]    *Auerbach*, 47 N.Y.2d at 630-631.

-74-

> [Directors] may be expected to show that the areas
> and subjects to be examined are reasonably
> complete and that there has been a good-faith
> pursuit of inquiry into such areas and subjects.
> What has been uncovered and the relative weight
> accorded in evaluating and balancing the several
> factors and considerations are beyond the scope of
> judicial concern.  Proof, however, that the
> investigation has been so restricted in scope, so
> shallow in execution, or otherwise so pro forma or
> halfhearted as to constitute a pretext or sham,
> consistent with the principles underlying the
> application of the business judgment doctrine,
> would raise questions of good faith or conceivably
> fraud which would never be shielded by that
> doctrine.[257]

Ultimately, then, *Auerbach* requires a court to scrutinize the methodology of a

how a particular business decision was made.  When the decision making process has

been satisfactory, officers and directors will be protected under the business judgment

rule, even though their decision turned out to be unwise.  But directors and officers of a

company must earn the protections of the business judgment rule by meeting minimum

standards of care in the *process* by which their decisions are made.

In addition, officers and directors have a duty of loyalty to the corporations they

serve.[258]  When a corporate director or officer has an interest in a decision, the business

judgment rule does not apply.[259]

---

[257]    *Auerbach*, 47 N.Y.2d at 634-635.

[258]    *See, e.g.*, *Norlin Corp. v. Rooney Pace, Inc.*, 744 F.2d 255, 264 (2d Cir. 1984); *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 923 F.Supp. 439, 447 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 900 (2d Cir. 1996).

[259]    *Croton River Club., Inc. v. Half Moon Bay Homeowners Assoc., Inc. (In re Croton River Club, Inc.)*, 52 F.3d 41, 44 (2d Cir. 1995).

B.     *Does Solvency Affect Officers' and Directors' Duties?*

Each of the two sides speaks of the Debtor's solvency or insolvency at the times the alleged breaches of fiduciary duty took place, as giving Koplik and Siegel more or less deference in their compliance with the duties in question. Thus the Officers contend that the Debtor was solvent at the time they engaged in the transactions in question; that their efforts were no more than reasonable ones to maximize wealth for the benefit of the *shareholders*—implying that for periods during which the Debtor was solvent, only a *shareholder* (which here was only Koplik) may complain—and that they "exercised sound judgment to promote the Debtor's business in the best interest of its *single shareholder*."[260] The Trustee, on the other hand, contends that when Koplik and Siegel engaged in the American Tissue transactions, the Debtor was insolvent or in the "zone of insolvency," and thus that "defendants' fiduciary duties expanded to include the Debtor's *creditors*,"[261] thereby making them "liable to the Debtor *and its creditors* for breaches of their fiduciary duties."[262]

The Court does not see the relevant issues in either side's terms, and in any event concludes that here the distinction does not matter. While there is more than a little language in the caselaw supporting the distinction the two sides make,[263] the thinking in

---

[260]     Def. Post-Trial Br. (ECF #128) at 76-79 (emphasis added).

[261]     Pl. Post-Trial Br. (ECF #127) at 41 (emphasis added).

[262]     *Id.* at 44 (emphasis added).

[263]     *See New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 7 (1953) ("If the corporation was insolvent . . . officers and directors . . . were to be considered as though trustees of the property for the corporate creditor-beneficiaries."); *Cooper v. Parsky*, 1997 WL 242534, at *22 (S.D.N.Y. Jan. 8, 1997) (Buchwald, M.J.), *adopted by* 1997 WL 150934 (S.D.N.Y. Mar 27, 1997) (Koeltl, J.), *rev'd on other grounds*, 140 F.3d 433 (2d Cir. 1998). In one case, a New York court looked to Delaware law to assist it in deciding a matter under New York law, but failed to consider all of it. *See Wilmington Trust Co. v. Strauss*, 2006 WL 3076611, at *10-11 (Sup. Ct. N.Y. Co. Oct. 30, 2006) ("under Delaware law, when a corporation is operating in the zone or

this area has evolved, at least under Delaware law,[264] to which courts considering similar

issues have often looked for guidance.  The Court believes that New York courts now

looking at the issue would agree with the Delaware courts that the distinction affects only

the persons or entities who may sue derivatively on behalf of the debtor—and that with or

without insolvency, neither shareholders nor creditors would have direct claims for

breaches of duties owed to the corporation.[265]

---

vicinity of insolvency, its directors' fiduciary duty extends not only to the corporation's
shareholders, but also to its creditors.") (citing only *Credit Lyonnais Bank Nederland, N.V. v.
Pathe Commc'ns Corp.*, 1991 WL 277613 (Del. Ch. 1991)).

[264]  The New York cases all pre-date, or fail to consider, the seminal decisions of the Delaware
Chancery Court in *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del.
Ch. 2004) (under Delaware law) and the Delaware Supreme Court in *North American Catholic
Educational Programming Foundation v. Gheewalla*, 930 A.2d 92 (Del. 2007) ("*Gheewalla*")
(under Delaware law) after which it now is clear, at least under Delaware law, that the Defendants'
obligations were "to the firm itself."  *See, e.g., Buchwald v. The Renco Group, Inc. (In re
Magnesium Corp. of America)*, 399 B.R. 722, 759 (Bankr. S.D.N.Y. 2009) ("*MagCorp*") (under
Delaware law); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 669 & n.158 (Bankr. S.D.N.Y.
2006) (under Delaware law).

[265]          As this Court noted in *MagCorp*, quoting *Production Resources*:

[P]oor decisions by directors that lead to a loss of corporate
assets and are alleged to be a breaches of equitable fiduciary
duties remain harms to the *corporate entity itself.*  Thus,
regardless of whether they are brought by creditors when a
company is insolvent, these claims remain derivative, with
either shareholders or creditors suing to recover for a harm
done to the corporation as an economic entity and any
recovery logically flows to the corporation and benefits the
derivative plaintiffs indirectly to the extent of their claim on
the firm's assets.  The reason for this bears repeating—the fact
of insolvency *does not change the primary object of the
director's duties, which is the firm itself.*  The firm's
insolvency simply makes the creditors the principal
constituency injured by any fiduciary breaches that diminish
the firm's value and logically gives them standing to pursue
these claims to rectify that injury.  Put simply, when a director
of an insolvent corporation, through a breach of fiduciary
duty, injures the firm itself, *the claim against the director is
still one belonging to the corporation.*

399 B.R. at 759, quoting *Production Resources*, 863 A.2d at 792 (emphasis added in *MagCorp*).
*Gheewalla*, which quoted and heavily relied on *Production Resources*, and which made these
aspects of *Production Resources'* analysis the holding of Delaware's highest court, is to the same
effect.

