UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                              :
                                                    :        Chapter 11
PERRY H. KOPLIK & SONS, INC.,                       :
                                                    :        Case No. 02-B-40648 (REG)
                      Debtor.                       :
------------------------------------------------------------X
MICHAEL S. FOX, as Litigation Trustee of            :
PERRY H. KOPLIK & SONS, INC.,                       :
                                                    :        Adv. Pro. 04-02490 (REG)
                      Plaintiff,                    :
                                                    :
            -against-                               :
                                                    :
MICHAEL KOPLIK and ALVIN SIEGEL,                    :
                                                    :
                      Defendants.                   :
------------------------------------------------------------X

DECISION ON REQUESTS TO MODIFY
PROPOSED FINDINGS

APPEARANCES:

SATTERLEE STEPHENS BURKE & BURKE LLP
Attorneys for Plaintiff
230 Park Avenue
New York, New York 10169
By:   Christopher R. Belmonte, Esq. (argued)
      Pamela A. Bosswick, Esq.

SEWARD & KISSEL LLP
Attorneys for Defendant
One Battery Park Plaza
New York, New York 10004
By:   Ronald L. Cohen, Esq.

SANFORD P. ROSEN & ASSOCIATES, PC
Attorneys for Defendants
747 Third Avenue
New York, New York 10017
By:   Sanford P. Rosen, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

By letter, the Officers, in reliance upon Fed.R.Civ.P. 60(a) and Fed.R.Bankr.P. 9024, ask this Court to modify its Proposed Findings of Fact and Conclusions of Law After Trial to reduce the recommended award of damages on the breach of fiduciary duty claims—from $5.4 million to $2.15 million. They contend that the Court made a clerical mistake, or a mistake resulting from oversight or omission, in computing the damages by failing to take into account the deductible under the Trade Credit Insurance Policy[1] and the fact that the policy had a covered percentage of only 85% of the Debtor's receivables.

In response, the Trustee acknowledges the Officers' points. But he contends that the Court failed also to consider evidence in the record that likewise was relevant to the computation of damages flowing from the breaches of fiduciary duty that the Court found—and that would have increased the resulting damages. The Trustee asserts that if the Court is going to reexamine the damages, it should reconsider its determination not to award damages for the knowing breaches of the Fleet Revolver, as the Court overlooked costs associated with the Forbearance Agreement that was executed after the Debtor was in default on the Fleet Revolver.[2]

---

[1] Familiarity with the matters discussed in the Proposed Findings of Fact and Conclusions of Law After Trial is presumed.

[2] The Trustee also contends that the Officers are inappropriately invoking Rule 60(a). He contends that matters they identify are not the types of clerical or other mistakes that Rule 60(a) covers— and that it is Rule 60(b), if any part of Rule 60, that is applicable. The Court agrees that the errors identified by the Officers are not of the character Rule 60(a) is intended to address, but believes that oversights discussed above and below that were identified by the Officers and the Trustee are of the type covered under Fed.R.Bankr.P. 9024 and Local Bankruptcy Rule 9023-1. In any event, the Court believes that it owes it to the parties, and to any court that might be considering this Court's findings on *de novo* review, to give them the best analysis possible, and is not of a mind to close its eyes to any matter which, upon further consideration, this Court now believes to have been in error.

The Trustee contends further that the Court erred when it failed to take into account that "it was highly improbable for the Debtor to have a complete victory with respect to all of the other [Lumbermen's] defenses." The Trustee states, accordingly, that it is "respectfully submitted that the Court's damage calculations with respect to the Trade Credit Insurance claims should be increased to reflect the realistic likelihood that the Debtor would not recover 100% on the remainder of its claims."[3]

After considering the parties' submissions and related oral argument, the Court agrees that there was evidence in the record that could fairly be said to have been overlooked by the Court that would have decreased the resulting damages to the extent argued by the Officers, and that would have increased the resulting damages to the extent argued by the Trustee. Thus the adjustments to the recommended damages urged by each will be made.

But two other matters remain, each of which presents more difficult issues. The first flows from the Trustee point just noted: whether the damages should be increased because the Court erroneously gave the Officers the benefit of the very top of the range of potential recoveries estimated by K&L (and thus total success) if the Estate were to have litigated with Lumbermen's on the latter's defenses to the Trade Credit Insurance Policy.[4]

There the Trustee is right. The Court should have made an express finding that the chances were remote that the Estate would have prevailed on every issue if it had litigated against Lumbermen's—though the exact amount of the actual recovery that

---

[3] Trustee Ltr. at 2.