Here, of course, the solvency-insolvency distinction is academic because Koplik
and Siegel, without dispute, owed fiduciary duties to the *Debtor*, at all relevant times.
That is sufficient for any and all purposes here.[266]  The Trustee could (and did) assert, on
behalf of the Debtor, claims based on alleged breaches of those fiduciary duties, which
were owed to the Debtor, for the benefit of all of its stakeholders, in any event.[267]
Creditors and other stakeholders of the Debtor will simply share in available assets in
accordance with their normal priorities.

C.    *To What Extent Do Different Standards Apply for Closely Held Corporations?*

A major area of dispute, particularly after the Court expressed concerns as to this
issue, is whether different standards should be held to apply to closely held corporations,
such as this one, where at all relevant times, Koplik was the sole shareholder, and may
have thought that he was gambling with his own money alone.  The Court concludes that
courts applying New York law would likely hold that while lower levels of formality are
acceptable for closely held corporations, the duties of care and loyalty still apply.

In *Global Minerals & Metals Corp. v. Holme*,[268] New York's First Department
(applying more generalized language from a Court of Appeals decision that also
involved, at least seemingly, a closely held corporation, though the Court of Appeals did

---

[266]    Likewise, the business judgment rule, if its requirements are otherwise satisfied, applies
irrespective of solvency or insolvency.  *See Official Committee of Unsecured Creditors of RSL
COM PRIMECALL, Inc. v. Beckoff (In re RSL COM PRIMECALL, INC.)*, 2003 Bankr. LEXIS
1635, at *30, 2003 WL 22989669, at *9 (Bankr. S.D.N.Y. Dec. 11, 2003) (Gropper, J.).

[267]    It would at least normally be true that officers and directors of an enterprise that was insolvent or
in the zone of insolvency couldn't properly gamble the farm to get stockholders back into the
money.  But that would be true not because the officers and directors owe a fiduciary duty to
creditors as such, but rather because such would be irresponsible for the *enterprise*.

[268]    35 A.D.3d 93, 824 N.Y.S.2d 210 (1st Dep't 2006).

not speak in those terms)[269] held expressly that defendant Holme, "as a shareholder in
Global, a closely held corporation, owed a fiduciary duty to the other Global
shareholders"—and, more relevant here, additionally "owed a fiduciary duty to Global
arising out of his status as a corporate officer and director."[270]   Lower court New York
state court decisions have held similarly,[271] as has Judge Lifland of this Court,[272] in a suit
by the chapter 7 trustee of Flutie New York Corp., a New York corporation,[273] against the
"*de facto* president" of the corporate debtor, in the absence of a formal operating board of
directors, who Judge Lifland found to have abused his position.[274]   Courts considering the

---

[269]   *See Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557, 568 (N.Y. 1984) ("***Alpert***") (in context of a
suit by plaintiff minority shareholders who held 26% of the stock of a corporation against the
acquirers of a majority of the stock, who then froze out, by merger, the minority; and where the
selling stockholders were two couples, who held about 66% of the stock, and were also the
company's sole directors and officers; finding fiduciary duties existed but were complied with:
"[b]ecause the power to manage the affairs of a corporation is vested in the directors and majority
shareholders, they are cast in the fiduciary role of 'guardians of the corporate welfare' . . . . In this
position of trust, they have an obligation to all shareholders to adhere to fiduciary standards of
conduct and to exercise their responsibilities in good faith when undertaking any corporate action,
including a merger.").

[270]   35 A.D. 3d at 98, 824 N.Y.S.2d at 214.  The Court notes that here the Court does not seek to hold
Koplik liable for any acts as a shareholder, and the Court makes no rulings here as to whether he
would have any additional, or different duties as a consequence of that status.  Rather, the issues
here involve Koplik's and Siegel's duties solely as officers and directors.

[271]   *See International Oil Field Services Corp. v. Fadeyi*, 2008 WL 899055, at *3, 2008 N.Y. Misc.
LEXIS 1924, at *3 (Sup. Ct. Nassau Co. Mar. 31, 2008) ("as long as [defendant] Jason was a
corporate officer , director or shareholder of International, a closely held corporation, he owed it a
fiduciary duty."); *Ajettix Inc. v. Raub*, 9 Misc. 3d 908, 912, 804 N.Y.S.2d 580, 587 (Sup. Ct.
Monroe Co. 2005) (in suit by closely held corporation Ajettix against former vice president and
secretary, one of two 50% stockholders, "[d]efendant's fiduciary obligation to Ajettix arose from
the status of defendant as a corporate officer and director").

[272]   *See Kittay v. Flutie New York Corp. (In re Flutie New York Corp.)*, 310 B.R. 31 (Bankr. S.D.N.Y.
2004) (Lifland, C.J.) ("***Flutie***").

[273]   *See id.* at 38.

[274]   *See id.* at 57.