[4] It will be recalled that K&L predicted a range of from $2 million to $9.6 million—with the latter figure being $2.15 million less than the total otherwise collectible under the policy, taking into account that no reasonable argument could be made for full recovery under the policy. To be conservative, the Court fixed the damages based on the $9.6 million high end of the $2 million/$9.6 million range. But even the $9.6 million would require victory for the estate on every single other issue.

-2-

might then have been obtained (on a litigation that ultimately was settled and never decided, and which would have involved a number of discrete issues) would still be speculative. In particular, on one of those issues (the so-called "**Approved Debtors Defense**,") discussed below, it is probable that the Estate would have lost on that issue, and that probability should not have been ignored.

The problem, however, is that the failures on the part of Koplik and Siegel that likely would have caused the Estate to lose on the Approved Debtors Defense were not anywhere near as egregious as their other failures. Though they might have avoided that particular loss with more care, the need to deal more carefully in this respect was not as obvious. On balance, the Court does not believe that it should be tacking on between $2.53 million and $4.36 million[5] on a matter where the propriety of Koplik's and Siegel's conduct could be subject to greater debate. The Court will enter more detailed findings in this area, but it will not change the amount of its recommended judgment in this respect.

The second of the difficult additional issues flows from the Court's erroneous understanding that $15 million of receivables were insured—or, to be more exact, its earlier failure to understand that while $15 million of receivables were insured, the most that could be recovered with respect to those receivables was $11.75 million. Thus the Court must consider the extent to which the damages award should be increased by reason of the Court's previous failure to have considered the lesser amount of Trade Credit Insurance protection that the Officers actually obtained.[6] On this issue, the Court

---

[5]   *See* n.11 *infra*, for the bases for the figures used here.

[6]   It will be recalled that the Officers obtained Trade Credit Insurance coverage for $15 million in trade credit accounts receivable, causing the Court to believe that the Estate was protected to that extent. The Officers' reargument motion pointed out that by reason of the fact that Lumbermen's would pay for only 85% of uncollected trade receivables, the estate could recover no more than $12.75 million, and that this amount would then have to be reduced by a $1 million deductible.

-3-

concludes that, while the matter is even closer than before, the factors that caused the Court not to award damages for the portion of the trade credit not covered by the Trade Credit Insurance Policy still sufficiently apply, even though the amount of trade credit that was not insured for markedly increased.

Thus the proposed damages will be adjusted as a consequence of each of the first two matters discussed above. With respect to the third matter, the Court will make supplemental factual findings, but will not change the amount of its recommended judgment. The Court's decision and recommendation to the district court will be modified accordingly.

*1.      Change Requested by the Officers*
*(Insurance Coverage for Receivables)*

In their letter, the Officers correctly assume that the Court calculated damages based on its assumption that securing coverage for $15 million in receivables meant that $15 million in receivables was protected, and that the maximum recovery under the Trade Credit Insurance Policy thus was $15 million. They also correctly assume that the Court subtracted K&L's highest recovery estimate of $9.6 million from $15 million to arrive at damages of $5.4 million. They then note that in fact, the Court's reliance on the $15 million failed to consider that the Debtors could only recover 85% of the $15 million, and that there was a $1 million deductible on the policy.

Though the Court's review of the record indicates that there were repeated references during the trial and its associated briefing to coverage for $15 million (and the Court can find no instances in which the distinction made now was ever called to the

---

Thus the most the estate could recover from Lumbermen's would be $11.75 million (as contrasted to the $15 million that the Court had assumed), leaving an additional $3.25 million uninsured.

-4-

attention of the Court at the time), the Officers are right in this regard. The damages thus must be reduced by the extent of the uninsured amount—*i.e.*, by reason of the coverage of only 85%, and the $1 million deductible. This requires reducing the damages premised on the Court's earlier calculation by $3.25 million, from $5.4 million to $2.15 million.

2.  *Change Requested by the Trustee
    (Damages Resulting from Revolver Default)*

In his responsive letter, the Trustee contends that even if the Court overlooked the $1 million deductible on the Trade Credit Insurance Policy, and the policy's coverage to the extent of only 85% of losses up to $15 million, the Court erred in another respect as well. The Trustee says that when the Court found knowing and intentional violations of the Revolver, but could find no damages resulting from those, it overlooked evidence in one of the exhibits showing how the Debtors were injured by those knowing violations by means other than Lumbermen's termination of liquidity under the Revolver.