-79-

issue involving companies organized under the laws of other states have ruled

likewise.[275]

Judge Lifland cited Judge Sweet's decision in *Cogan*,[276] which, while dealing

with duties to a Delaware corporation (and which thus was applying Delaware law),

discussed the issue extensively.  In *Cogan*, the chapter 7 trustee of Trace International

Holdings brought claims against officers and directors of a privately held corporation,

dominated by its controlling shareholder and founder Marshall Cogan, alleging breaches

of their fiduciary duties of care and loyalty in abdicating their responsibilities for the

benefit of Marshall Cogan.  As part of a lengthy analysis after which he found the

directors liable, Judge Sweet observed:

> Given the lack of public accountability present in a
> closely held private corporation, it is arguable that
> such officers and directors owe a greater duty to the
> corporation and its shareholders to keep a sharp eye
> on the controlling shareholder.  *At the very least,
> they must uphold the same standard of care as
> required of officers and directors of public
> companies or private companies that are not so
> dominated by a founder/controlling shareholder.*[277]

---

[275]   *See Justmed v. Byce*, 2007 WL 2479887, at *11 (D. Idaho Aug. 29, 2007) (Williams, C.M.J.) ("In
a closely-held corporation, directors owe a fiduciary duty to one another, *to the corporation* and to
the shareholders") (emphasis added) (decided under Idaho law), *rev'd in part on other grounds*,
*Daley v. Chang (In re Joy Recovery Technology Corp.)*, 286 B.R. 54, 81 (Bankr. N.D. Ill. 2002
(Schmetterer, J.) (holding that "[the company] was a closely held corporation and that [defendant
officer] owed a fiduciary duty to the corporation and its shareholders.") (seemingly under Illinois
law).

[276]   *See* n.255 *supra*.  *Cogan* was vacated and remanded upon an appeal to the Circuit, which
concluded that the defendants were entitled to a jury trial and could avail themselves of
exculpatory provisions in Trace's certificate of incorporation that would impair the Trustee's
rights, on behalf of the corporation, for otherwise established breaches of the duty of care.  *See*
413 F.3d at 340-341, 342.  Those concerns are inapplicable here, as here no jury trial was
demanded, and the Debtor lacks a provision in its certificate of incorporation or bylaws of the type
that granted exculpation in *Cogan*.

[277]   294 B.R. at 463 (emphasis added).  The Court does not need here to decide, and does not decide,
whether the fiduciary duties of officers and directors should be deemed to be enhanced.  It is
sufficient, for the purposes here, to conclude that they are no less.

-80-

This Court believes that other courts considering New York law, like Judge

Lifland in *Flutie*, will look to *Cogan* as well, at least with respect to the portion of *Cogan*

quoted in italics above.

In response, the Officers do not argue that *Cogan* was wrongly decided in this

respect; they argue instead that lesser levels of corporate formality are acceptable for

closely held corporations, particularly where there is an overlap between the

corporation's officers and directors.  But this does not negate the existence of the

fiduciary duties for which the Trustee argues, except to the limited extent that the failure

to comply with corporate formalities is argued (as it is here) to constitute an independent

basis for finding a breach of the duty of care.

New York cases have indeed effectively held, as the Officers argue,[278] that

"certain corporate formalities are not expected to be followed in closely held

corporations."[279]  But the Trustee is correct in his point that the remarks of that character

were not stated in the context, relevant here, of "the business judgment rule, due care,

and/or the potential liability of corporate fiduciaries for entering into business

decisions."[280]  Rather, they involved authority to bind the corporation or shareholders to

transactions in the absence of appropriate corporate formalities.[281]

---

[278]    *See* Def. Post-Trial Br. (ECF #128) at 72-73.

[279]    *See Haff v. Long Island Fuel Corp.*, 233 A.D. 117, 121 (2d Dep't 1931) ("*Haff*") ("In the
         management and affairs of a family corporation, irregularities not directly harmful in their nature
         will be overlooked, and invalidity will not be sought if the declaration of illegality would work
         injustice.").

[280]    Pl. Post-Trial Reply Br. (ECF #131) at 56.

[281]    *See, e.g., Haff*, 233 A.D. at 121 ("In the management and affairs of a family corporation,
         irregularities not directly harmful in their nature will be overlooked, and invalidity will not be
         sought if the declaration of illegality would work injustice.").  *See also Barkin Construction Co. v.
         Goodman*, 221 N.Y. 156, 161 (1917) (Cardozo, J.) ("***Barkin Construction***"), upon which the *Haff*
         court had relied, where a jury was held to be authorized to consider whether a company was bound

-81-

Both sides' experts here recognized that closely held corporations commonly fail to comply with corporate formalities. And one of the teachings of *Barkin Construction* and *Haff*, which likewise recognize that, is that "courts are not to shut their eyes to the realities of business life." Because *Barkin Construction* and *Haff* are not fiduciary duty cases, they cannot be read to say or imply that fiduciary duties go away when closely held corporations are involved. But those cases can be fairly read, in this Court's view, as undercutting the Trustee's contention that closely held corporations' officers' and directors' failures to comply with corporate formalities give rise to independent breaches of fiduciary duty.[282] It may be that failures to comply with corporate formalities have evidentiary significance in evaluating a more generalized lack of care. But *Barkin Construction* and *Haff* suggest that such failures, in a closely held corporation situation, are not actionable by themselves.[283]

But the Court's rejection of that particular Trustee contention does not, of course, detract in any significant way from the Court's agreement with the Trustee's more

---

to repayment of a loan made in the absence of normal corporate authorization. ("Courts are not to shut their eyes to the realities of business life. Here was a small corporation controlled by a single family. Its business was run without formality . . . . None the less it was run, and responsibility must be centred somewhere. In the daily conduct of its affairs there was no one except the secretary who assumed to speak for it. If he was not the manager, the company had none.").

[282]    Similarly, the Trustee's expert spoke at length as to the desirability of boards having independent directors, along with other corporate governance measures which no doubt improve the quality of corporate decision making. But these "best practices," while laudatory, do not yet set the bar for minimally acceptable levels of care.

[283]    Thus if, by way of example, officers of a closely corporation engaged in all of the necessary analysis before making a business decision, their failure to meet as a board and enact corporate resolutions would not, under the New York cases, make an otherwise thoughtful decision improper.

-82-

important contention[284]—that even if entitled to act with less corporate formality,

Officers are still required to act with due care in making decisions affecting the Debtor.

D.    *Causation*

Of course, a breach of fiduciary duty is actionable only if the complained of

breaches caused the losses in question.[285]  The plaintiff bears the burden of proof on

establishing that the alleged breaches of fiduciary duty caused the injury to the Debtor.[286]

In cases involving breach of fiduciary duty claims, where the remedy sought is

damages to compensate for a claimant's loss, the usual damages-causation rule for tort

and contract breach cases is appropriate.[287]  The requirements for showing the necessary

causation in a breach of fiduciary duty case have been stated in slightly different ways

(and sometimes involve concerns not applicable here),[288] but uniformly have required a

showing of two separate things:  "cause in fact" (often referred to as "but-for" causation,

---

[284]    Pl. Post-Trial Reply Br. at 57.