The Trustee is correct in this regard. The Court did indeed overlook evidence in Pl. Exh. 50 establishing out of pocket losses on the part of the Debtors arising from the breaches of the Revolver apart from the potentially much more extensive injury upon which the Court had focused.

Pl. Exh. 50 shows that securing a forbearance from Fleet, on behalf of the Revolver lenders, cost the Debtors $2,311,613, principally in the form of fees for securing the Revolver lenders' forbearance, and in legal fees. While these are not as great in amount as the damages that would have been incurred if Fleet had instantly terminated lending under the Revolver and had refused to forbear, the Court has little

doubt, now that the Trustee has called the Court's attention to this exhibit, that they are nevertheless recoverable.

In response to this, the Officers contend (having especially made the point in oral argument) that Fleet was going to decline to extend the Revolver anyway, and thus that these charges do not relate to the loss. They further contend that there were many breaches of the Revolver that led to the need for forbearance, of which the knowing breaches by Koplik and Siegel were only part. The first point is unpersuasive; the Forbearance Agreement expressly contained acknowledgements by the Debtors (signed by Koplik), acknowledging the defaults, and confirming that the Forbearance Agreement resulted from them.[7] The second is unpersuasive as well. At least eight of the defaults acknowledged in the Forbearance Agreement (though with some overlap, since use of proceeds restrictions were repeatedly violated by unauthorized advances of funds)[8] related directly to the knowing acts Koplik and Siegel had taken that had led to the defaults, any one of which would have been sufficient to put the Revolver into default.

Costs incurred under the Forbearance Agreement totaled $2,311,613. The Court overlooked this showing of damages, to the extent of $2,311,613, and the Trustee's damages must be increased by this amount.

---

[7] *See* Pl. Exh. 7.

[8] They resulted from breaches of sections 4.11 (no material misstatements); 4.15 (use of proceeds); and 7.03 (incurring indebtedness in violation of limits on the Debtor's borrowing ability). They also resulted from advances to American Tissue in connection with transactions with Kimberly Clark; in connection with American Tissue's acquisition of Ponderosa's facility; in connection with American Tissue's acquisition of the Keiffer facilities; and in connection with American Tissue's acquisition of Shelby Mills facility. They also resulted from causing Asia Pulp and Paper to advance funds to American Tissue to facilitate the latter in making the $10.5 million interest payment.

-6-

    *3.    Change Requested by the Trustee*
          *(Unlikelihood that Debtors Would Win on Every Issue*
          *Litigated That Might Be Litigated with Lumbermen's)*

Then, the Trustee asks the Court to reconsider its determination to give the Officers the benefit of the doubt and to assume victory by the Estate on every single one of the issues that the Estate might have litigated with Lumbermen's, by reason of the Court's view, when it issued its original decision, that a prediction of the outcome of any litigation with Lumbermen's would be too speculative. This issue, in contrast to the first two issues discussed above, does not relate to a matter the Court overlooked. It is in substance a request that since the Court is adjusting the damages to get them right, it can and should see whether, upon further reflection, an adjustment is needed in this respect as well.

Upon further consideration of the matter, the Court is of the view that it can fix error of this character too, and that it should.[9] Just as appellate courts can correct errors of law or findings of fact that are clearly erroneous, a court whose decisions are subject to such review is free to fix them itself, when and if it is of the view that it erred. And that is no less true (and arguably more true) here, where the Court's decision is a recommendation to the district court that would be subjecting these findings to *de novo* review anyway. Finally, as a matter of judicial responsibility, the Court believes it owes a responsibility to its colleagues at the district court to provide the best recommendation possible. That requires fixing any errors of which this Court becomes aware.

---

[9]   *See, e.g.*, *Marsden v. Select Medical Corp.*, 2007 U.S. Dist. LEXIS 9893, at *3-*5, *20, 2007 WL 518556, at *1, *5 (E.D. Pa. Feb. 12, 2007) (reconsidering decision on its own motion; "Justice Frankfurter once remarked that, 'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' *Henslee v. Union Planters Nat'l Bank & Trust Co.*, 355 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). This is one of those moments.").

On the merits, the Court believes that it made one, though ultimately only one, material error in analyzing the potential outcome of litigation with Lumbermen's if that litigation had ensued.  That is with respect to the Approved Debtors Defense—relating to receivables from American Tissue affiliate account debtors that Lumbermen's contended were not covered under the policy.  Specific American Tissue affiliates were named under the policy (referred to as "**Approved Debtors**"), and without doubt receivables from such Approved Debtors were covered (subject, of course, to any other applicable defenses).  But other American Tissue affiliates were not named under the policy.