[285]    *Semi-Tech*, 353 F. Supp. 2d at 482.

[286]    *See American Federal Group, Ltd. v. Barnett Rothenberg*, 136 F.3d 897, 908 (2d Cir. 1998)
("**American Federal Group**") (citing *Stoeckel v. Block*, 170 A.D.2d 417 (1st Dep't 1991)).

[287]    *RSL Communications*, 649 F. Supp. 2d at 208 (quoting *American Federal Group*, 136 F.2d at 907
n.7).

[288]    For instance, the damage must be a *foreseeable* consequence of the wrongful conduct.  *See, e.g.*,
*Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 623 (S.D.N.Y. 2008).  But losses
on the part of the Debtor were here foreseeable as a result of irresponsible lending practices or
failures to take steps necessary to recover under the Trade Insurance policy.

Also, the analysis must be more nuanced if wrongful conduct by two or more parties contributed
to the loss.  As Judge Sullivan explained in *RSL Communications*, courts developed a test—
"dubbed, somewhat misleadingly, the 'substantial factor' test"—that might be applied where there
were multiple potential causes of a single harm. *See* 649 F. Supp. 2d at 209, quoting *Rodriguez v.
Budget Rent-A-Car Sys., Inc.*, 44 A.D.3d 216, 841 N.Y.S. 2d 486, 490 (1st Dep't 2007) ("'Where
the independent and negligent acts or omissions of two or more parties cause injury to another,
each of those negligent acts or omissions is regarded as a cause [of] that injury provided it was a
substantial factor in bringing about that injury.'").  Judge Sullivan observed, understandably, that
each of the potential causes would have to be independently sufficient to have caused the
plaintiff's injury.  But because here "independent and negligent acts or omissions of two or more
parties" are lacking, that doctrine has no further relevance here.

though the Court prefers the former description, because it more clearly describes what a court must find), and "proximate" causation.[289]

As Judge Sullivan explained in *RSL Communications*,[290] the most recent of the causation analysis cases (which was affirmed by the Second Circuit "for substantially the reasons" stated by Judge Sullivan):

> "But for" causation, which the Court refers to as
> "factual causation," presents a "threshold question"
> of whether the alleged breach of fiduciary duty was
> a "cause in fact" of the loss complained of by the
> plaintiff.[291]

By reason of this requirement, as Judge Sullivan explained, quoting Learned Hand (then a district judge) in a breach of fiduciary duty case long ago, "[t]he plaintiff must accept the burden of showing that the performance of the defendant's duties would have avoided loss, and what loss it would have avoided."[292]  As Judge Kaplan noted in *Semi-Tech*, this requirement is often satisfied.  But that will depend, as it did in *Semi-Tech* and as it does here, on the particular failure of duty involved.[293]

---

[289]   *See Semi-Tech*, 353 F. Supp. 2d at 482 ("Causation of course has two major components: cause-in-fact, or 'but-for' cause, and proximate cause."); *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 1999 WL 1277245, at *14 (S.D.N.Y. Nov. 29, 1999); *BNY Capital Mkts, Inc. v. Moltech Corp.*, 2001 WL 262675, at *10 (S.D.N.Y. Mar. 14, 2001) (Lynch, J., then a district judge) ("Under New York law, a party claiming that it has been damaged by actions of its fiduciary must prove not only that the breach was the 'but for' cause of the damage, but also that it constituted proximate causation."); *RSL Communications*, 649 F. Supp. 2d at 208 ("This 'usual . . . causation rule' requires proof of two sub-elements: 'but for' and proximate causation.").

[290]   *See* n.289 *supra*.

[291]   *RSL Communications*, 649 F. Supp. 2d at 208.

[292]   *RSL Communications*, 649 F. Supp. 2d at 208, quoting *Barnes v. Andrews*, 298 F. 614, 616 (S.D.N.Y. 1924) (Hand, J.).

[293]   Cutting through often generalized and abstract jargon, the Court would suggest a useful test, derived from Judge Hand's analysis in *Barnes* and Judge Sullivan's in *RSL Communications*: "would it have made a difference"?  Use of such a test will sometimes, though not always, require making a distinction between affirmative acts, on the one hand, and acts of omission, on the other. And however the relevant failures are characterized, the analysis will usually, if not always, require attention to the nature of particularized failings.  For instance, as discussed above, the

-84-

The second aspect of the causation inquiry is "proximate cause, or more appropriately, legal cause."[294]  To show proximate cause, a plaintiff must establish that the defendant's negligence was a substantial foreseeable factor in bringing about his or her injury.[295]  But "legal cause" "has proven to be . . . incapable of being precisely defined to cover all situations."[296]  This is in part because the concept stems from policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct.

Depending upon the nature of the case, a variety of factors may be relevant in assessing legal cause.  Given the unique nature of the inquiry in each case, it is for the finder of fact to determine legal cause, once the court has been satisfied that a prima facie case has been established.  To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury.  Plaintiff need not demonstrate, however, that the precise manner in which the accident happened, or the extent of injuries, was foreseeable.[297]

---

failure to obtain promissory notes and other documentation for the massive loans to American Tissue fell dramatically below reasonable standards of care, but if the requisite notes or other documentation for the loans here had been obtained, it wouldn't have made a difference.  On the other hand, the decision to lend to American Tissue obviously made a difference; the Debtor would have suffered no losses if that decision had been made differently.  But the Officers' failing here wasn't in making the loans in and of themselves; it was in doing so without appropriate care, requiring a further analysis as to how things would have been different if they had exercised reasonable care, a matter discussed below.

[294]    *Derdiarian v. Felix Contracting Corp.*,  51 N.Y.2d 308, 314, 414 N.E.2d 666, 670 (N.Y. 1980) ("***Derdiarian***"); *RSL Communications*, 649 F. Supp. 2d at 209 (quoting *Derdiarian*).

[295]    *See, e.g.*, *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 520, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980); *Derdiarian*, 51 N.Y.2d at 315.