To recover insurance on receivables from Unnamed Subsidiaries, the Estate would need to secure reformation of the policy, presumably on the basis of mutual mistake.  But K&L observed that "[v]arious facts weigh against [the Estate's] argument that the Policy should be reformed to include the Unnamed Subsidiaries."[10]  These included, most significantly, facts that language specifically requested by the Debtor that would have covered all American Tissue affiliates did not find its way into the final policy, and that instead the Debtor was asked to specify the American Tissue affiliates that would be covered.

In the Court's view, it is at least probable, and possibly even nearly certain, that the Estate would have lost on the Approved Debtors Defense if it had litigated with Lumbermen's over this issue.  Those qualitative judgments translate roughly into probabilities of a loss as to this issue of from 55% to 95%.  If Lumbermen's were to prevail on this issue, the Estate's claim against Lumbermen's would be reduced by $5.4 million, and the Estate would have suffered to the extent of 85% of that amount.

---

[10] Pl. Exh. 35 at 86.

When the Court issued its original decision, it effectively gave the Officers credit for a scenario under which the Estate, in litigating with Lumbermen's, would prevail on every issue, other than the Overdue Debtors provision (as to which K&L concluded that the Estate would certainly lose).  But especially with the Trustee have expressed his concerns in that regard, the Court is constrained now to agree with the Trustee that the Court erred in this respect, and to conclude that the likelihood that the Estate would win on every issue is remote.  The Court's analysis should have taken into account the probability that the Estate would lose on the Approved Debtors Defense, with a probability of from about 55% to 95% that it would be unable to recover with respect to another $5.4 million of American Tissue affiliate receivables.

But whether to impose additional damages on the Officers of the $2.53 million to $4.36 million[11] that would otherwise be recoverable by reason of sales to unnamed American Tissue subsidiaries is a different question.  If the Officers had taken the time to understand policy details—as contrasted to the basics of what the Trade Credit Insurance Policy said—they might have noticed that the policy covered only American Tissue and certain named American Tissue affiliates (and that others generating receivables were not on the list), but it is not clear to the Court that even more careful executives would have picked this up.  The deficiency that would have led to this loss—selling to American Tissue affiliates that were not listed on the policy—is not at all as obvious or egregious as re-aging receivables, or failing to familiarize oneself with the requirements of the policy. The Court cannot find the Officers' overlooking the fact that some American Tissue

---

[11]  Presumably, the Estate, even if successful, could collect for only 85% of the covered receivables. These figures are the product of multiplication of the $5.4 million that would be lost as a consequence of the Approved Debtors Defense, the probabilities of an Estate loss as to these issues (55% to 95%), and the 85% insured amount for the receivables in question.

-9-

subsidiaries were not listed to be sufficiently negligent to constitute an actionable breach of the duty of care.

As it did with the American Tissue affiliates, the Court has considered the remaining issues on a prospective litigation with Lumbermen's, and considers the outcome on the rest to be too uncertain to conclude that they are anything but speculative. Thus no further adjustments will be made.

4.    *Lesser Amount Insured*

When the Court read the Officers' letter and concluded that the Officers were right in their contention that the Court had misunderstood the maximum level of insurance coverage, it asked the parties to discuss an additional issue. While the Court had considered the uninsured portion to be an acceptable risk when the Court thought that receivables up to $15 million had been insured, would it have to reexamine this finding if it were to find (as the Court now thinks it must) that Koplik and Siegel had left their trade receivables uninsured to the additional extent of another $3.25 million?

This too is a difficult question, but on balance the Court believes it should not adjust the damages as a consequence of this matter. The added exposure is not dramatically different than the original exposure. As importantly, adding this as damages would effectively undo the correction that the Court firmly feels that it must make as a consequence of the Officers' original point.

Conclusion

For the foregoing reasons:

> (a) the damages will be decreased by $3,250,000 to account for the deductible and coverage to the extent of only 85% of losses; and

-10-

     (b) the damages will be increased by $2,311,613 to account for the costs associated with the Forbearance Agreement.

Amended Proposed Findings of Fact and Conclusions of Law after Trial, consistent with these conclusions, are being filed with this Decision.

Dated: New York, New York     _s/Robert E. Gerber_
   July 11, 2012        United States Bankruptcy Judge