[296]    *Derdiarian*, 51 N.Y.2d at 314; *accord RSL Communications*, 649 F. Supp. 2d at 209, *quoting Derdiarian*.

[297]    *Derdiarian*, 51 N.Y.2d at 314-315.

-85-

Also, whether the issue is regarded as relevant to "cause in fact" or "legal [*i.e.*,

"proximate"] cause," courts must consider, upon an appropriate showing of facts,

whether an intervening event might be found to have caused the loss, or to have

superseded the alleged breach of duty in causing the damage of which the plaintiff

complains. Judge Sullivan's discussion of intervening cause concerns suggests that he,

like this Court, would regard matters of intervening or superseding cause as more

relevant to "cause in fact."[298]  But however their significance is denominated, it is plain

that matters that may be found to be intervening or superseding cause—*other* factors that

may have caused the loss, or that may have resulted in circumstances under which the

result would have been no different—must be considered in any causation analysis even

after breaches of duty are found.[299]

E.     *Duty of Loyalty Concerns*

Where officers or directors of a corporation considering a transaction are not

disinterested and have a personal stake in the outcome, their determination is not entitled

---

[298]    *See RSL Communications*, 649 F. Supp. at 220 ("In sum, the essential question with respect to the factual causation inquiry is whether, but for Defendants' failure to consider the interests of RSL Plc in isolation by holding meetings of this wholly owned subsidiary's board, the value of RSL Plc would have declined by $1 billion between June 2000 and March 2001. In light of the uncontested evidence that the deterioration in the telecommunications industry during 2000 served as an intervening cause of Plaintiff's losses, Plaintiff 'must advance more than mere speculation in order to overcome the showing that their loss was attributable' to Defendants' alleged breaches of fiduciary duty.").

[299]    An intervening act by a third party does not necessarily break the causal connection between a defendant's negligence and the plaintiff's injury. *See Derdiarian*, 51 N.Y.2d at 315. But the causal connection can be broken if the intervening act is "of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." *Gordon v. Eastern Ry. Supply, Inc.*, 82 N.Y.2d 555, 562, 606 N.Y.S.2d 127, 626 N.E.2d 912 (N.Y. 1993). "If the intervening act was a foreseeable consequence of the defendant's negligence, he will be held liable." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 395 (E.D.N.Y. 2004) (Weinstein, J.). Conversely, if it was not, it may be a defense. But to supersede a defendant's negligence, an intervening cause must neither be normal nor foreseeable. *In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 838 (2d Cir. 1992).

to the deference usually given under the business judgment rule.  Instead they must show

the entire fairness of the transaction, or that it is "intrinsically fair."[300]

As Judge Sweet explained in *Cogan*, under the "entire fairness" doctrine, a self-

dealing transaction must be justified under both elements of "a two-pronged inquiry into

the fair process and the fair price of the transaction."  As a procedural matter, the court

must consider whether the board made the necessary investigation and undertook due

deliberation with respect to the decision the board made.  As a substantive matter, the

court must consider whether the decision is defensible on the merits.

Approval of loan forgiveness has marked similarities to approval of

compensation.  "[D]irectors who approve their own compensation bear the burden of

proving that the transaction was fair to the corporation."[301]  As the *Lippman* court held,

quoting a decision of the Delaware Supreme Court:

> Like any other interested transaction, directoral self-
> compensation decisions lie outside the business
> judgment rule's presumptive protection, so that,
> where properly challenged, the receipt of self-
> determined benefits is subject to an affirmative

---

[300]     *Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.)*, 323 B.R. 345,
385 (Bankr. S.D.N.Y. 2005) (Gerber, J.) (under Delaware law), *citing, inter alia, Weinberger v.
UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) ("*Weinberger*"); *Cogan*, 294 B.R. at 508 (under
Delaware law).  Though New York law may not be as well as developed as the Delaware law, it is
to the same effect.  *See Alpert*, n.269 *supra*, 63 N.Y.2d at 570-571 ("when there is an inherent
conflict of interest, the burden shifts to the interested directors or shareholders to prove good faith
and the entire fairness of the merger," citing, *inter alia, Weinberger*); *Lippman v. Shaffer*,
15 Misc. 3d 705, 711-12, 836 N.Y.S.2d 766 (Sup. Ct. Monroe Co. 2006) ("*Lippman*") (the
business judgment rule does not apply when directors "have an interest in the challenged
transaction . . . . Where such self-interest exists, the burden shifts to the self-interested director to
demonstrate the 'entire fairness' and reasonableness of the actions," citing *Alpert*, other New York
cases, and *Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1371 n.7 (Del. 1995) (under
Delaware law)).

[301]     *Marx v. Akers*, 88 N.Y.2d 189, 204 n.6, 644 N.Y.S.2d 121 (1986) ("*Marx*"); *accord Lippman*,
*supra* n.300, 15 Misc. 3d at 712 (quoting *Marx*).

showing that the compensation arrangements are
fair to the corporation.[302]

The same principles should be applied when a corporate officer or director grants "self-

determined benefits" of loan forgiveness to himself.

F.    *Fraudulent Transfer Claims*

Fraudulent transfer claims, if timely, may be brought on behalf of an estate, as

they have been brought here by the Trustee, under both federal and state law.  Section

548 of the Code, as it existed when this case was brought, provided, in relevant part:

> (a)(1) The trustee may avoid any transfer (including
> any transfer to or for the benefit of an insider under
> an employment contract) of an interest of the debtor
> in property, or any obligation (including any
> obligation to or for the benefit of an insider under
> an employment contract) incurred by the debtor,
> that was made or incurred on or within 2 years
> before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily—
>
> . . .
>
>    (B)(i) received less than a reasonably
> equivalent value in exchange for such
> transfer or obligation; and
>
>    (ii)(I) was insolvent on the date that such
> transfer was made or such obligation was
> incurred, or became insolvent as a result of
> such transfer or obligation . . . .

Also, section 544 of the Code authorizes the Trustee to bring fraudulent transfer

claims on behalf an estate when such claims could be brought under state law by an entity

that was a creditor at the time of the transfer.  See N.Y. Debtor & Creditor L. §§ 273 and

278, upon which the Trustee relies:

---

[302]    15 Misc. 3d at 712, *quoting Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002).

> Every conveyance made and every obligation
> incurred by a person who is or will be thereby
> rendered insolvent is fraudulent as to creditors
> without regard to his actual intent if the conveyance
> is made or the obligation is incurred without a fair
> consideration.[303]
>
> 1. Where a conveyance or obligation is fraudulent
> as to a creditor, such creditor, when his claim has
> matured, may, as against any person except a
> purchaser for fair consideration without knowledge
> of the fraud at the time of the purchase, or one who
> has derived title immediately or mediately from
> such a purchaser,
>
> a. Have the conveyance set aside or obligation
> annulled to the extent necessary to satisfy his
> claim[.][304]

Under each of the two regimes discussed above, recovery is barred to the extent

that the transferee against whom the claim is made gave value to the debtor in exchange.

Payment on an antecedent debt or obligation is at least usually deemed to be an exchange

for value,[305] and where, as here, there is a forgiveness of a contractual obligation, that

forgiveness could be deemed to be for fair value if (but only if) it was for consideration

or represented a pre-existing legal obligation.[306]

Here the fraudulent transfer issues before the Court do not involve cutting-edge

issues of the interpretation of either the federal or state statutes.  They instead simply

require the Court to examine the Debtor's solvency at the time of the debt forgiveness,

---

[303] N.Y. DEBT. & CRED. LAW § 273.

[304] *Id.* § 278.

[305] *See Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 323 B.R. 838, 842.
Payment on account of an antecedent debt may be preferential, but it does not result in a
fraudulent transfer.

[306] *See Savage & Associates, P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 81, 86-87 (Bankr.
S.D.N.Y. 2005) (Bernstein, C.J.) (determination that forgiveness of indebtedness was a fraudulent
transfer).

-89-

and the extent to which the debt forgiveness was in exchange for a pre-existing legal

obligation, or other fair consideration.

II.

Application of Principles to Facts Here

A.    *Alleged Breaches of Duties of Loyalty and Care*

Applying the legal principles described above, the Court makes the proposed

findings that follow, as facts or mixed questions of fact and law.

1.    *Transactions with American Tissue*

The Officers extended direct loans (approximately $8.5 million) and trade credit

(approximately $18 million) to American Tissue, with only modest analysis and even less

in the way of traditional corporate formalities.  With respect to the trade credit, they

secured insurance to protect the Debtor with respect to $15 million of that exposure, but

then failed to take steps necessary to achieve compliance with requirements for recovery

under the policy.  They also knowingly violated covenants under the Revolver, risking

the financing which was essential to the Debtor's liquidity.

Particularly in the aggregate, the Officers' failings were profound.  But their

performance was not deficient in all of the respects claimed by the Trustee, and many of

the deficiencies ultimately cannot be found to have caused the Debtor's loss.  The

Trustee's American Tissue claims thus must be considered individually.

(a)    *Loans*

As described more fully in the Court's Findings of Fact,[307] the Officers made

direct loans totaling $8.5 million in the aggregate, on an unsecured basis, without

---

[307]    *See* page 34 *supra*.

-90-

requiring any promissory notes.  The loans were violative of covenants under the

Revolver.  None of the several loans was made with written analysis.  At least three of

them—Ponderosa, Keiffer and Shelby Mills—were made overnight or within a very short

period of time.  What passed for analysis was Siegel's computations on a scratch pad of

the profit he expected—notes that he discarded after his retirement.

As noted above,[308] Koplik and Kelly read American Tissue's financial statements.

But there is no indication that they used the information they thereby learned, or

considered the wisdom of loans in such a large amount in any other focused way.  As

described more fully in the Court's Findings of Fact, by reason of the haste by which the

loans to American Tissue were made, the failure to obtain basic documentation, and the

lack of focused credit analysis (even to the point that no written evidence of any

evaluation could be found), the Court finds breaches of the duty of care with respect to

the American Tissue loans.

But failure to employ due care in making the American Tissue loans is not by

itself sufficient to establish liability.  The Court must then consider the causation

requirements discussed above.  Of course, if the direct loans had never been made, the

Debtor would not have suffered the loss on them, but the Officers' failure was not in

making the loans at all, but in making them with the haste, lack of documentation, and,

most importantly, lack of focused credit analysis.

Part (though much less than all) of the Trustee's showing of lack of care falls

short on proximate cause or fact causation analysis.  The failure to get promissory notes

was an evidentiary element in the Trustee's strong showing of the lack of care, but as

---

[308]   *See* n.94 *supra.*

noted above, the Debtor's loss didn't result from an inability to prove the debt; it resulted

from American Tissue's inability to pay.  Somewhat similarly, the Court cannot find the

Debtor's losses to have resulted from the Officers' failures to hold board meetings or

otherwise comply with corporate formalities; if the Officers had engaged in the

necessarily analysis *qua* officers, that would have been quite sufficient, and New York

law, discussed above, recognizes the different ways by which closely held corporations

govern themselves.[309]  And while the Court found dreadful management and

irresponsibility in connection with the intentional violations of the Revolver,[310] the Bank

ultimately did not pull the plug on the Debtor's financing.

But of course a major element of the Court's finding in this area was the Court's

finding that in making the direct loans, the Officers acted with too much haste and not

enough analysis.  And that passes muster under both of the "fact causation" (or "but for")

and "proximate cause" requirements discussed above, at least as they normally are

applied.

But whether it is regarded as an additional element of those requirements, or as a

separate factor, there is here the additional "intervening factor" concern, that troubled this

Court so much that, as Judge Sullivan did in *RSL Communications*, this Court asked for

extra briefing on the matter.  That is, of course, the fraud at American Tissue.  American

Tissue's financial statements had been falsified, inflating American Tissue's revenues,

improperly capitalizing expenses and assets, and otherwise overstating revenues and

---

[309]    Likewise, the Court respected the testimony of Trustee expert William Guth, and has no doubt that
the corporate governance practices he advocated were not met by the Officers, and of course were
far better than those the Officers employed.  But as he recognized, they amounted to "best
practices," and cannot be regarded as minimal standards that officers of closely held corporations
must meet.  *See* Trial Tr. 4/16/08 at 234.

[310]    *See* page 43, *supra*.

assets.  If the Officers had more carefully reviewed American Tissue's financial statements, and other financial information American Tissue might have provided, the information they then would have reviewed would have shown a much healthier company than American Tissue actually was.  And the Court has found that Koplik and Siegel did not know of the fraud, and, while the matter is close, were not negligent in failing to discover it.

A similar question is whether, while not negligent in failing to discover American Tissue's fraud, Koplik and Siegel violated their duty of care anyway, because of their knowledge of bounced checks, inabilities to meet payroll, and a lack of American Tissue liquidity.  While this question is likewise close, the Court cannot quite find that the Trustee met his burden of proof on that issue.  The Officers' real offense was their lack of due diligence in examining the available American Tissue financial information, given what they already knew.  And the Court cannot find that the failure to examine the financial information in a focused way caused the Debtor's loss, when the financial information inflated assets and revenues anyway.  The falsified American Tissue financials—which if accurate might have tipped the scales against extensions of credit— must be regarded as an intervening cause.

(b)    *Trade Credit Generally*

The considerations with respect to the Officers' approval of trade credit to American Tissue are partly the same and partly different.  As discussed above in the Court's Findings of Fact,[311] the Officers' trade credit underwriting practices in general were not particularly bad, but they could be, and were, trumped by *ad hoc* decisions made

---

[311]    *See* page 21 et seq., *supra.*

by Koplik and Siegel, based on their perceptions of the potential profitability of credit to American Tissue. But as also discussed in the Court's Findings of Fact,[312] if Koplik and Siegel were to utilize their expectations of profit to trump normal trade credit underwriting considerations, they needed to do so in a thoughtful way—and they failed to do so.

And the Debtor would then be protected to the extent, but only the extent, to which the Trade Credit Insurance ameliorated the resulting risk. The Court has found that the first $15 million in trade credit could be justified only if Koplik and Siegel scrupulously complied with requirements for recovery under the Trade Credit Insurance Policy—which they manifestly failed to do. That was a serious breach of the duty of care—so significant that it is addressed separately below.[313]

The Court has also found, though again the question is close, that the Trustee failed to meet his burden to show failures of the duty of care with respect to the $4 million in trade credit that exceeded the coverage under the Trade Credit Insurance Policy. The combination of the due diligence that was undertaken and the Trade Credit Insurance Policy—assuming compliance with the Trade Credit Insurance Policy requirements—would bring the risk associated with the incremental $4 million in trade credit down to a level where profit making opportunities could trump the risk.

---

[312]    *See* page 24, *supra*.

[313]    Loss causation and proximate cause considerations are not a bar to the actionability of the failures to comply with conditions for recovery under the Trade Credit Insurance Policy, however, at least for the reason that if the conditions had been complied with, the Debtor would recovered more under the policy with or without fraud at American Tissue. And for that same reason, the fraud at American Tissue cannot here be regarded as an intervening cause.

*(c) Trade Credit Insurance*

Though the Court has found that Koplik and Siegel would not have violated their duty of care with respect to the trade credit if they took reasonable steps to assure compliance with requirements for recovery on the policy, it has found as a fact that they failed to do so.[314]  In particular, it has found that the Officers had a shocking lack of knowledge of the requirements for recovery under the policy, and that, lacking knowledge of what they needed to do (and avoid doing) to recover under the policy, took measures that were violative of conditions for recovery.

The Court has further found, for reasons discussed at considerable length above,[315] that the Officers' action and inaction in connection with the Trade Credit Insurance constituted serious breaches of the duty of care.

Holding the Officers responsible for breaches of the duty of care in connection with the Debtor's Trade Credit Insurance easily passes muster under any and all causation analysis.  The failure to comply with requirements for recovery under the policy directly and proximately resulted in the inability to make stronger arguments in negotiations with Lumbermen's—and in litigation with Lumbermen's, the Debtor might very well have obtained even less than the $1.7 million that it did.  Unlike other aspects of the Trustee's claim, there here is no issue with respect to intervening cause.  Even with the fraud at American Tissue, the Debtor could reasonably have expected to recover all or substantially all of its $15 million in coverage under the Trade Insurance Policy if the Officers had taken the steps necessary to protect the Debtor's rights to recover under it.

---

[314]      *See* page 25 et seq., *supra*.

[315]      *See* page 29 et seq., *supra*.

-95-

2.      *Transactions with Entities Other Than American Tissue*[316]

With the exception of the Liberty Umbrella transaction, the Officers' conduct with respect to the non-American Tissue transactions was unobjectionable (or at least protected under the business judgment rule) or, while subject to criticism, failed to result in injury to the Debtor.

With respect to Willendra, the Court has found that the expenditures to recover on the paper machine (and the related letter of credit) were a reasonable exercise of business judgment. While the Debtor ultimately did not recover the totality of its arguable entitlement, the Court does not believe that such can fairly be blamed on Koplik and Siegel.

The Officers' liability with respect to the Samoa transaction is more debatable, even though the Court has found that the Debtor lost money on the Samoa transactions. As discussed above,[317] the Officers repeatedly violated covenants under the Revolver when they extended the Samoa credit. But while Fleet could have taken action against the Debtor as a result (most significantly, by pulling the plug on the Debtor's financing), Fleet did not do so. In other respects, the Trustee failed to meet his burden of showing that the Officers' level of care with respect to the Samoa transactions fell so far from accepted standards as to forfeit the protections of the Business Judgment Rule.

The transactions with Liberty Umbrella cannot be justified in any way. Koplik's explanations for loans made to a company controlled by his brother-in-law, selling promotional items for which there was no showing of a Debtor need, were unpersuasive.

---

[316]     *See* page 49, *supra*.

[317]     *See* page 53, *supra*.

Neither the transactions with Liberty Umbrella, nor, especially, the loans to it, were necessary or desirable for the Debtor's business. Koplik gambled with the Debtor's money to help a family member, and of course he cannot here invoke the protections of the Business Judgment Rule. The Court finds violations of the duties of loyalty and of care with respect to the Liberty Umbrella transactions, for which Koplik must be held to be responsible.

3.    *Self Dealing Transactions*

The facts set forth in the Court's findings with respect to the self dealing transactions, described at length above,[318] constitute paradigmatic examples of breaches of the duty of loyalty. As the Debtor was crashing around them, and in acute financial distress, Koplik and Siegel forgave loans to themselves. Under the principles described above, since they were interested in the outcome, they could not act to benefit themselves without acting with "entire fairness."

Here there was neither investigation nor deliberation with respect to Koplik's forgiveness of the loan to himself. To the extent Koplik thought about the propriety of his loan forgiveness at all, he did it on assumptions. And the Court heard no evidence that anyone other than Koplik (or Koplik and Siegel) wanted his indebtedness released.

As importantly or more so, as a substantive matter, the decision was not in any way defensible on the merits. The loan forgiveness resulted in no benefit to the Debtor. It was a gift. The Court has no basis for finding that, at the time, services Koplik was providing were worth the nearly $300,000 that he caused to be forgiven, and indeed the Court must find to the contrary.

---

[318]    *See* page 57 et seq. *supra.*

Similarly, the Court is unwilling to find, as argued on behalf of Siegel, that the forgiveness of his loan was anything other than gratuitous.[319]  Siegel did not prove the existence of a pre-existing agreement to cancel his loan, and the evidence establishes the contrary.

Each of Koplik and Siegel must be held liable, for breach of the duty of loyalty, for the loan to himself that he caused to be forgiven.[320]

B.     The Fraudulent Transfer Claims

As discussed above, the issues underlying the fraudulent transfer claims are straightforward.  By December 2001, the Debtor was insolvent.  Like the scenario discussed by this Court in another of its decisions in *Adelphia*,[321] here the Debtor was "not in the 'zone of insolvency,' or a little bit insolvent.  [It was] hopelessly insolvent."[322]

Then, for reasons addressed just above in connection with the self-dealing transactions, the Court finds that neither Koplik nor Siegel provided reasonably equivalent value for the loan forgiveness in his favor.[323]

Each therefore should be liable, under the Bankruptcy Code's fraudulent transfer provisions (Bankruptcy Code sections 548 and 550) and, by reason of section 544 of the Code, New York's comparable provisions (N.Y. Debtor and Creditor Law §§ 273, 274, and 275).

---

[319]    *See* page 61, *supra*.

[320]    Additionally, since it appears that Koplik approved the loan forgiveness to Siegel, he is jointly and severally liable for that, for breach of the duty of care.

[321]    *See Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.)*, 323 B.R. 345 (Bankr. S.D.N.Y. 2005).

[322]    *Id.* at 386.

[323]    Understandably, neither disputes that loan forgiveness, to the extent value was not given, can be a fraudulent transfer.  *See supra* n.306.

III.

Damages

The Court's bases for its findings as to the appropriate damages are discussed at length in its Findings of Fact above.[324]  The damages with respect to Liberty Umbrella ($52,494), the Koplik loan forgiveness ($299,800), and the Siegel loan forgiveness ($100,000) are straightforward, exactly measuring up to the Debtor's losses with respect to those elements of the Trustee's claims.  They are not at all speculative.

The more difficult issue, as discussed in connection with the Court's damages Findings of Fact, is how to fix the damages that should be awarded on the failures of care with respect to the Trade Insurance.  The Court has little difficulty in determining that these damages should be based on imputed recoveries within the K&L predicted range (*i.e.*, between $2.0 million and $9.6 million), resulting in damages, with respect to this element of the Trustee's claims, of from $5.4 million (assuming the maximum recovery estimated by K&L) to $13 million (assuming the minimum).[325]  But after that the task becomes more difficult.

The three most plausible alternatives for fixing damages would entail computing them based on imputed recoveries using the midpoint of the K&L range; the range's high end (*i.e.*, assuming the maximum recovery estimated by K&L); or a fixed amount in that range based on an estimation by the Court of the likely outcome.  The midpoint in the K&L range, an imputed recovery of $5.8 million, that would equate to 39% of the claim, (resulting in damages of $9.2 million), could of course be used, but it could be criticized

---

[324]     *See* page 68, *supra*.

[325]     In percentage terms, K&L estimated the potential recovery to be from approximately 13% to 64% of the $15 million claim.

-99-

as arbitrary, and not pegged to any particularly likely litigation outcome.  The third

alternative (predicting a particular outcome) would attach more certainty to an uncertain

outcome than the circumstances would warrant, after an undertaking that judges do not,

in somewhat analogous circumstances, customarily undertake.[326]  There are just too many

variables for this or any other Court to make a finding as to what the recovery "should

have been."  By reason of the many uncertainties, the Court believes that it should be

conservative in its damage award (notwithstanding the impact on the Plaintiff Trustee),

using the $9.6 million high end of potential recovery estimated by K&L—resulting in

damages of $5.4 million, for which Koplik and Siegel should be jointly and severally

liable.

<u>Conclusion</u>

For the foregoing reasons, the Court proposes that judgment be entered against

Koplik and Siegel to the extent, but only the extent, of the following:

(a) With respect to the trade insurance duty of care claims, against

Koplik and Siegel, jointly and severally, for $5.4 million;

(b) With respect to the Liberty Umbrella duty of care and duty of

loyalty claims, against Koplik (and not Siegel) for $52,494;

(c) With respect to the Koplik loan forgiveness duty of care and

duty of loyalty claims, against Koplik (and not Siegel) for $299,800; and

---

[326]     The Court notes, in this connection, though the analogy is an imperfect one, that when bankruptcy
courts rule on the acceptability of settlements in the Fed.R.Bankr.P. 9019 context, they merely
"canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of
reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983).

(d) With respect to the Siegel loan forgiveness duty of care and duty of loyalty claims, against Koplik and Siegel, jointly and severally, for $100,000.

At an appropriate time (unless the district court concludes that this Court should do otherwise), the Court will additionally enter its own judgment, on the federal and state fraudulent transfer claims:

(a) against Koplik in the amount of $299,800, and

(b) against Siegel in the amount of $100,000.

Any and all of the judgments must be drafted to avoid duplicative recoveries with respect to the same losses on the part of the Debtor.

Dated: New York, New York      *s/Robert E. Gerber*
     March **30**, 2012      United States Bankruptcy Judge